1  Dale C. Campbell, State Bar No. 99173
   James Kachmar, State Bar No. 216781
2  W. Scott Cameron, State Bar No. 229828
   **WEINTRAUB GENSHLEA CHEDIAK**
3  Law Corporation
   400 Capitol Mall, 11th Floor
4  Sacramento, California   95814
   (916) 558-6000 – Main
5  (916) 446-1611 – Facsimile

6  Attorneys for Plaintiffs
   The Morning Star Packing Company;
7  Liberty Packing Company, LLC, and
   The Morning Star Company

8

9

10                 UNITED STATES DISTRICT COURT

11                 EASTERN DISTRICT OF CALIFORNIA

12

13  THE MORNING STAR PACKING          ) Case No.
    COMPANY, a California limited partnership;  )
14  LIBERTY PACKING COMPANY, LLC, a   )
    California limited liability company;  )
15  CALIFORNIA FRUIT & TOMATO KITCHENS,  ) COMPLAINT FOR:
    LLC, a California limited liability company;  )
16  and THE MORNING STAR COMPANY, a   ) 1. VIOLATIONS OF ROBINSON-PATMAN
    California corporation,            )    ACT [15 U.S.C. § 13(c)];
17                                     ) 2. VIOLATIONS OF SHERMAN ACT
                    Plaintiffs,        )    [15 U.S.C. § 1];
18                                     ) 3. VIOLATIONS OF RICO
           vs.                         )    [18 U.S.C. § 1962(c)];
19                                     ) 4. CONSPIRACY TO VIOLATE RICO
    SK FOODS, L.P., a California limited  )    [18 U.S.C. § 1962(d)]; and
20  partnership; SCOTT SALYER, an individual;  ) 5. COMMON LAW UNFAIR COMPETITION
    RANDALL RAHAL, an individual; INTRAMARK  )    AND VIOLATION OF CAL. BUS. &
21  USA, INC., a New Jersey corporation; and  )    PROF. CODE § 17200
    DOES 1 through 50, inclusive,      )
22                                     )
                    Defendants.        )
23                                     )
                                       )
24  _____  )

25

26

27

28

{3099/14137/DCC/1083893.DOC;}                1                                    Complaint

JURISDICTION AND VENUE

1.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, federal question jurisdiction.   This matter arises out of violations of the Robinson-Patman Act, 15 U.S.C. § 13(c), the Sherman Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*   Supplemental jurisdiction over the claims based on California state law is proper pursuant to 28 U.S.C. § 1367.   Venue is proper in the Eastern District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

THE PARTIES

Plaintiffs

2.     Plaintiff The Morning Star Packing Company ("MS Packing") is a California limited partnership, with its principal places of business in Los Banos, California, and Williams, California.   MS Packing is duly authorized to do business in California.   MS Packing is a manufacturer and marketer of "Processed Tomato Products" as defined below in paragraph 12, including ingredient tomato paste, diced tomatoes, and fire-roasted diced tomatoes.   MS Packing distributes its products in both national and international markets.

3.     Plaintiff Liberty Packing Company, LLC ("Liberty") is a California limited liability company authorized to conduct business in the State of California, with its principal place of business in Santa Nella, California.   Liberty is a manufacturer of bulk tomato products (including the same Processed Tomato Products as MS Packing).   Liberty distributes its products in both national and international markets through MS Packing.

4.     California Fruit & Tomato Kitchens, LLC ("Cal Fruit") is a California limited liability company authorized to do business in California.   Cal Fruit manufactures and sells retail and food service fruit and tomato products, including Processed Tomato Products and finished tomato sauces such as spaghetti sauce and pizza sauce.

5.     Plaintiff The Morning Star Company ("Morning Star") is a California corporation, with its principal place of business in Woodland, California.   Morning Star is duly authorized to do business in California.   Morning Star is the general partner of MS Packing and the

weintraub genshlea chediak
LAW CORPORATION

managing member of Liberty and Cal Fruit. Morning Star employs the individuals who work for MS Packing, Liberty, and their sister companies. Morning Star then allocates to each of the facilities the cost of the workers assigned to that operation.

Morning Star, MS Packing, Liberty and Cal Fruit are collectively referred to in this Complaint as "Plaintiffs."

Defendants

6.     Plaintiffs are informed and believe and thereon allege that defendant SK Foods, L.P. ("SK Foods") is a California limited partnership, with operations in Lemoore, Williams, Monterey, and Ripon, California. SK Foods has substantial operations within the Eastern District of California. SK Foods, among other things, processes tomatoes into bulk, food service and retail products such as tomato paste, whole peeled tomatoes, diced tomatoes, fire-roasted tomatoes, and finished tomato sauces.

7.     Plaintiffs are informed and believe and thereon allege that defendant Scott Salyer ("Salyer") is an individual who resides in Monterey, California. Plaintiffs are informed and believe that Salyer is an owner, principal, partner and employee of SK Foods. Plaintiffs are informed and believe and thereon allege that Salyer operates SK Foods and exercises strict control over its agents and employees, and that Salyer directly participated in the wrongful conduct alleged in this Complaint.

8.     Plaintiffs are informed and believe and thereon allege that defendant Randall Rahal ("Rahal") is an individual residing in New Jersey. Plaintiffs are informed and believe and thereon allege that Rahal transacts significant business in the State of California on behalf of SK Foods and/or Salyer. Plaintiffs are informed and believe and thereon allege that Rahal served on SK Foods' Board of Directors from 2004 until at least April 2008. Plaintiffs are further informed and believe, and thereon allege, that at all relevant times Rahal was an agent or partner of SK Foods.

9.     Plaintiffs are informed and believe and thereon allege that defendant Intramark USA, Inc. ("Intramark USA") is a New Jersey corporation with offices in Westwood, New Jersey. Plaintiffs are informed and believe that Rahal formed Intramark USA in or about 1990, is

currently the president of Intramark USA, and that he uses that company to broker and/or transact business on behalf of SK Foods in California and elsewhere.  Intramark USA is a wholesaler of food ingredients, including Processed Tomato Products as defined below.

SK Foods, Salyer, Rahal, and Intramark USA will be referred to collectively herein as "Defendants."

10.    The true names and capacities of Does 1-50, inclusive, are unknown to Plaintiffs, who therefore sue these Doe defendants by such fictitious names.  Plaintiffs pray for leave to amend this Complaint to show the true names and capacities of said Does when the same have been ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of said Does is responsible for the actions hereinafter alleged and described.

11.    Upon information and belief, at all times herein mentioned, each defendant, including the Doe defendants, acted individually and/or as the agent, co-conspirator, aider, abettor, joint venturer, alter ego, third-party beneficiary, employee, officer, director or representative of the other defendants and, in doing the things hereinafter averred, acted within the course and scope of such agency, employment or conspiracy and with the consent, permission and authorization of each of the remaining defendants.  Upon information and belief, all actions of each defendant as averred in the claims for relief stated herein were ratified and approved by every other defendant or their officers, directors or managing agents.

## The Processed Tomato Products Industry

12.    The tomato industry in the United States is divided into two distinct segments – fresh tomatoes and processing tomatoes.  Fresh tomatoes are typically hand-picked while they are still green and sold for resale directly to retailers or to restaurants.  Processing tomatoes, on the other hand, are typically cultivated for use in tomato-based products such as tomato paste, tomato sauce, diced tomatoes, whole peeled tomatoes, fire-roasted tomatoes, finished sauces such as spaghetti and pizza sauces, and other processed tomato products ("Processed Tomato Products").

/ / /

/ / /

weintraub genshlea chediak
LAW CORPORATION

13.    Tomatoes grown for use in Processed Tomato Products and fresh tomatoes are generally not substitutes for one another.  Each consists of tomato varieties bred specifically for their respective separate and distinct markets.

14.    Fresh tomatoes are grown in every state in the United States.  They are hand-picked and shipped to distributors, wholesalers, and retailers.  Fresh tomato prices tend to be higher and more variable than tomatoes grown for use in Processed Tomato Products.

15.    Processing tomatoes, which are grown for use in Processed Tomato Products, are typically hybrid tomato plants that are genetically and physically more uniform.  The tomatoes are allowed to ripen on the vine and are then harvested by machine.  Once harvested, the vine-ripe tomatoes are processed within hours.  The short period of time between harvesting and processing limits the geographic scope of the market for growing processing tomatoes to a relatively short distance from a processing facility.  Approximately 95% of the Processed Tomato Products in the United States come from tomatoes grown and processed in California.

16.    Some processing tomatoes are sold to tomato processors, such as Plaintiffs and SK Foods, to make Processed Tomato Products for resale to food remanufacturers and others.  A portion of the processing tomatoes crop is sold directly to vertically integrated food manufacturers, such as Del Monte Foods and Campbell Soup Company, who process the tomatoes internally for use in their own consumer food products.

17.    Plaintiffs are in the business of processing tomatoes into Processed Tomato Products, and have designed, built, and operate three tomato processing facilities in California.  Plaintiffs market and sell their products in interstate commerce and worldwide, as do their competitors, such as SK Foods.  The market for Processed Tomato Products is highly competitive.  A single contract to any one customer typically involves the sale of millions of pounds of Processed Tomato Products.  A pricing difference of even a penny per pound can and will likely significantly influence the total cost to, and therefore, strongly influence a buyer's decision.  Plaintiffs rely heavily on the years of operational and design knowledge as well as

/ / /

1  the specialized training, knowledge, and skills of their employees to achieve maximum quality

2  product at the lowest cost possible.

3      18.    SK Foods is also in the business of processing tomatoes into Processed Tomato

4  Products, and therefore competes directly with Plaintiffs.  SK Foods has two tomato processing

5  plants in California.  According to SK Foods' website, SK Foods claims to be "a leading grower

6  and processor of tomato products for manufacturers, retail and food service markets."

7  Plaintiffs are informed and believe that in 2003 SK Foods also became the sole owner of

8  Cedenco Foods, Ltd., with locations in New Zealand and Australia, which also produce

9  Processed Tomato Products.

10      19.    Processed Tomato Products are used by direct purchasers in the food product

11  manufacturing, food service, food distribution, and food marketing industries.  Bulk tomato

12  paste accounts for approximately 70% of the process tomatoes processed each year.  In recent

13  years, the production of bulk tomato paste in the United States has been approximately 2.5 -

14  3 billion pounds per year with an annual value of approximately $1 billion.  Major

15  independent producers of bulk tomato paste (excluding companies which produce only tomato

16  paste for their own use) include  Morning Star, Ingomar Packing Co., SK Foods, J. G. Boswell

17  Tomato Co., LLC, and Los Gatos Tomato Products.  Like other Processed Tomato Products,

18  typical sales of bulk tomato paste are in the range of millions of pounds per contract, so that

19  even a small variation in unit price (price per pound) can have a substantial effect on the total

20  contract price and the resulting profit for the buyer.

21      20.    The industry is generally designed such that sales of bulk tomato paste, and

22  other Processed Tomato Products, are sent out for competitive bid from the various tomato

23  processors.  Plaintiffs are informed and believe and thereon allege that one reason for this

24  system is to avoid any one competitor from gaining an unfair advantage through the use of

25  improper payments or bribes.

26      21.    Large corporate purchasers of Processed Tomato Products, such as Kraft Foods,

27  Agusa, B&G Foods, ConAgra Foods, Frito-Lay, Safeway, and others, generally use purchasing

28  agents to make purchases of tomato products.  These purchasing agents, typically employees

weintraub genshlea chediak
LAW CORPORATION

of the purchaser, are agents of the purchaser and owe the purchaser a fiduciary duty of honest services in making these purchases.

### Defendants' Scheme Involving Commercial Bribery

22.     Plaintiffs are informed and believe, and thereon allege, that on or about April 16, 2008, federal agents, pursuant to federal seizure warrants, seized approximately $415,000 from a Sun National Bank account in the name of Intramark USA, and approximately $184,246.76 from a second Sun National Bank account in the name of Intramark USA.   These funds are the subject of a civil forfeiture action filed on or about August 14, 2008 and entitled:   United States v. Approximately $415,000 In U.S. Currency seized from Sun National Bank, et al., 2:08-CV-01899-GEB-GGH (hereinafter, "the Forfeiture Action"].   These funds were at least in part received by Intramark USA from SK Foods and were seized on the basis of being the proceeds of an illegal scheme of commercial bribery.  Plaintiffs are informed and believe, and thereon allege, that Intramark USA conceded that these funds were the proceeds of an illegal scheme of commercial bribery when it did not make a claim for these funds after they were seized despite having received notice of the seizure and the basis therefore.

23.     In support of the complaint in the Forfeiture Action, the U. S. Government filed the declaration of Paul S. Artley, Special Agent, U. S. Department of Justice, Federal Bureau of Investigation ("FBI") (the "Artley Declaration"), containing sworn statements made under penalty of perjury regarding the ongoing investigation of Rahal, Intramark USA, and SK Foods. This investigation is being conducted jointly by the FBI, the Internal Revenue Service Criminal Investigation Division, the Office of the Inspector General, Food and Drug Administration, and the Department of Justice, Antitrust Division (the "Federal Investigation").   The Artley Declaration contains pertinent details of the results of the Federal Investigation, including intercepted telephone conversations between Rahal, Salyer, and others obtained pursuant to federal wiretap warrants signed by Judge Lawrence K. Karlton, examination of bank records, and interviews with witnesses and suspects.   The sworn testimony set forth in the Artley Declaration provides some of the basis for the allegations set forth in this Complaint.

24.    Plaintiffs are informed and believe, and thereon allege, that Rahal (through Intramark USA) worked on behalf of SK Foods as a sales broker in transactions involving sales of Processed Tomato Products from SK Foods to large corporate customers, including Kraft Foods, Agusa, B&G Foods, ConAgra Foods, Frito-Lay, Safeway, and others.  In that capacity, Rahal oversaw, among other things, the negotiation and execution of contracts between SK Foods and many of its corporate customers, including the corporate customers listed above. Rahal also acted as an advisor, corporate director, and/or partner of SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from SK Foods employees.

25.    Plaintiffs are informed and believe, and thereon allege, that in the process of handling transactions of Processed Tomato Products for SK Foods, Rahal paid illegal bribes to the purchasing agents for some of these large corporate customers to secure contracts for SK Foods and that Rahal made these illegal bribe payments on behalf of and with SK Foods' knowledge, approval, and direction.  The Artley Declaration also details, and Plaintiffs are informed and believe, and thereon allege, that SK Foods provided money to Rahal with which to bribe purchasing agents.  Plaintiffs are also informed and believe, and thereon allege, that Rahal, in addition to paying bribes for contracts on behalf of SK Foods, also made illegal payments to purchasing agents in order to obtain bid information submitted by Plaintiffs and other SK Foods competitors.

26.    The Artley Declaration also describes how Rahal would typically identify purchasing agents who were susceptible to bribes by dropping a $100 bill and picking it up and saying, "You must have dropped this, is it yours?" If the purchasing agent said "yes," then Rahal believed that the purchasing agent was susceptible to bribes.  Plaintiffs are informed and believe, and thereon allege, that Rahal made payoffs through his company, Intramark USA, in an effort to isolate and conceal SK Foods and Salyer from the illegal conduct in case Rahal was caught or sued.  Special Agent Artley concluded in his Declaration, and Plaintiffs also believe, that this concealment shows that all Defendants knew that the bribe payments were illegal.

27.     Based upon the Artley Declaration, Plaintiffs are informed and believe, and thereon allege, that once Rahal got a purchasing agent to accept a bribe, the purchasing agent's loyalty was generally to Defendants and that Rahal took advantage of these relationships in order to obtain from the purchasing agent the bid information submitted by SK Foods' competitors, including Plaintiffs.   Defendants then used the competitor's bid information Rahal illegally obtained from the purchasing agents to establish what SK Foods would bid.   The Artley Declaration also describes how Defendants did not always submit the lowest bid but were still able to win contracts due to the bribe payments made to the purchasing agent.

28.     In December 2008, Rahal signed a "Plea and Cooperation Agreement" in which he agreed to enter a plea of guilty to a three-count Information in the United States District Court for the Eastern District of California, <u>United States of America v. Rahal</u>, Case No. 2:08-CR-566 LKK.   In entering his guilty plea, Rahal admitted his part in the scheme for commercial bribery herein alleged, and pleaded guilty to several felonies, including RICO violations, money laundering, antitrust violations, and aiding and abetting.   Rahal also admitted that there was an agreement between him and other leaders, employees, and associates of SK Foods to conduct SK Foods' affairs through a pattern of racketeering activity in the Eastern District of California and elsewhere.   Rahal also admitted that bribes were paid with the knowledge, and in some instances at the direction of, leaders of SK Foods, which Plaintiffs are informed and believe include Salyer and others.

29.     The purchasing agents herein referenced all acted as agents for their respective companies in transactions involving the sale or purchase of Processed Tomato Products in interstate commerce.   As such, each purchasing agent owed a fiduciary duty to the company it represented to act only on that company's behalf, and not on the agent's own behalf.   By accepting a bribe, a purchasing agent is acting on that agent's own behalf and in favor of the purchasing agent's own financial interest, rather than in the interest of the company the agent represented.   Therefore, the making and accepting of a bribe payment, constitutes a payment

/ / /

weintraub genshlea chediak
LAW CORPORATION

1    that corrupts or interferes with the fiduciary duty owed by the purchasing agent to the company

2    he or she represents and deprives the company of the honest service of that purchasing agent.

3         30.    The Artley Declaration states, and Plaintiffs are informed and believe, and

4    thereon allege, that the corporate customers with whom Rahal sought contracts on behalf of

5    SK Foods all have Code of Conduct policies in place.  Pursuant to these policies, employees,

6    including purchasing agents, are deemed to have a duty to their employers to avoid conflicts of

7    interest and to avoid accepting anything of value which may influence their objectivity on the

8    company's behalf.  At least one company has a policy that provides that employees can never

9    use a competitor's confidential or proprietary information.

10        31.    The Artley Declaration describes SK Foods, through Rahal and Intramark USA,

11   making bribe payments to "[J.D.]," the purchasing agent for Agusa, in exchange for competitor

12   bid information and to secure contracts for the sale of Processed Tomato Products from SK

13   Foods.  During the Federal Investigation, several telephone calls were intercepted pursuant to

14   Court-authorized wiretaps which confirmed the bribe payments.

15        32.    Plaintiffs are informed and believe, and thereon allege, that on or about July 13,

16   2007, Rahal told Salyer, during an intercepted telephone call, "I got to see my friend [J.D.]

17   over at Agusa, he's now my best friend, and give him something.  He told me, he's doing

18   exactly what he told me, he's rejecting that Chinese paste left and right."  Salyer responded,

19   "Perfect, but it's small volumes."  Rahal responded, "I know, but we started at zero volume and

20   I don't think we'll ever be a big player in there, I don't think the Mendios (owners of Agusa) will

21   ever let us be a big player, unless there's a catastrophe."  Salyer then stated, "Unless they start

22   rejecting everybody else's paste, too."  Rahal responded, "You never know what can happen,

23   a little bit of money in the right place can do."

24        33.    The Artley Declaration also describes, and Plaintiffs are informed and believe,

25   and thereon allege, that a telephone call between Rahal and SK Foods employee, "T.M.," on

26   or about July 18, 2007.  During that call, Rahal confirmed that Agusa had purchased

27   1,200,000 pounds of tomato paste from SK Foods.  Rahal ended the conversation saying,

28   / / /

weintraub genshlea chediak
LAW CORPORATION

1   "OK.  I just wanted to make sure.  If I give him money, I want to make damn sure what the hell

2   I'm paying him for."

3       34.   The Federal Investigation also involved physical surveillance by federal agents.

4   Plaintiffs are informed and believe, and thereon allege, that on or about July 18, 2007, Rahal

5   met with [J.D.], the purchasing agent for Agusa, at a restaurant in Lemoore, California.  During

6   the meeting, Rahal gave [J.D.] a Bank of America envelope containing cash as a bribe

7   payment in connection with the sale of tomato products from SK Foods to Agusa.  Also during

8   this meeting, Rahal asked [J.D.] for a list of his sales customers and the contract prices.  Rahal

9   called [J.D.] on or about July 19, 2007, and asked him to send the information via email.

10  Rahal also asked [J.D.] to provide financial statements of Agusa, his employer.

11      35.   As described in the Artley Declaration, Plaintiffs are informed and believe, and

12  thereon allege, that on or about April 16, 2008, [J.D.] admitted to federal agents that he

13  accepted cash payments from Rahal related to the purchase of Processed Tomato Products by

14  Agusa from SK Foods.

15      36.   Plaintiffs are informed and believe, and thereon allege, that SK Foods, through

16  Rahal and Intramark USA, paid bribe payments to [R.T.], the corporate purchasing manager

17  for B&G Foods, in exchange for competitor bid information and to secure contracts for the sale

18  of Processed Tomato Products from SK Foods.

19      37.   The Artley Declaration, and Plaintiffs are informed and believe, and thereon

20  allege, that a telephone call took place between Rahal and [R.T.] on or about June 8, 2007,

21  during which Rahal arranged to pay [R.T.] a bribe of one-half cent per pound of the total

22  quantity of chili peppers and jalapenos that B&G Foods purchased from SK Foods.  Rahal told

23  [R.T.], "I don't know how big your chili purchase is, but it can be a lot of money.  It's your kids'

24  education.

25      38.   The Artley Declaration also describes, and Plaintiffs are informed and believe,

26  and thereon allege, that Rahal had another telephone conversation with [R.T.] on or about

27  July 12, 2007, and confirmed the prior bribe.  In that telephone conversation, Plaintiffs are

28  informed and believe, and thereon allege, that Rahal stated, "I just want to make sure that you

weintraub genshlea chediak
LAW CORPORATION

know that you're getting half of that 13 million pounds.  That's yours."  **[R.T.]** responded, "All right."   Rahal then stated, "That's a penny on 13 [million pounds] is $130,000.  So you're getting half of that, make no bones about it."  **[R.T.]** replied, "Okay."

39.    The Artley Declaration states, and Plaintiffs are informed and believe, and thereon allege, that SK Foods, through Rahal, paid at least five checks totaling approximately $15,000 to **[R.T.]**, through his wife, as bribes described herein.  Special Agent Artley concludes in his declaration that Rahal attempted to conceal the true identity of the recipient of the illegal bribe payment by making the checks out to **[R.T.]**'s wife.

40.    Plaintiffs are informed and believe, and thereon allege, that SK Foods, through Rahal and Intramark USA, paid bribe payments to **[P.C.]**, the Director of Agricultural Operations for ConAgra, in exchange for competitor bid information and to secure contracts for the sale of Processed Tomato Products from SK Foods.

41.    As described in the Artley Declaration, Plaintiffs are informed and believe, and thereon allege, that sometime prior to December 11, 2006, **[P.C.]** gave SK Foods, through Rahal, information on bids submitted by Morning Star, Rio Bravo, and Ingomar Packing over the telephone.

42.    The Artley Declaration also shows, and Plaintiffs are informed and believe, and thereon allege, that sometime prior to December 15, 2006, Rahal, on behalf of SK Foods, agreed to pay **[P.C.]** one cent per pound as a kickback, or illegal bribe, on a ten million pound contract for tomato paste between ConAgra and SK Foods.  The Federal Investigation details how Rahal paid this bribe using money he received from Salyer and/or SK Foods by funneling it through his personal bank account, and may have included Rahal paying certain of **[P.C.]**'s family expenses.  Plaintiffs are informed and believe and thereon allege that Rahal used his personal bank account to funnel payments to **[P.C.]** to secure contracts for the sale of Processed Tomato Products from SK Foods in order to conceal the source or identity of the payments because Defendants knew the payments were illegal.

43.    The Artley Declaration describes how, and Plaintiffs are informed and believe, and thereon allege, that on or about June 15, 2007, a telephone call took place between

1   Rahal and [P.C.] regarding a potential three-year contract between SK Foods and ConAgra.

2   [P.C.] indicated that ConAgra was reluctant to sign the contract because it thought SK Foods

3   was selling similar products to a competitor, Hatch Chile Company, at a lower price.  Plaintiffs

4   are informed and believe, and thereon allege, that Rahal requested that SK Foods produce a

5   false invoice showing a higher than actual price from SK Foods to Hatch.   Plaintiffs are

6   informed and believe, and thereon allege, that an SK Foods employee created an invoice

7   showing a price 39% higher than actual and provided it to Rahal, who in turn provided it to

8   [P.C.] and that ConAgra signed a three-year contract with SK Foods within a week of that

9   invoice being created.  In his Plea and Cooperation Agreement, Rahal admitted that the total

10  price on that contract, on which Plaintiffs were deprived of the opportunity to compete due to

11  the bribe payments made by SK Foods, was $74,570,000.

12      44.      The Federal Investigation also established, and Plaintiffs are informed and

13  believe, and thereon allege, that the bribes paid by SK Foods through Rahal to [P.C.] also were

14  for the purpose of having [P.C.] accept delivery of tomato paste from SK Foods that did not

15  meet ConAgra's specifications.  Plaintiffs are informed and believe, and thereon allege, that on

16  or about March 12, 2008, a telephone call took place between Rahal and SK Foods employee

17  [M.P.].  During this call, Rahal told [M.P.] that, "[P.C.] protects me as best he can and [P.C.]

18  said 'Randy, this thing's getting out of hand.  You gotta [sic] be careful what you're shipping to

19  us.'  We [SK Foods] pack garbage for them anyway and they always take it, but we've hit new

20  lows."  Plaintiffs are informed and believe and thereon allege that this exchange was in

21  reference to SK Foods labeling its tomato paste with a higher than actual percentage of soluble

22  solids in violation of federal laws and its contracts with ConAgra.

23      45.      Plaintiffs are informed and believe, and thereon allege, that SK Foods, through

24  Rahal and Intramark USA, paid bribe payments to "[J.W.], the Manager, New Products and

25  Analysis Ingredients Purchasing" at Frito-Lay, Inc. to secure contracts for the sale of tomato-

26  based and other food products.

27      46.      As described in the Artley Declaration, Plaintiffs are informed and believe, and

28  thereon allege, that on March 3, 2008, a telephone call took place between Rahal and [J.W.],

1  during which Rahal stated: "I'll tell you what it is working good, is White Oak and this

2  jalapeno thing, and the money is now coming in."   [J.W.] responded, "OK, good."   Rahal

3  concluded, "So [Rahal's bookkeeper] will be here Wednesday . . . we'll just keep doing that,

4  she wants to do it the same way she did before."   Plaintiffs are informed and believe, and

5  thereon allege, that Rahal was telling [J.W.] that since payment was coming to Rahal for the

6  jalapenos, Rahal's bookkeeper would be sending [J.W.] his part of the "payment" in the same

7  manner as bribes/kickbacks were previously paid to [J.W.] on tomato contracts.

8       47.   As described in Rahal's Plea and Cooperation Agreement, Plaintiffs are also

9  informed and believe, and thereon allege, that Rahal, with the knowledge and encouragement

10  of other leaders and employees of SK Foods, paid approximately $81,000 in bribes to [J.W.]

11  on SK Foods' behalf in order to secure contracts for SK Foods with Frito-Lay for the sale of

12  tomato-based and other food products at elevated prices.

13       48.   The Artley Declaration states, and Plaintiffs are informed and believe, and

14  thereon allege, that Salyer and SK Foods, through Rahal and Intramark USA, paid bribe

15  payments to [R.W.], the purchasing agent for Kraft Foods, in exchange for competitor bid

16  information and to secure contracts for the sale of Processed Tomato Products from SK Foods.

17  In the Plea and Cooperation Agreement, Rahal admits that SK Foods, through Rahal, paid

18  [R.W.] at least $158,000 in illegal bribe payments since 2004 to secure Kraft's business and to

19  induce [R.W.] to provide SK Foods with certain proprietary information of SK Foods

20  competitors.

21       49.   The Artley Declaration describes, and Plaintiffs are informed and believe, and

22  thereon allege, that on or about June 6, 2007, a telephone call took place between Rahal and

23  [R.W.] about an outstanding invoice that Kraft owed to SK Foods.   During the call Rahal told

24  [R.W.] that, "you and I got money in there," meaning that [R.W.] would receive a kickback

25  once the pending invoice was paid by Kraft.

26       50.   The Artley Declaration also describes, and Plaintiffs are informed and believe,

27  and thereon allege, that during another telephone call on June 6, 2007, Rahal told [R.W.] that

28  / / /

**weintraub** genshlea chediak
LAW CORPORATION

Complaint

he would pay for medical insurance for [R.W.]'s daughter.  Plaintiffs are informed and believe that this was another offer by Defendants to pay a bribe/kickback to [R.W.]

51.    The Artley Declaration details how, and Plaintiffs are informed and believe, and thereon allege, that during a telephone call on April 2, 2008, Rahal told SK Foods employee [A.H.] that [R.W.] was sending him the offer that Chris Rufer, owner of plaintiff Morning Star, had submitted on a contract proposal to Kraft Foods.  The Artley Declaration describes various measures that Rahal and [R.W.] took to conceal the transfer of this information, and ultimately [R.W.] mailed the information to Rahal directly rather than send it via fax.  Plaintiffs are informed and believe that Defendants' efforts to affirmatively conceal the sender and recipient of Plaintiffs' bid information demonstrate that Defendants were conscious of guilt.

52.    The Artley Declaration also describes, and Plaintiffs are informed and believe, and thereon allege, that a telephone call took place on or about April 9, 2008, during which [R.W.] told Rahal that he needed $20,000 for taxes.  Rahal told [R.W.] that, "the most important thing is you get your taxes … paid.  I have that money.  You don't.  So I'll take care of that and then we'll work through it on, you know, down the road."  Rahal later told [R.W.] that he would send him $24,000.

53.    The Artley Declaration confirms, and Plaintiffs are informed and believe, and thereon allege, that on or about April 16, 2008, [R.W.] admitted to federal agents that he accepted payments from Rahal relating to the purchase of products by Kraft Foods from SK Foods.

54.    The Federal Investigation also established, and Plaintiffs are informed and believe, and thereon allege, that Salyer and SK Foods, through Rahal and Intramark USA, paid bribe payments to [M.C.], the purchasing agent for Safeway, to secure contracts for the sale of tomato products from SK Foods.

55.    The Artley Declaration details, and Plaintiffs are informed and believe, and thereon allege, that bank records from Intramark USA show that Rahal paid [M.C.] bribe payments of at least $1,000 each from SK Foods in July 2005, December 2005, July 2007, and other times.

56.     As described in the sworn Artley Declaration, Plaintiffs are informed and believe, and thereon allege, that on or about April 22, 2008, [M.C.] admitted to federal agents that he accepted cash payments from Rahal relating to the purchase of products by Safeway from SK Foods.

<u>FIRST CLAIM FOR RELIEF</u>

(Violations of the Robinson-Patman Act, 15 U.S.C. § 13(c))

(Against All Defendants)

57.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

58.     At all relevant times, Plaintiffs were competitors of SK Foods in the market for Processed Tomato Products, including tomato paste.  Both Plaintiffs and SK Foods sold Processed Tomato Products in interstate commerce.  At all relevant times, Plaintiffs desired to compete with, and did attempt to compete with, SK Foods on contracts for the sale of Processed Tomato Products in interstate commerce to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.

59.     Plaintiffs are informed and believe, and thereon allege, that as detailed in the Artley Declaration and Rahal's Plea and Cooperation Agreement, SK Foods paid bribe payments to the purchasing agents for companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others, in connection with the purchase of Processed Tomato Products from SK Foods in interstate commerce.  Plaintiffs are further informed and believe, and thereon allege, that Salyer, Intramark USA, and Rahal all participated in making these bribe payments on behalf of SK Foods.

60.     Rahal admitted in his Plea and Cooperation Agreement that the bribe payments made by SK Foods to the purchasing agents for the purchasing companies were in direct contravention of the conflict of interest policies of the purchasing companies and deprived the purchasing companies of the right to the purchasing agents' honest services.  Thus, these bribe payments corrupted the fiduciary relationships between the purchasing companies and their purchasing agents involving the sale of tomato products in interstate commerce.  Moreover,

Plaintiffs are informed and believe, and thereon allege, that the purchasing agents did not provide any legitimate service to Defendants for the illegal bribes they received from Defendants.

61.     Defendants' pattern and practice of making bribe payments to purchasing agents described above resulted in a decrease in competition for the Processed Tomato Products due to SK Foods being awarded the contracts without true competition.  As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have been unable to compete effectively for contracts for the sale of Processed Tomato Products to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.  At all times, Plaintiffs have been ready to, and have attempted to, compete with SK Foods for these contracts.  Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others, and as a result, Plaintiffs have been injured in their business or property.

62.     This scheme of commercial bribery in connection with the sale of products in interstate commerce by Defendants is a per se violation of section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), thereby entitling Plaintiffs to recover threefold their damages, the cost of suit, and reasonable attorneys' fees pursuant to statute, 15 U.S.C. § 15(a).

WHEREFORE, Plaintiffs pray for judgment as set forth below.

<u>SECOND CLAIM FOR RELIEF</u>

(Violations of the Sherman Act, 15 U.S.C. § 1)

(Against All Defendants)

63.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

64.     Plaintiffs are informed and believe, and thereon allege, that beginning no later than February 2006, and continuing until at least April 2008, SK Foods, Salyer, Intramark USA, Rahal, other SK Foods employees, and other co-conspirators agreed and conspired with each other and with various purchasing agents to participate in a pattern of collusive bidding practices designed to eliminate competition in the market for Processed Tomato Products by

allocating contracts to SK Foods and the other co-conspirators without true competition, and to rig bids for Processed Tomato Products.   The primary purpose of this conspiracy was to eliminate competition and fix prices in the market of Processed Tomato Products sold in the United States.

65.    The Processed Tomato Products sold by one or more of the conspirators traveled in interstate commerce.   The business activities of the Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce.

66.    Plaintiffs are informed and believe, and thereon allege, that pursuant to the above-described agreement, Rahal, Salyer, Intramark USA, and their co-conspirators submitted artificially inflated bids and price quotations.   Defendants and the co-conspirators ensured that SK Foods' bids would be the winning bids by paying illegal bribes to the purchasing agents. Rahal, on behalf of all Defendants, also acted to enforce the agreements by paying illegal bribes to obtain and distribute information about bids submitted by SK Foods' competitors, including Plaintiffs, for the same contracts.

67.    Defendants' agreement to use illegal bribes to reduce competition in the market for Processed Tomato Products alleged herein, and the carrying out of that agreement, caused antitrust injury in the form of a reduction in competition in the market in the United States for Processed Tomato Products and an increase in prices paid by consumers of Processed Tomato Products.

68.    The actions of the Defendants described herein caused actual injury to Plaintiffs in that Plaintiffs were not awarded contracts they otherwise would have been awarded absent the price-fixing agreement described herein.   Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay Kraft Foods, Safeway, and others, and as a result, Plaintiffs have been injured in their business or property.

69.    Defendants' actions herein described constitute a violation of the Sherman Act, 15 U.S.C. § 1, thereby entitling Plaintiffs to recover threefold their damages, the cost of suit, and reasonable attorneys' fees pursuant to statute, 15 U.S.C. § 15(a).   On or about

**weintraub** genshlea chediak
LAW CORPORATION

1   December 16, 2008, Rahal admitted the facts alleged herein, and his part in the conspiracy, in

2   entering his guilty plea and executing the Plea and Cooperation Agreement.

3          WHEREFORE, Plaintiffs pray for judgment as set forth below.

4                          <u>THIRD CLAIM FOR RELIEF</u>

5                  (Violations of the RICO, 18 U.S.C. § 1962(c))

6                          (Against All Defendants)

7          70.     Plaintiffs reallege and incorporate herein by reference each and every foregoing

8   paragraph of this Complaint as if set forth in full.

9   <u>The RICO Enterprise</u>

10         71.     Defendant SK Foods, including its leaders, employees, and associates,

11  constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4).  Rahal, Salyer, Intramark USA,

12  and other unnamed conspirators were leaders, employees, and associates of the enterprise.

13  Plaintiffs are informed and believe, and thereon allege, that Salyer directed the activities of the

14  enterprise, which consisted of selling tomato products in interstate commerce.  Plaintiffs are

15  informed and believe and thereon allege that Rahal carried out the orders and directions of

16  Salyer, which included using Intramark USA to arrange the sales of tomato products on behalf

17  of SK Foods with and without the use of commercial bribes.

18  <u>Pattern of Racketeering Activity</u>

19  <u>Violations of California Penal Code Section 641.3, Commercial Bribery</u>

20         72.     The acts of commercial bribery as described above are chargeable as violations

21  of California Penal Code Section 641.3, New Jersey Statutes Annotated § 2C:21-10, Texas

22  Penal Code § 32.43,  and are punishable by imprisonment in the state prison for more than

23  one year.   The acts of commercial bribery as described above are also predicate offenses

24  constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

25  <u>Violations of the Travel Act, 18 U.S.C. § 1952</u>

26         73.     As alleged herein, Defendants repeatedly used the mail and telephone, services

27  in interstate commerce in carrying out the acts of commercial bribery between the years 2004

28  and 2008.

weintraub genshlea chediak
LAW CORPORATION

74.    Each use of the mail and telephone by Defendants to promote, manage, establish, or carry on the unlawful activity, i.e., the scheme of commercial bribery herein alleged, constitutes a violation of the Travel Act, 18 U.S.C. § 1952.   These Travel Act violations are also predicate offenses constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

## Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(3)(C)

75.    Plaintiffs are informed and believe and thereon allege that for each of the years from at least 2004 to 2008 relevant herein, Intramark USA received a wire transfer from SK Foods in the approximate amount of at least $600,000.  Plaintiffs are informed and believe and thereon allege that these transfers were the proceeds from, or were traceable to the proceeds from, specified unlawful activity, namely the herein described scheme of commercial bribery in violation of California Penal Code section 641.3.

76.    Plaintiffs are informed and believe, and thereon allege, that Rahal and Intramark USA used these funds, or some of them, to make the herein described bribe payments to various purchasing agents on behalf of all Defendants.   In his Plea and Cooperation Agreement, Rahal admitted that he knew the funds were the proceeds from, or were traceable to the proceeds from, specified unlawful activity, namely the herein described scheme of commercial bribery in violation of California Penal Code Section 641.3.   Plaintiffs are informed and believed and thereon allege that Salyer and all other Defendants also shared this knowledge.

77.    In his Plea and Cooperation Agreement, Rahal admitted, and Plaintiffs are informed and believe, and thereon allege, that the funds transferred between SK Foods and Intramark USA were transferred with the intent to promote the carrying on of the specified unlawful activity, namely commercial bribery.

78.    The above-described conduct of Defendants, and each of them, constitutes money laundering in violation of 18 U.S.C. § 1956, Laundering of Monetary Instruments.  This violation of 18 U.S.C. § 1956 is listed as a predicate offense in the definition of "racketeering activity" in the RICO Act, 18 U.S.C. § 1961(1).

weintraub genshlea chediak
LAW CORPORATION

1    Mail Fraud and Wire Fraud, 18 U.S.C. §§ 1341, 1343

2    　　　79.    As described herein, Defendants used the mails in furtherance of their scheme of

3    commercial bribery.  Specifically, on or about April 2, 2008, Kraft Foods buyer, **[R.W.],** mailed

4    confidential bid information for a pending contract with Kraft Foods to Rahal.  This information

5    was part of Defendants' scheme of commercial bribery and was part of Defendants' scheme to

6    defraud or for obtaining money or property by means of false or fraudulent pretenses,

7    representations, or promises in which Defendants used or caused others to use the mails in

8    violation of 18 U.S.C. § 1341.

9    　　　80.    As described herein, Defendants repeatedly used or caused others to use wire

10   communications in interstate commerce for the purpose of executing the scheme or artifice

11   devised by Defendants to defraud or for obtaining money or property by means of false or

12   fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343.

13   Specifically, Rahal repeatedly used the telephone to communicate with Salyer, other SK Foods

14   employees, and various purchasing agents to arrange for bribe payments to be paid to the

15   purchasing agents as alleged herein.

16   　　　81.    The above-described conduct of Defendants constitutes a pattern of racketeering

17   activity as defined in RICO.  18 U.S.C. § 1961(5).

18   　　　82.    As described herein, Defendants, and each of them, have conducted or

19   participated in, directly or indirectly, the conduct of the enterprise's affairs through a pattern or

20   racketeering activity in violation of 18 U.S.C. § 1962(c).  Plaintiffs are informed and believe, as

21   Rahal admits in his Plea and Cooperation Agreement, that there was an agreement between

22   Rahal and other leaders, employees and associates of SK Foods, including Salyer, to conduct

23   the enterprise's affairs through a pattern or racketeering activity.

24   　　　83.    As a direct and proximate result of Defendants' conduct as described herein,

25   Plaintiffs have been unable to compete for contracts for the sale of tomato products to

26   companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.

27   Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies

28   such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others, and as a

weintraub genshlea chediak
LAW CORPORATION

1   result, Plaintiffs have been therefore injured in their business or property by reason of the

2   above-described violation of 18 U.S.C. § 1962(c).  Plaintiffs are thus entitled to recover

3   threefold the damages they have sustained, plus their costs and reasonable attorneys' fees

4   pursuant to 18 U.S.C. § 1964(c).

5          WHEREFORE, Plaintiffs pray for judgment as set forth below.

6                          <u>FOURTH CLAIM FOR RELIEF</u>

7                   (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

8                          (Against All Defendants)

9          84.   Plaintiffs reallege and incorporate herein by reference each and every foregoing

10  paragraph of this Complaint as if set forth in full.

11         85.   Plaintiffs are informed and believe, and thereon allege, that Defendants, and

12  each of them, conspired and agreed with each other to conduct or participate in, directly or

13  indirectly, the conduct of the enterprise's affairs through the pattern or racketeering activity

14  herein described.  In his Plea and Cooperation Agreement, Rahal admits that there was an

15  agreement between himself and other leaders, employees and associates of SK Foods to

16  conduct the enterprise's affairs through a pattern or racketeering activity.  Specifically, as

17  detailed above, Rahal participated in telephone calls with Salyer and other SK Foods officers

18  and employees regarding the scheme to make bribe payments to purchasing agents for various

19  companies.  Defendants, and each of them, agreed to the scheme to make bribe payments to

20  the purchasing agents to secure contracts for the sale of tomato products from SK Foods.

21         86.   Plaintiffs are informed and believe, and thereon allege, that Defendants

22  committed several overt acts in furtherance of the conspiracy, including but not limited to

23  SK Foods wiring approximately $600,000 each January for use in making bribe payments,

24  Rahal contacting purchasing agents and offering the purchasing agent a $100 bill to test

25  whether the purchasing agent was susceptible for bribe payments, and Rahal actually making

26  bribe payments to the above-named purchasing agents.

27  / / /

28  / / /

87.     By conspiring with each other to conduct or participate in, directly or indirectly, the conduct of the enterprise's affairs through the pattern of racketeering activity herein described, Defendants, and each of them, have violated 18 U.S.C. § 1962(d).

88.     As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have been unable to compete for contracts for the sale of tomato products to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others. Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others, and as a result, Plaintiffs have been therefore injured in their business or property by reason of the above-described violation of 18 U.S.C. § 1962(d).  Plaintiffs are thus entitled to recover threefold the damages they have sustained, plus their costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs pray for judgment as set forth below.

<u>FIFTH CLAIM FOR RELIEF</u>

(Common Law Unfair Competition and Unfair Competition

Pursuant to Cal. Bus. & Prof. Code § 17200)

(Against All Defendants)

89.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

90.     Common law unfair competition and California Business and Professions Code sections 17200 *et seq.* prohibit any business practices that are unlawful, fraudulent, or unfair as defined by that statute.

91.     The wrongful conduct of Defendants as alleged above, including, but not limited to, commercial bribery and conspiracy to commit commercial bribery, constitute unlawful, unfair, and fraudulent business acts and practices under California Business and Professions Code sections 17200 *et seq.* and common law unfair competition.  Defendants' conduct has harmed Plaintiffs financially, including but not limited to losing sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.

92.     California Business and Professions Code section 17203 authorizes restitutionary relief against any person who has engaged or proposed to engage in unfair competition.  Defendants have been unjustly enriched by virtue of their unfair competition as set forth hereinabove.  Plaintiffs request that the Court order Defendants to disgorge to Plaintiffs all monies and/or property acquired by means of Defendants' unlawful, unfair, and fraudulent business practices.  Common law unfair competition authorizes the payment of damages as a result of such wrongful conduct and Plaintiffs hereby request the Court to order payment of such damages according to proof.

93.     As a direct and proximate result of Defendants' acts of unfair competition, Plaintiffs have suffered injury and harm.  Defendants should be enjoined from engaging in further acts of unfair competition.

94.     Plaintiffs are informed and believe, and thereon allege, that Defendants conducted the acts alleged herein with the intent to cause injury to Plaintiffs and that the acts constituted despicable conduct carried on with a willful and conscious disregard of the rights of Plaintiffs.  Defendants acted with oppression, fraud, and malice, thereby entitling Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

**PRAYER**

**AS TO THE FIRST AND SECOND CLAIMS FOR RELIEF**

**(Antitrust Violations of the Robinson-Patman Act and Sherman Act)**

**(Against All Defendants)**

1.     For an order requiring Defendants, and each of them, to show cause, if any they have, why they should not be enjoined as hereinafter set forth, during the pendency of this action;

2.     For a temporary restraining order, a preliminary injunction, and a permanent injunction, all requiring Defendants, and each of them, and their respective officers, directors, agents, attorneys, servants and employees, and all persons acting under, in concert with, or for them:

**weintraub** genshlea chediak
LAW CORPORATION

(a)     to refrain from making bribe payments to purchasing agents for any company in connection with the purchase or sale of tomato products in interstate commerce;

(b)     to refrain from requesting or receiving bid information from purchasing agents regarding bids submitted by SK Foods' competitors in connection with contracts for the sale or purchase of tomato products in interstate commerce;

3.     For general damages and the amount necessary to prevent the unjust enrichment of Defendants, trebled according to statute, 15 U.S.C. § 15(a);

4.     For punitive and exemplary damages;

5.     For prejudgment interest according to statute, 15 U.S.C. § 15(a); and

6.     For Plaintiffs' reasonable attorneys' fees according to statute, 15 U.S.C. § 15(a).

AS TO THE THIRD AND FOURTH CLAIMS FOR RELIEF

(RICO)

(Against All Defendants)

7.     For general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1962(c);

8.     For prejudgment interest according to statute, 15 U.S.C. § 15(a); and

9.     For Plaintiffs' reasonable attorneys' fees according to statute, 15 U.S.C. § 15(a).

AS TO THE FIFTH CLAIM FOR RELIEF

(Unfair Competition)

(Against All Defendants)

10.     For restitution to Plaintiffs of all sums acquired by Defendants and disgorgement of all profits acquired by means of Defendants' unlawful, unfair, and fraudulent business practices.

11.     For interest on these sums at the legal rate;

12.     For an order requiring Defendants, and each of them, to show cause, if any they have, why they should not be enjoined as hereinafter set forth, during the pendency of this action;

/ / /

1    13.    For a temporary restraining order, a preliminary injunction, and a permanent

2  injunction, all requiring Defendants, and each of them, and their respective officers, directors,

3  agents, attorneys, servants and employees, and all persons acting under, in concert with, or for

4  them;

5         (a)    to refrain from making bribe payments to purchasing agents for any

6  company in connection with the purchase or sale of tomato products in interstate commerce;

7         (b)    to refrain from requesting or receiving bid information from purchasing

8  agents regarding bids submitted by SK Foods' competitors in connection with contracts for the

9  sale or purchase of tomato products in interstate commerce;

10                          AS TO ALL CAUSES OF ACTION

11                             (Against All Defendants)

12    14.    For costs of suit; and

13    15.    For such other and further relief as the Court may deem just and proper.

14

15  Dated:  January 22, 2009              Respectfully submitted,

16                                        **WEINTRAUB GENSHLEA CHEDIAK**
                                          Law Corporation
17

18

19                                        By:____/s/  Dale C. Campbell_____
                                              Dale C. Campbell
20                                            State Bar No. 99173

21                                            Attorneys for Plaintiffs
                                              The Morning Star Packing Company,
22                                            Liberty Packing Company, LLC, California
                                              Fruit and Tomato Kitchens, LLC, and
23                                            The Morning Star Company

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby request a trial by jury provided by Rule 38 of the Federal Rules of Civil Procedure.


Dated:  January 22, 2009

Respectfully submitted,

**WEINTRAUB GENSHLEA CHEDIAK**
Law Corporation


By:____/s/ Dale C. Campbell_____
        Dale C. Campbell
        State Bar No. 99173

        Attorneys for Plaintiffs
        The Morning Star Packing Company,
        Liberty Packing Company, LLC, California
        Fruit and Tomato Kitchens, LLC, and
        The Morning Star Company