1  Dale C. Campbell, State Bar No. 99173
   James Kachmar, State Bar No. 216781
2  **WEINTRAUB GENSHLEA CHEDIAK**
   Law Corporation
3  400 Capitol Mall, 11th Floor
   Sacramento, California  95814
4  (916) 558-6000 – Main
   (916) 446-1611 – Facsimile
5
   Attorneys for Plaintiffs
6  The Morning Star Packing Company;
   Liberty Packing Company, LLC, California
7  Fruit & Tomato Kitchens, LLC, and
   The Morning Star Company
8

9

10                    UNITED STATES DISTRICT COURT

11                    EASTERN DISTRICT OF CALIFORNIA

12

13  THE MORNING STAR PACKING              ) Case No. 2:09-CV-00208-MCE-EFB
    COMPANY, a California limited partnership; )
14  LIBERTY PACKING COMPANY, LLC, a       )
    California limited liability company;      ) SECOND AMENDED COMPLAINT FOR:
15  CALIFORNIA FRUIT & TOMATO KITCHENS,   )
    LLC, a California limited liability company; ) 1. VIOLATIONS OF ROBINSON-PATMAN
16  and THE MORNING STAR COMPANY, a       )       ACT [15 U.S.C. § 13(c)];
    California corporation,                ) 2. VIOLATIONS OF SHERMAN ACT
17                                         )       [15 U.S.C. § 1];
                  Plaintiffs,             ) 3. VIOLATIONS OF RICO
18                                         )       [18 U.S.C. § 1962(c)]; and
         vs.                              ) 4. CONSPIRACY TO VIOLATE RICO
19                                         )       [18 U.S.C. § 1962(d)]
    SK FOODS, L.P., a California limited   )
20  partnership; SK PM CORPORATION, a     )
    California corporation; SCOTT SALYER, an )
21  individual; RANDALL RAHAL, an individual; ) DEMAND FOR JURY TRIAL
    INTRAMARK USA, INC., a New Jersey      )
22  corporation; INGOMAR PACKING          )
    COMPANY, LLC, a California limited liability )
23  compnay; GREG PRUETT, an individual; LOS )
    GATOS TOMATO PRODUCTS; STUART         )
24  WOOLF, an individual; ALAN HUEY, an   )
    individual; and DOES 1 through 50,     )
25  inclusive,                            )
                                           )
26                Defendants.             )
                                           )
27  _____ )

28

## JURISDICTION AND VENUE

1.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, federal question jurisdiction.   This matter arises out of violations of the Robinson-Patman Act, 15 U.S.C. § 13(c), the Sherman Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*   Supplemental jurisdiction over the claims based on California state law is proper pursuant to 28 U.S.C. § 1367.   Venue is proper in the Eastern District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

Plaintiffs

2.     Plaintiff The Morning Star Packing Company ("MS Packing") is a California limited partnership, with its principal places of business in Los Banos, California, and Williams, California.   MS Packing is duly authorized to do business in California.   MS Packing is a manufacturer and marketer of "Processed Tomato Products" as defined below in paragraph 19, including ingredient tomato paste, diced tomatoes, and fire-roasted diced tomatoes.   MS Packing distributes its products in both national and international markets.

3.     Plaintiff Liberty Packing Company, LLC ("Liberty") is a California limited liability company authorized to conduct business in the State of California, with its principal place of business in Santa Nella, California.    Liberty is a manufacturer of bulk tomato products (including the same Processed Tomato Products as MS Packing).   Liberty distributes its products in both national and international markets through MS Packing.

4.     California Fruit & Tomato Kitchens, LLC ("Cal Fruit") is a California limited liability company authorized to do business in California.   Cal Fruit manufactures and sells retail and food service fruit and tomato products, including Processed Tomato Products and finished tomato sauces such as spaghetti sauce and pizza sauce.

5.     Plaintiff The Morning Star Company ("Morning Star") is a California corporation, with its principal place of business in Woodland, California.   Morning Star is duly authorized to do business in California.   Morning Star is the general partner of MS Packing and the

weintraub genshlea chediak
LAW CORPORATION

Second Amended Complaint

1  managing member of Liberty and Cal Fruit.  Morning Star employs the individuals who work

2  for MS Packing, Liberty, and their sister companies.  Morning Star then allocates to each of the

3  facilities the cost of the workers assigned to that operation.

4       Morning Star, MS Packing, Liberty, and Cal Fruit are collectively referred to in this

5  Complaint as "Plaintiffs."

6  <u>Defendants</u>

7       6.    Defendant SK Foods, L.P. ("SK Foods") is a California limited partnership, which

8  had operations in Lemoore, Williams, Monterey, and Ripon, California at all relevant times

9  herein.  SK Foods has or had substantial operations within the Eastern District of California.

10  SK Foods, among other things, processes tomatoes into bulk, food service and retail products

11  such as tomato paste, whole peeled tomatoes, diced tomatoes, fire-roasted tomatoes, and

12  finished tomato sauces.  At all relevant times, SK Foods was a direct competitor of Plaintiffs in

13  the Processed Tomato Products industry.  SK Foods filed for bankruptcy on or about May 7,

14  2009, while this action was pending.[1]

15       7.    Defendant SK PM Corporation ("SK PM") is a California corporation, and at all

16  relevant times herein, was the general partner of SK Foods.  Plaintiffs are informed and believe,

17  and thereon allege, that at all relevant times, SK PM was owned, managed and directed by

18  Scott Salyer.  As the general partner of SK Foods, SK PM is liable for any torts committed by the

19  partnership, SK Foods.

20       8.    Defendant Scott Salyer ("Salyer") is an individual who resides, or at all relevant

21  times resided, in Monterey, California.  Salyer is, or at all relevant times was, an owner,

22  principal, partner and employee of SK Foods and its general partner SK PM.  Plaintiffs are

23  informed and believe, and thereon allege, that Salyer operates, or at all relevant times

24  operated, SK Foods and exercises strict control over its agents and employees, and that Salyer

25  directly participated in the wrongful conduct alleged in this First Amended Complaint.

26  _____

27  [1] After the commencement of this action, SK Foods became the subject of a petition for relief under Chapter 11 of the U. S. Bankruptcy Code, filed in the U. S. Bankruptcy Court for the Eastern District of California.  Plaintiffs

28  acknowledge that this action is stayed as against SK Foods and remains automatically stayed pursuant to 11 U.S.C. § 362.  Plaintiffs reserve all rights to seek relief from the automatic stay to proceed against SK Foods.

weintraub genshlea chediak
LAW CORPORATION

9.    Defendant Randall Rahal ("Rahal") is an individual residing in New Jersey. Plaintiffs are informed and believe, and thereon allege, that Rahal transacts or has transacted significant business in the State of California on behalf of SK Foods and/or Salyer.  Plaintiffs are informed and believe, and thereon allege, that Rahal served on SK Foods' Board of Directors from 2004 until at least April 2008.  Plaintiffs are further informed and believe, and thereon allege, that at all relevant times Rahal was an agent or partner of SK Foods.

10.    Defendant Intramark USA, Inc. ("Intramark") is a New Jersey corporation with offices in Westwood, New Jersey.  Plaintiffs are informed and believe, and thereon allege, that Rahal formed Intramark in or about 1990, is currently the president of Intramark, and that he uses, or has used at all relevant times, Intramark to broker and/or transact business on behalf of SK Foods in California and elsewhere.  Intramark is a wholesaler of food ingredients, including Processed Tomato Products as defined below.

11.    Ingomar Packing Company, LLC ("Ingomar"), is a California limited liability company with its principal place of business in Los Banos, California.  Ingomar is a producer and processor of tomatoes and is a direct competitor of Plaintiffs in the Processed Tomato Products industry.  Plaintiffs are also informed and believe, and thereon allege, that Ingomar operated as a general partnership prior to June 29, 2005, when it was reorganized as a limited liability company.

12.    Defendant Greg Pruett ("Pruett") is an individual who resides in the State of California.  Plaintiffs are informed and believe, and thereon allege, that at all relevant times herein, Pruett is and/or was the president of Ingomar and personally participated in the unlawful activities alleged herein.

13.    Plaintiffs are informed and believe, and thereon allege, that Los Gatos Tomato Products ("Los Gatos") is a partnership of three or four family farming operations with its principal place of business in Huron, California.   Los Gatos produces Processed Tomato Products and is a direct competitor of Plaintiffs in the Processed Tomato Products industry.

/ / /

/ / /

14.    Defendant Stuart Woolf ("Woolf") is, or at all relevant times herein was, the President and/or General Manager of Los Gatos.  Plaintiffs are informed and believe, and thereon allege, that Woolf personally participated in the unlawful activities alleged herein.

15.    Defendant Alan Huey ("Huey") is an individual who resides in the State of California.  Plaintiffs are informed and believe, and thereon allege, that, at all relevant times herein, Huey was a senior vice president of SK Foods who personally participated in the unlawful activities alleged herein.

16.    For purposes of this amended complaint, SK Foods, SK PM, Salyer, Rahal, Intramark, Ingomar, Los Gatos, Pruett, Woolf, and Huey will be referred to collectively herein as "Defendants."  As used in this amended complaint, the term "SK Defendants" shall mean and include SK Foods, SK PM, Salyer, Rahal, Intramark, and Huey.  As used in this amended complaint, the term "CTEG Defendants" shall mean and include SK Foods, Salyer, Rahal, Intramark, Ingomar, Los Gatos, Pruett, and Woolf.

17.    The true names and capacities of Does 1-50, inclusive, are unknown to Plaintiffs, who therefore sue these Doe defendants by such fictitious names.  Plaintiffs pray for leave to amend this Second Amended Complaint to show the true names and capacities of said Does when the same have been ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of said Does is responsible for the actions hereinafter alleged and described.

18.    Upon information and belief, at all times herein mentioned, each defendant, including the Doe defendants, acted individually and/or as the agent, co-conspirator, aider, abettor, joint venturer, alter ego, third-party beneficiary, employee, officer, director or representative of the other defendants and, in doing the things hereinafter averred, acted within the course and scope of such agency, employment or conspiracy and with the consent, permission and authorization of each of the remaining defendants.  Upon information and belief, all actions of each defendant as averred in the claims for relief stated herein were ratified and approved by every other defendant or their officers, directors or managing agents.

/ / /

**weintraub** genshlea chediak
LAW CORPORATION

<u>The Processed Tomato Products Industry</u>

19.    The tomato industry in the United States is divided into two distinct segments – fresh tomatoes and processing tomatoes.  Fresh tomatoes are typically hand-picked while they are still green and sold for resale directly to retailers or to restaurants.  Processing tomatoes, on the other hand, are typically cultivated for use in tomato-based products such as tomato paste, tomato sauce, diced tomatoes, whole peeled tomatoes, fire-roasted tomatoes, finished sauces such as spaghetti and pizza sauces, and other processed tomato products ("Processed Tomato Products").

20.    Tomatoes grown for use in Processed Tomato Products and fresh tomatoes are generally not substitutes for one another.  Each consists of tomato varieties bred specifically for their respective separate and distinct markets.

21.    Fresh tomatoes are grown in every state in the United States.  They are hand-picked and shipped to distributors, wholesalers, and retailers.  Fresh tomato prices tend to be higher in price and more variable than tomatoes grown for use in Processed Tomato Products.

22.    Processing tomatoes, which are grown for use in Processed Tomato Products, are typically hybrid tomato plants that are genetically and physically more uniform.  The tomatoes are allowed to ripen on the vine and are then harvested by machine.  Once harvested, the vine-ripe tomatoes are processed within hours.  The short period of time between harvesting and processing limits the geographic scope of the market for growing processing tomatoes to a relatively short distance from a processing facility.  Approximately 95% of the Processed Tomato Products in the United States come from tomatoes grown and processed in California.

23.    Some processing tomatoes are sold to tomato processors, such as Plaintiffs, SK Foods, Ingomar, and Los Gatos to make Processed Tomato Products for resale to food remanufacturers and others.  A portion of the processing tomatoes crop is sold directly to vertically integrated food manufacturers, such as Del Monte Foods and Campbell Soup Company, who process the tomatoes internally for use in their own consumer food products.

/ / /

24.    Plaintiffs are in the business of processing tomatoes into Processed Tomato Products, and have designed, built, and currently operate three tomato processing facilities in California.  Plaintiffs market and sell their products in interstate commerce (and worldwide), as do their competitors, such as SK Foods, Ingomar and Los Gatos.  The market for Processed Tomato Products is highly competitive.  A single contract to any one customer typically involves the sale of millions of pounds of Processed Tomato Products.  A pricing difference of even a penny per pound can and will likely significantly influence the total cost to, and therefore, strongly influence a buyer's decision.  Plaintiffs rely heavily on their years of operational and design knowledge as well as the specialized training, knowledge, and skills of their employees to achieve maximum quality product at the lowest cost possible.

25.    SK Foods, Ingomar and Los Gatos are also in the business of processing tomatoes into Processed Tomato Products, and therefore compete directly with Plaintiffs.  SK Foods has, or at all relevant times herein had, two tomato processing plants in California.  According to SK Foods' website, SK Foods claims to be "a leading grower and processor of tomato products for manufacturers, retail and food service markets."  Plaintiffs are informed and believe that in 2003, SK Foods (or a related entity) also became the sole owner of Cedenco Foods, Ltd., with locations in New Zealand and Australia, which also produce Processed Tomato Products.  Ingomar has two plants in California that make tomato paste and diced tomatoes.  Los Gatos has one plant in California that manufactures tomato paste.

26.    Processed Tomato Products are used by direct purchasers in the food product manufacturing, food service, food distribution, and food marketing industries.  Bulk tomato paste accounts for approximately 70% of the process tomatoes processed each year.  In recent years, the production of bulk tomato paste in the United States has been approximately 2.5 – 3 billion pounds per year with an annual value of approximately $1 billion.  Major independent producers of bulk tomato paste (excluding companies which produce only tomato paste for their own use) include Morning Star, SK Foods, Ingomar, Los Gatos, and J. G. Boswell Tomato Co., LLC.  Like other Processed Tomato Products, typical sales of bulk tomato paste are in the range of millions of pounds per contract, so that even a small variation

weintraub genshlea chediak
LAW CORPORATION

in unit price (price per pound) can have a substantial effect on the total contract price and the resulting profit for the buyer.

27.    The industry is generally designed such that sales of bulk tomato paste, and other Processed Tomato Products, are open to competitive bid from the various tomato processors.  Plaintiffs are informed and believe, and thereon allege, that one reason for this system is to avoid any one competitor from gaining an unfair advantage through the use of improper payments or bribes.

28.    Large corporate purchasers of Processed Tomato Products, such as Kraft Foods, Agusa, B&G Foods, ConAgra Foods, Frito-Lay, Safeway, and others, generally use purchasing agents to make purchases of tomato products.  These purchasing agents, typically employees of the purchaser, are agents of the purchaser and owe the purchaser a fiduciary duty of honest services in making these purchases.

## Defendants' Scheme Involving Commercial Bribery

29.    Plaintiffs are informed and believe, and thereon allege, that on or about April 16, 2008, federal agents, pursuant to federal seizure warrants, seized approximately $415,000 from a Sun National Bank account in the name of Intramark USA, and approximately $184,246.76 from a second Sun National Bank account in the name of Intramark USA.  These funds are the subject of a civil forfeiture action filed on or about August 14, 2008 and entitled:  United States v. Approximately $415,000 In U. S. Currency seized from Sun National Bank, et al., 2:08-CV-01899-GEB-GGH (hereinafter, "the Forfeiture Action").  These funds were at least in part received by Intramark from SK Foods and were seized on the basis of being the proceeds of an illegal scheme of commercial bribery.  Plaintiffs are informed and believe, and thereon allege, that Intramark conceded that these funds were the proceeds of an illegal scheme of commercial bribery when it did not make a claim for these funds after they were seized despite having received notice of the seizure and the basis therefor.

30.    In support of the complaint in the Forfeiture Action, the U. S. Government filed the declaration of Paul S. Artley, Special Agent, U. S. Department of Justice, Federal Bureau of

weintraub genshlea chediak
LAW CORPORATION

1    Investigation ("FBI") (the "Artley Declaration"), containing sworn statements made under

2    penalty of perjury regarding the ongoing investigation of Rahal, Intramark, SK Foods, and

3    others.  This investigation is being conducted jointly by the FBI, the Internal Revenue Service

4    Criminal Investigation Division, the Office of the Inspector General, Food and Drug

5    Administration, and the Department of Justice, Antitrust Division (the "Federal Investigation").

6    The Artley Declaration contains pertinent details of the results of the Federal Investigation,

7    including intercepted telephone conversations between Rahal, Salyer, and others obtained

8    pursuant to federal wiretap warrants signed by Judge Lawrence K. Karlton, examination of

9    bank records, and interviews with witnesses and suspects.  The sworn testimony set forth in the

10   Artley Declaration provides some of the basis for the allegations set forth in this Second

11   Amended Complaint.

12       31.    In connection with the Federal Investigation referred to above, the U. S.

13   Government submitted an "Application and Affidavit for Search Warrant," Case No. 2:08-SW-

14   0123, on or about April 15, 2008.  The Government's Application included a 110-page

15   affidavit from Agent Artley ("the Artley Search Warrant Affidavit") that was unsealed by the

16   Court in or about March 2010, after Plaintiffs had filed their First Amended Complaint in this

17   action.  The Artley Search Warrant Declaration contains additional, pertinent details of the

18   results of the Federal Investigation, including intercepted telephone conversations between

19   Rahal, Salyer, and others obtained pursuant to federal wiretap warrants signed by Judge

20   Lawrence K. Karlton, examination of bank records, and interviews with witnesses and suspects.

21   The sworn testimony set forth in the Artley Search Warrant Declaration provides some of the

22   basis for the allegations set forth in this Second Amended Complaint.

23       32.    Plaintiffs are informed and believe, and thereon allege, that Rahal (through

24   Intramark) worked on behalf of SK Foods as a sales broker in transactions involving sales of

25   Processed Tomato Products from SK Foods to large corporate customers, including Kraft

26   Foods, Agusa, B&G Foods, ConAgra Foods, Frito-Lay, Safeway, and others.  In that capacity,

27   Rahal oversaw, among other things, the negotiation and execution of contracts between

28   SK Foods and many of its corporate customers, including the corporate customers listed above.

**weintraub** genshlea chediak
LAW CORPORATION

Rahal also acted as an advisor, corporate director, and/or partner of SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from Salyer, Huey, and other SK Foods employees.

33.    As Artley's Affidavit details, Plaintiffs are informed and believe, and thereon allege, that in the process of handling transactions of Processed Tomato Products for SK Foods, Rahal paid illegal bribes to the purchasing agents for some of these large corporate customers to secure contracts for SK Foods and that Rahal made these illegal bribe payments on behalf of and with SK Foods' and Salyer's knowledge, approval, and direction.  The Artley Declaration also details, and Plaintiffs are informed and believe, and thereon allege, that SK Foods provided money to Rahal with which to bribe purchasing agents.  Plaintiffs are also informed and believe, and thereon allege, that Rahal, in addition to paying bribes for contracts on behalf of SK Foods, also made illegal payments to purchasing agents in order to obtain confidential bid information submitted by Plaintiffs and perhaps other SK Foods competitors.  Plaintiffs are informed and believe and thereon allege that as a result of these bribes, confidential bid information submitted by Plaintiffs was obtained by and shared with the CTEG Defendants.

34.    The Artley Declaration also describes how Rahal would typically identify purchasing agents who were susceptible to bribes by dropping a $100 bill and picking it up and saying, "You must have dropped this, is it yours?"  If the purchasing agent said "yes," then Rahal believed that the purchasing agent was susceptible to bribes.  Plaintiffs are informed and believe, and thereon allege, that Rahal made payoffs through his company, Intramark USA, in an effort to isolate and conceal SK Foods and Salyer from the illegal conduct in case Rahal was caught or sued.  Special Agent Artley concluded in his Declaration, and Plaintiffs also believe, that this concealment shows that Defendants SK Foods, Salyer, Huey, Rahal, and Intramark knew that the bribe payments were illegal.

35.    Based upon the Artley Declaration, Plaintiffs are informed and believe, and thereon allege, that once Rahal got a purchasing agent to accept a bribe, the purchasing agent's loyalty was generally to the SK Defendants and that Rahal took advantage of these

weintraub genshlea chediak
LAW CORPORATION

relationships in order to obtain from the purchasing agent the bid information submitted by SK Foods' competitors, including Plaintiffs.  The SK Defendants and the CTEG Defendants then used the competitor's bid information Rahal illegally obtained from the purchasing agents, including Plaintiffs' bid information, to establish what SK Foods and the other CTEG Defendants would bid.  The Artley Declaration also describes how the SK Defendants did not always submit the lowest bid but were still able to win contracts due to the bribe payments made to the purchasing agent.

36.    On September 24, 2008, the *San Francisco Chronicle* reported that "[f]ederal investigators confirmed Tuesday that they were looking into the possibility that California tomato processors have engaged in price-fixing schemes."  According to the *San Francisco Chronicle* report, "[a] lawyer for one major processor, SK Foods of Lemoore (Kings County), said the government had sought information about price-fixing at the same time FBI and Internal Revenue Service agents served a series of search warrants in the Central Valley in April and seized millions of pages of documents from tomato processors."  The September 24, 2008 story in the *San Francisco Chronicle* also reported that, "Brian Maschler, an attorney for SK Foods, said investigators were also interested in a partnership the company formed in 2006 with Ingomar Packing of Los Banos (Merced County) and Los Gatos Tomato Products of Huron (Fresno County)."

37.    In December 2008, Rahal signed a "Plea and Cooperation Agreement" in which he agreed to enter a plea of guilty to a three-count Information in the United States District Court for the Eastern District of California, <u>United States of America v. Rahal</u>, Case No. 2:08-CR-566 LKK.  In entering his guilty plea, Rahal admitted his part in the scheme for commercial bribery herein alleged, and pleaded guilty to several felonies, including RICO violations, money laundering, antitrust violations, and aiding and abetting.  Rahal also admitted that there was an agreement between him and other leaders, employees, and associates of SK Foods to conduct SK Foods' affairs through a pattern of racketeering activity in the Eastern District of California and elsewhere.  Rahal also admitted that bribes were paid with the knowledge, and

/ / /

weintraub genshlea chediak
LAW CORPORATION

in some instances at the direction of, leaders of SK Foods, which Plaintiffs are informed and believe include Salyer, Huey, and others.

38.   The purchasing agents herein referenced all acted as agents for their respective companies in transactions involving the sale or purchase of Processed Tomato Products in interstate commerce.  As such, each purchasing agent owed a fiduciary duty to the company it represented to act only on that company's behalf, and not on the agent's own behalf.  By accepting a bribe, a purchasing agent is acting on that agent's own behalf and in favor of the purchasing agent's own financial interest, rather than in the interest of the company the agent represented.  Therefore, the making and accepting of a bribe payment, constitutes a payment that corrupts or interferes with the fiduciary duty owed by the purchasing agent to the company he or she represents and deprives the company of the honest service of that purchasing agent.

39.   The Artley Declaration states, and Plaintiffs are informed and believe, and thereon allege, that the corporate customers with whom Rahal sought contracts on behalf of SK Foods all have Code of Conduct policies in place.  Pursuant to these policies, employees, including purchasing agents, are deemed to have a duty to their employers to avoid conflicts of interest and to avoid accepting anything of value which may influence their objectivity on the company's behalf.  At least one company has a policy that provides that employees can never use a competitor's confidential or proprietary information.

40.   The Artley Declaration describes SK Foods, through Rahal and Intramark USA, making bribe payments to "[J.D.]," the purchasing agent for Agusa, in exchange for competitor bid information and to secure contracts for the sale of Processed Tomato Products from SK Foods.  During the Federal Investigation, several telephone calls were intercepted pursuant to Court-authorized wiretaps which confirmed the bribe payments.

41.   On or about July 13, 2007, Rahal told Salyer, during an intercepted telephone call, "I got to see my friend [J.D.] over at Agusa, he's now my best friend, and give him something.  He told me, he's doing exactly what he told me, he's rejecting that Chinese paste left and right."  Salyer responded, "Perfect, but it's small volumes."  Rahal responded, "I know, but we started at zero volume and I don't think we'll ever be a big player in there, I don't think

weintraub genshlea chediak
LAW CORPORATION

the Mendios (owners of Agusa) will ever let us be a big player, unless there's a catastrophe." Salyer then stated, "Unless they start rejecting everybody else's paste, too."  Rahal responded, "You never know what can happen, a little bit of money in the right place can do."

42.     The Artley Declaration also describes, and Plaintiffs are informed and believe, and thereon allege, that a telephone call between Rahal and SK Foods employee, "T.M.," on or about July 18, 2007.   During that call, Rahal confirmed that Agusa had purchased 1,200,000 pounds of tomato paste from SK Foods.  Rahal ended the conversation saying, "OK.  I just wanted to make sure.  If I give him money, I want to make damn sure what the hell I'm paying him for."

43.     The Federal Investigation also involved physical surveillance by federal agents. On or about July 18, 2007, Rahal met with [J.D.], the purchasing agent for Agusa, at a restaurant in Lemoore, California.  During the meeting, Rahal gave [J.D.] a Bank of America envelope containing cash as a bribe payment in connection with the sale of tomato products from SK Foods to Agusa.  Also during this meeting, Rahal asked [J.D.] for a list of his sales customers and the contract prices.  Rahal called [J.D.] on or about July 19, 2007, and asked him to send the information via email.  Rahal also asked [J.D.] to provide financial statements of Agusa, his employer.

44.     As described in the Artley Declaration, on or about April 16, 2008, [J.D.] admitted to federal agents that he accepted cash payments from Rahal related to the purchase of Processed Tomato Products by Agusa from SK Foods.

45.     Plaintiffs are informed and believe, and thereon allege, that SK Foods, through Rahal and Intramark USA, paid bribe payments to [R.T.], the corporate purchasing manager for B&G Foods, in exchange for competitor bid information and to secure contracts for the sale of Processed Tomato Products from SK Foods.

46.     The Artley Declaration states that a telephone call took place between Rahal and [R.T.] on or about June 8, 2007, during which Rahal arranged to pay [R.T.] a bribe of one-half cent per pound of the total quantity of chili peppers and jalapenos that B&G Foods purchased / / /

1  from SK Foods.  Rahal told [R.T.], "I don't know how big your chili purchase is, but it can be a

2  lot of money.  It's your kids' education."

3      47.    The Artley Declaration also describes that Rahal had another telephone

4  conversation with [R.T.] on or about July 12, 2007, and confirmed the prior bribe.  In that

5  telephone conversation, Plaintiffs are informed and believe, and thereon allege, that Rahal

6  stated, "I just want to make sure that you know that you're getting half of that 13 million

7  pounds.  That's yours."  [R.T.] responded, "All right."  Rahal then stated, "That's a penny on

8  13 [million pounds] is $130,000.  So you're getting half of that, make no bones about it."

9  [R.T.] replied, "Okay."

10      48.    The Artley Declaration states, and Plaintiffs are informed and believe, and

11  thereon allege, that SK Foods, through Rahal, paid at least five checks totaling approximately

12  $15,000 to [R.T.], through his wife, as bribes described herein.  Special Agent Artley concludes

13  in his declaration that Rahal attempted to conceal the true identity of the recipient of the illegal

14  bribe payment by making the checks out to [R.T.]'s wife.

15      49.    Plaintiffs are informed and believe, and thereon allege, that SK Foods, through

16  Rahal and Intramark USA, paid or attempted to pay bribe payments to [P.C.], the Director of

17  Agricultural Operations for ConAgra, in exchange for competitor bid information and to secure

18  contracts for the sale of Processed Tomato Products from SK Foods.  Plaintiffs are informed

19  and believe that P.C. provided confidential bid information to SK Foods, Intramark and/or

20  Rahal.

21      50.    As described in the Artley Declaration, sometime prior to December 11, 2006,

22  [P.C.] gave SK Foods, through Rahal, information on bids submitted by Morning Star,

23  Rio Bravo, and Ingomar Packing over the telephone.

24      51.    The Artley Declaration also explains that sometime prior to December 15, 2006,

25  Rahal, on behalf of SK Foods, agreed to pay [P.C.] one cent per pound as a kickback, or

26  illegal bribe, on a ten million pound contract for tomato paste between ConAgra and

27  SK Foods.  The Federal Investigation details how Rahal allegedly paid this bribe using money

28  / / /

weintraub genshlea chediak
LAW CORPORATION

**weintraub** genshlea chediak
LAW CORPORATION

he received from Salyer and/or SK Foods by funneling it through his personal bank account, and may have included Rahal paying certain of [P.C.]'s family expenses.

52.     The Artley Declaration describes how on or about June 15, 2007, a telephone call took place between Rahal and [P.C.] regarding a potential three-year contract between SK Foods and ConAgra.  [P.C.] indicated that ConAgra was reluctant to sign the contract because it thought SK Foods was selling similar products to a competitor, Hatch Chile Company, at a lower price.  Plaintiffs are informed and believe, and thereon allege, that Rahal requested that SK Foods produce a false invoice showing a higher than actual price from SK Foods to Hatch. Plaintiffs are informed and believe, and thereon allege, that an SK Foods employee created an invoice showing a price 39% higher than actual and provided it to Rahal, who in turn provided it to [P.C.] and that ConAgra signed a three-year contract with SK Foods within a week of that invoice being created.  In his Plea and Cooperation Agreement, Rahal admitted that the total price on that contract, on which Plaintiffs were deprived of the opportunity to compete due to the bribe payments made by SK Foods, was $74,570,000.

53.     The Federal Investigation also established, and Plaintiffs are informed and believe, and thereon allege, that the bribes SK Foods paid, or attempted to pay, through Rahal to [P.C.] also were for the purpose of having [P.C.] accept delivery of tomato paste from SK Foods that did not meet ConAgra's specifications.  Plaintiffs are informed and believe, and thereon allege, that on or about March 12, 2008, a telephone call took place between Rahal and SK Foods employee [M.P.].  During this call, Rahal told [M.P.] that, "[P.C.] protects me as best he can and [P.C.] said 'Randy, this thing's getting out of hand.  You gotta [sic] be careful what you're shipping to us.'  We [SK Foods] pack garbage for them anyway and they always take it, but we've hit new lows."  Plaintiffs are informed and believe, and thereon allege, that this exchange was in reference to SK Foods labeling its tomato paste with a higher than actual percentage of soluble solids and mold content in violation of federal laws and its contracts with ConAgra.

54.     Plaintiffs are informed and believe, and thereon allege, that SK Foods, through Rahal and Intramark USA, paid bribe payments to "[J.W.], the Manager, New Products and

1    Analysis Ingredients Purchasing" at Frito-Lay, Inc. to secure contracts for the sale of tomato-

2    based and other food products.

3         55.    As described in the Artley Declaration, on March 3, 2008, a telephone call took

4    place between Rahal and [J.W.], during which Rahal stated:  "I'll tell you what it is working

5    good, is White Oak and this jalapeno thing, and the money is now coming in."   [J.W.]

6    responded, "OK, good."  Rahal concluded, "So [Rahal's bookkeeper] will be here Wednesday

7    . . . we'll just keep doing that, she wants to do it the same way she did before."  Plaintiffs are

8    informed and believe, and thereon allege, that Rahal was telling [J.W.] that since payment was

9    coming to Rahal for the jalapenos, Rahal's bookkeeper would be sending [J.W.] his part of the

10   "payment" in the same manner as bribes/kickbacks were previously paid to [J.W.] on tomato

11   contracts.

12        56.    As described in Rahal's Plea and Cooperation Agreement, Plaintiffs are also

13   informed and believe, and thereon allege, that Rahal, with the knowledge and encouragement

14   of other leaders and employees of SK Foods, paid at least $81,000 in bribes to [J.W.] on

15   SK Foods' behalf in order to secure contracts for SK Foods with Frito-Lay for the sale of

16   tomato-based and other food products at elevated prices.

17        57.    The Artley Declaration states that Salyer and SK Foods, through Rahal and

18   Intramark USA, paid bribe payments to [R.W.], the purchasing agent for Kraft Foods, in

19   exchange for competitor bid information and to secure contracts for the sale of Processed

20   Tomato Products from SK Foods.  In the Plea and Cooperation Agreement, Rahal admits that

21   SK Foods, through Rahal, paid [R.W.] at least $158,000 in illegal bribe payments since 2004

22   to secure Kraft's business and to induce [R.W.] to provide SK Foods with certain confidential,

23   proprietary information of SK Foods competitors, including Plaintiffs.

24        58.    The Artley Declaration describes, and Plaintiffs are informed and believe, and

25   thereon allege, that on or about June 6, 2007, a telephone call took place between Rahal and

26   [R.W.] about an outstanding invoice that Kraft owed to SK Foods.  During the call Rahal told

27   [R.W.] that, "you and I got money in there," meaning that [R.W.] would receive a kickback

28   once the pending invoice was paid by Kraft.

weintraub genshlea chediak
LAW CORPORATION

59.    The Artley Declaration also describes that during another telephone call on June 6, 2007, Rahal told [R.W.] that he would pay for medical insurance for [R.W.]'s daughter. Plaintiffs are informed and believe that this was another offer by the SK Defendants to pay a bribe/kickback to [R.W.]

60.    The Artley Declaration details how during a telephone call on April 2, 2008, Rahal told SK Foods employee [A.H.] that [R.W.] was sending him the offer that Chris Rufer, owner of plaintiff Morning Star, had submitted on a contract proposal to Kraft Foods.   The Artley Declaration describes various measures that Rahal and [R.W.] took to conceal the transfer of this information, and ultimately [R.W.] mailed the information to Rahal directly rather than send it via fax.  Plaintiffs are informed and believe that Defendants' efforts to affirmatively conceal the sender and recipient of Plaintiffs' bid information demonstrate that Defendants were conscious of guilt.

61.    The Artley Declaration also describes a telephone call took place on or about April 9, 2008, during which [R.W.] told Rahal that he needed $20,000 for taxes.  Rahal told [R.W.] that, "the most important thing is you get your taxes … paid.  I have that money.  You don't.  So I'll take care of that and then we'll work through it on, you know, down the road." Rahal later told [R.W.] that he would send him $24,000.

62.    The Artley Declaration confirms that on or about April 16, 2008, [R.W.] admitted to federal agents that he accepted payments from Rahal relating to the purchase of products by Kraft Foods from SK Foods.

63.    The Federal Investigation also established, and Plaintiffs are informed and believe, and thereon allege, that Salyer and SK Foods, through Rahal and Intramark USA, paid bribe payments to [M.C.], the purchasing agent for Safeway, to secure contracts for the sale of tomato products from SK Foods.

64.    The Artley Declaration details that bank records from Intramark show that Rahal paid [M.C.] bribe payments of at least $1,000 each from SK Foods in July 2005, December 2005, July 2007, and other times.

/ / /

Second Amended Complaint

**weintraub** genshlea chediak
LAW CORPORATION

65.     As described in the sworn Artley Declaration, Plaintiffs are informed and believe, and thereon allege, that on or about April 22, 2008, [M.C.] admitted to federal agents that he accepted cash payments from Rahal relating to the purchase of products by Safeway from SK Foods.

66.     In January 2009, James Wahl, Jr. ("Wahl"), Senior Group Manager for Ingredients Purchasing for Frito-Lay North America, Inc. ("Frito-Lay") agreed to plea guilty in an information charging two counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 in the case titled *United States v. Wahl*, Case No. C-09-0040-LKK in the Eastern District of California.  Wahl had the authority to negotiate and enter into contracts for the purchase of Processed Tomato Products for Frito-Lay.  Wahl admitted that, in his capacity at Frito-Lay, he accepted bribes from Rahal, on behalf of SK Foods.  Between 1998 and April 2008, Wahl accepted at least $160,000 in bribes from SK Foods.  In return for the bribes, Wahl ensured that Frito-Lay purchased Processed Tomato Products from SK Foods rather than from certain competitors and also provided SK Foods with information that allowed SK Foods to sell certain food products to Frito-Lay at inflated prices.

67.     On January 27, 2009, Roger Watson ("Watson"), Purchasing Manager for Kraft Foods, Inc. ("Kraft"), agreed to plead guilty to two counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 in the case titled, *United States v. Watson*, Case No. CR-S 09-0035 LKK (E.D. Cal.).  Watson admitted that in his capacity as Kraft's Purchasing Manager, he accepted personal bribes from Rahal on behalf of SK Foods.  Between January 2004 and April 2008, Watson accepted at least $158,000 in bribes from SK Foods.  In return for the bribes, Watson ensured that Kraft purchased Processed Tomato Products from SK Foods rather than from certain competitors and also provided SK Foods with information that allowed SK Foods to sell certain food products to Kraft at inflated prices.

68.     On May 5, 2009, Robert C. Turner, Jr. ("Turner"), corporate purchasing manager for B&G Foods, Inc. ("B&G"), agreed to plead guilty to two counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 in the case titled *United States v. Turner*, Case No. CR 09-0145 LKK (E.D. Cal.).  Turner admitted that, in his capacity as B&G's

weintraub genshlea chediak
LAW CORPORATION

purchasing manager, he accepted personal bribes from Rahal on behalf of SK Foods. Between September 2004 and April 2008, Turner accepted at least $14,700 in bribes from SK Foods.  In return for the bribes, Turner ensured that B&G purchased Processed Tomato Products from SK Foods rather than from certain competitors and also provided SK Foods with information that allowed SK Foods to sell certain food products to B&G at inflated prices.  Prior to his employment at B&G, Turner was employed as a purchasing manager at Nabisco Inc. and accepted approximately $50,000 in bribes from Rahal on SK Foods' behalf in the same manner as his time at B&G.

69.    On or about November 4, 2009, defendant Alan Huey ("Huey") agreed to plead guilty to a one-count Information  charging him with conspiracy to commit an offense in violation of 18 U.S.C. § 371, namely honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and to cause the introduction and delivery for introduction of adulterated and misbranded food into interstate commerce with intent to defraud in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), in the case titled: *United States v. Huey*, Case No. 2:09-CR-468 LKK (E.D. Cal.).  In his guilty plea, Huey admitted that he knew about the bribes paid by Rahal on SK Foods' behalf to the purchasing agents of several of SK Foods' customers as described above and that he benefitted from these bribes, by among other things, receiving confidential and proprietary bid and pricing information of SK Foods' competitors and using this information to help determine pricing and enjoying greater flexibility in contracting terms.

70.    Huey, in his plea agreement, also admitted that on April 2, 2008, he engaged in a phone conversation with Rahal in which Huey instructed Rahal to forward him Morning Star's contract offer to Kraft for the sale of tomato products to Kraft.  On April 7, 2008, after Rahal had received Morning Star's contract offer to Frito-Lay from Wahl, Rahal forwarded this Morning Star's confidential contract offer to Huey and "other senior SK Foods leaders."

71.    On January 6, 2010, the U.S. Government filed an Information against Michael Chavez ("Chavez") in the case styled *United States v. Chavez*, Case No. 2-10-CR-0002-LKK, alleging two counts of wire fraud in violation of 18 U.S.C. §§ 1343 *et seq*.  According to the Information, Chavez served as a corporate purchasing manager for Safeway, Inc. and received

weintraub genshlea chediak
LAW CORPORATION

{1270631.DOC;}

Second Amended Complaint

1   bribe payments in the amount of of at least $5,000 between May 2005 and October 2007 in

2   return for ensuring that Safeway purchased processed tomato products from SK Foods rather

3   than from certain competitors of SK Foods, including Plaintiffs.   On or about January 20,

4   2010, Chavez agreed to plead guilty to the Information charging him with two counts of wire

5   fraud in violation of 18 U.S.C. § 1343.  In his plea, Chavez admitted that, between May 2005

6   and October 2007, he accepted approximately $5,000 in personal bribe payments from Rahal

7   on behalf of SK Foods.   Chavez further admitted that, in return for the personal bribe

8   payments, he agreed to, and did, ensure that Safeway purchased Processed Tomato Products

9   from SK Foods rather than from SK Foods' competitors.

10   **CTEG Price-Fixing, Bid Rigging and Market Allocation Conspiracy**

11        72.    Plaintiffs are informed and believe, and thereon allege, that since approximately

12   late 2005, the CTEG Defendants conspired together and with unnamed co-conspirators to fix

13   the prices of their Processed Tomato Products at supra-competitive levels, rig bids and allocate

14   market share between them.  This conspiracy was motivated by several factors.

15        73.    Plaintiffs are informed and believe, and thereon allege, that by late 2005,

16   SK Foods encountered certain marketplace challenges.   Because SK Foods was a non-

17   integrated producer of Processed Tomato Products, it was required to purchase its tomatoes

18   from tomato farmers.  In or about 2003-2004, SK Foods unsuccessfully attempted to purchase

19   its competitor, Ingomar, which was vertically integrated and owned tomato farms.

20        74.    Plaintiffs are informed and believe, and thereon allege, that in or about 2004 or

21   2005, SK Foods encountered difficulties with J. G. Boswell Co. ("Boswell") with which it had

22   long-term contracts to purchase tomatoes.  Boswell had decided to process its own tomatoes

23   (opening its own processing facility in Bakersfield, California) and reduced the amount of

24   tomatoes it would sell to SK Foods.

25        75.    Plaintiffs are informed and believe, and thereon allege, that at about this same

26   time, as the push increased for ethanol production, many farmers who had historically grown

27   tomatoes switched to corn which further reduced the supply of tomatoes and raised prices.

28   / / /

weintraub genshlea chediak
LAW CORPORATION

76.     Plaintiffs are informed and believe, and thereon allege, that it was in the context of these circumstances that the CTEG Defendants decided in 2005 to create CTEG, as a vehicle through which to agree on prices for Processed Tomato Products, rig bids and allocate market share (i.e. customers and/or territories) between them.

**CTEG Is Formed.**

77.     In or around 2005, the CTEG Defendants decided to form CTEG originally as a joint venture for the stated purpose to arrange the sale of Processed Tomato Products overseas.  However, Plaintiffs are informed and believe, and thereon allege, that the true purpose of CTEG's formation was to create a vehicle for the CTEG Defendants to agree on <u>domestic</u> U. S. prices for the sale of Processed Tomato Products.

78.     Plaintiffs are informed and believe and thereon allege that Salyer of SK Foods was the mastermind behind CTEG and envisioned it as a vehicle to control the marketplace and eventually "crush" competitors such as Plaintiffs.  Salyer joined with Pruett of Ingomar and Woolf of Los Gatos to create CTEG.   Roger Wasson ("Wasson"), a consultant in the agricultural industry, was appointed as CTEG's executive director.  CTEG applied for an Export Trade Certificate of Review ("ETCR") from the U. S. Department of Commerce in December 2005 and listed SK Foods, Ingomar, and Los Gatos as its members.  The primary contact listed on the application was Wasson.

79.     CTEG's application was granted on February 10, 2006, and CTEG eventually received grant monies from the Commerce Department.

80.     Plaintiffs are informed and believe, and thereon allege, that in or about late 2005, before CTEG had been granted its ETCR, Salyer, Pruett, and Woolf reached an agreement to fix prices of their Processed Tomato Products, and specifically tomato paste and diced tomatoes, which included the following terms:

(a)     Salyer, Pruett, and Woolf would agree on the prices SK Foods, Ingomar, and Los Gatos would charge for tomato paste and diced tomatoes;

/ / /

/ / /

(b)     Salyer, Pruett, Woolf agreed that SK Foods, Ingomar, and Los Gatos would not compete for each other's respective "Legacy" accounts, that is, those accounts which each company had with a long-standing customer; and

(c)     Salyer, Pruett, and Woolf agreed that, where SK Foods, Ingomar and/or Los Gatos had "shared" Legacy accounts, they would not compete for each other's share of that customer's business.

81.     The Artley Search Warrant Affidavit states, and Plaintiffs are informed and believe and thereon allege, that in or about April 12, 2006, the CTEG Defendants met to discuss, among other things, an agreement regarding the prices for the domestic sales of their tomato products; customer information regarding price quotes and quantities; and a "downside" price, i.e., an agreed-upon floor for domestic prices.

82.     As described in the Artley Search Warrant Affidavit, Plaintiffs are informed and believe and thereon allege that in or about March 2007, the CTEG Defendants met and agreed that they would not compete against each other, especially when competing with Plaintiffs and that they would submit bids within an agreed to price range and would exchange a matrix that would identify their respective customers to further their price fixing, bid rigging and market allocation scheme.

83.     Plaintiffs are informed and believe and thereon allege that, as the Artley Search Warrant Affidavit describes, the CTEG Defendants discussed the need to develop a matrix to determine which customers were prior customers of which CTEG member(s) or of Plaintiffs' to enable the market allocation and bid rigging scheme and allow the CTEG Defendants to focus on competing for Plaintiffs' customers and not their own.

84.     For instance, Plaintiffs are informed and believe, and thereon allege, as the Artley Search Warrant Affidavit details, that in or about April 2007, the CTEG Defendants obtained plaintiffs' confidential bid proposal as a result of the bribery scheme and thereby learned that Morning Star had bid $.35/lb. for a contract to sell tomato paste to Kraft. Plaintiffs are informed and believe and thereon allege that (1) Kraft was a legacy account of SK Foods and Ingomar; (2) the CTEG Defendants were advised that Kraft would still award the

contract to one or more of the CTEG Defendants for $.36/lb. as long as not other submitted bids were below $.36/lb.; (3) the CTEG Defendants submitted rigged bids of at least $.36/lb. to Kraft; and (4) SK Foods and Ingomar were awarded the contract as part of their legacy accounts despite Morning Star having submitted the lower bid.

85.    On at least one occasion, Plaintiffs are informed and believe, and thereon allege, that the CTEG Defendants submitted bids to sell tomato paste to a customer which was one of SK Foods' Legacy accounts.  When SK Foods learned that one of the other CTEG members, Los Gatos, had underbid SK Foods, Woolf agreed on Los Gatos' behalf to withdraw the bid in furtherance of the conspiracy to fix prices, rig bids and allocate market share.

86.    Plaintiffs are also informed and believe, and thereon allege, that throughout the conspiracy, Wasson was used as an intermediary to communicate pricing information among CTEG's members, including delivering price information on certain bids submitted to ConAgra Foods in or about 2007, including a bid submitted by Plaintiffs.

87.    Plaintiffs are also informed and believe, and thereon allege, that Salyer, Pruett, and Woolf would typically meet in connection with industry-related conventions, such as the California Tomato Growers Association and the California League of Food Processors, during which they would confirm their agreement on the price for Processed Tomato Products.

88.    As described above, Rahal and Intramark, on SK Foods' and Salyer's behalf, would bribe the purchasing agents of the various customers, including the Legacy accounts as defined by CTEG, so that the customer would purchase Processed Tomato Products from SK Foods or one of the other CTEG Defendants and provide pricing information of other competitors, such as Plaintiffs, to SK Foods, which would share that information with the other CTEG Defendants.  The bribes also allowed Rahal, Salyer, and SK Foods to monitor and "police" the price-fixing and market allocation conspiracy between the CTEG Defendants. Plaintiffs are informed and believe, and thereon allege, that CTEG Defendants, as part of the price-fixing conspiracy, were aware that the SK Defendants were bribing customers, in part, to obtain other competitors', including Plaintiffs', confidential bids in furtherance of the price-fixing, bid rigging and market allocation conspiracy.

weintraub genshlea chediak
LAW CORPORATION

89.     As the government pleadings and the guilty pleas described above demonstrate, and as described above, there was a conspiracy among the CTEG Defendants to fix prices for Processed Tomato Products, submit rigged bids and allocate customers among the conspirators.   This conspiracy was effectuated through:   (a) CTEG, of which SK Foods, Ingomar, and Los Gatos were members; (b) direct conspiratorial meetings and communications, including meetings and communications to exchange prices of, and agree on prices for, Processed Tomato Products; and (c) use of customers' purchasing agents (including those receiving bribes from Rahal and Intramark) to (i) police the conspiracy and (ii) learn what prices for Processed Tomato Products nonparticipants in the conspiracy were charging so that the conspirators' prices could be adjusted accordingly and rigged bids submitted.

Equitable Tolling and Fraudulent Concealment

90.     Plaintiffs had no knowledge of the combination and conspiracy alleged herein or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to August 14, 2008, when it was publicly revealed that the DOJ was investigating possible price-fixing of Processed Tomato Products.

91.     Plaintiffs could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence, because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations as alleged above.

92.     To that end, as late as November 2008, Salyer was giving an interview to *Tomato News* magazine wherein he falsely asserted that SK Foods had not committed any illegal conduct and had not engaged in any price-fixing.

93.     As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting the causes of action by Plaintiffs.

/ / /

/ / /

/ / /

weintraub genshlea chediak
LAW CORPORATION

## FIRST CLAIM FOR RELIEF

### (Violations of the Robinson-Patman Act, 15 U.S.C. § 13(c))

### (Against SK Defendants)

94.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Second Amended Complaint as if set forth in full.

95.    At all relevant times, Plaintiffs were competitors of SK Foods in the market for Processed Tomato Products, including tomato paste.  Both Plaintiffs and SK Foods sold Processed Tomato Products in interstate commerce.  At all relevant times, Plaintiffs desired to compete with, and did attempt to compete with SK Foods on contracts for the sale of Processed Tomato Products in interstate commerce to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.

96.    Plaintiffs are informed and believe, and thereon allege, that as detailed in the Artley Declaration, the plea and cooperation agreements of Turner, Wahl, Watson, Rahal Huey, and Chavez, the SK Defendants made bribe payments to the purchasing agents for companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others, in connection with the purchase of Processed Tomato Products from SK Foods in interstate commerce.  Plaintiffs are further informed and believe, and thereon allege, that Salyer, Intramark USA, and Rahal all participated in making these bribe payments on behalf of SK Foods.

97.    Rahal admitted in his Plea and Cooperation Agreement that the bribe payments made by SK Foods to the purchasing agents for the purchasing companies were in direct contravention of the conflict of interest policies of the purchasing companies and deprived the purchasing companies of the right to the purchasing agents' honest services.  Thus, these bribe payments corrupted the fiduciary relationships between the purchasing companies and their purchasing agents involving the sale of tomato products in interstate commerce.  Moreover, Plaintiffs are informed and believe, and thereon allege, that the purchasing agents did not provide any legitimate service to the SK Defendants for the illegal bribes they received.

/ / /

weintraub genshlea chediak
LAW CORPORATION

98.   The SK Defendants' pattern and practice of making bribe payments to purchasing agents described above resulted in a decrease in competition for the Processed Tomato Products due to SK Foods (and possibly Ingomar and Los Gatos) being awarded the contracts without true competition.  As a direct and proximate result of the SK Defendants' conduct as described herein, Plaintiffs have been unable to compete effectively for contracts for the sale of Processed Tomato Products to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.  At all times, Plaintiffs have been ready to, and have attempted to, compete with SK Foods (as well as Ingomar and Los Gatos) for these contracts.  The SK Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others and, as a result, Plaintiffs have been injured in their business or property.

99.   This scheme of commercial bribery in connection with the sale of products in interstate commerce by the SK Defendants is a per se violation of section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), thereby entitling Plaintiffs to recover threefold their damages, the cost of suit, and reasonable attorneys' fees pursuant to statute, 15 U.S.C. § 15(a).

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### (Violations of the Sherman Act, 15 U.S.C. § 1)

### (Against the CTEG Defendants)

100.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Second Amended Complaint as if set forth in full.

101.   Plaintiffs are informed and believe, and thereon allege, that beginning no later than February 2006, and continuing until at least April 2008, the CTEG Defendants and other co-conspirators agreed and conspired with each other and with various purchasing agents to participate in a pattern of collusive bidding practices designed to eliminate competition in the market for Processed Tomato Products by allocating contracts to SK Foods, Ingomar, and Los Gatos without true competition, and to rig bids for Processed Tomato Products.   The primary purpose of this conspiracy was to eliminate competition, including competition from

weintraub genshlea chediak
LAW CORPORATION

Plaintiffs, fix prices, and allocate customers in the market of Processed Tomato Products sold in the United States.

102.   The Processed Tomato Products sold by one or more of the conspirators traveled in interstate commerce.   The business activities of the CTEG Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce.

103.   Plaintiffs are informed and believe, and thereon allege, that pursuant to the above-described agreement, the CTEG Defendants and their co-conspirators submitted artificially inflated bids and price quotations.  Defendants and the co-conspirators ensured that SK Foods' bids (and possibly the bids of Ingomar and Los Gatos) would be the winning bids by paying illegal bribes to the purchasing agents.  The SK Defendants also acted to enforce the agreements among the CTEG Defendants by paying illegal bribes to obtain and distribute information about bids submitted by non-conspiring competitors, including Plaintiffs, for the same contracts.  Plaintiffs are informed and believe, and thereon allege, that this improperly obtained bid information was shared with all the SK Defendants and the CTEG Defendants, who used this information in preparing their own bids and in furtherance of the price fixing conspiracy.

104.   The CTEG Defendants' agreement to use illegal bribes and/or to fix prices and/or allocate purchasers of Processed Tomato Products was intended to reduce competition in the market for Processed Tomato Products alleged herein, and the carrying out of that agreement, caused antitrust injury in the form of a reduction in competition in the market in the United States for Processed Tomato Products and an increase in prices paid by consumers of Processed Tomato Products.

105.   The actions of the CTEG Defendants described herein caused actual injury to Plaintiffs in that Plaintiffs were not awarded contracts they otherwise would have been awarded absent the price-fixing agreement described herein.  The CTEG Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay Kraft Foods, Safeway, and others and, as a result, Plaintiffs have been injured in their business or property.

weintraub genshlea chediak
LAW CORPORATION

1    106.   The CTEG Defendants' actions herein described constitute a violation of the

2    Sherman Act, 15 U.S.C. § 1, thereby entitling Plaintiffs to recover threefold their damages, the

3    cost of suit, and reasonable attorneys' fees pursuant to statute, 15 U.S.C. § 15(a).

4                              THIRD CLAIM FOR RELIEF

5                     (Violations of RICO, 18 U.S.C. § 1962(c))

6                              (Against All Defendants)

7    107.   Plaintiffs reallege and incorporate herein by reference each and every foregoing

8    paragraph of this Second Amended Complaint as if set forth in full.

9    The RICO Enterprise

10   108.   Defendants SK Foods, Intramark, Ingomar, Los Gatos, and SK PM, and their

11   leaders, including Salyer, Huey, Rahal, Pruett, and Woolf, constitute an "enterprise" associated

12   in fact as defined in 18 U.S.C. § 1961(4), referred to hereinafter as the "SK/CTEG Enterprise."

13   Salyer, Rahal, Huey, SK Foods, SK PM, Intramark, Ingomar, Los Gatos, Pruett, and Woolf, and

14   other unnamed conspirators were leaders, employees, and associates of the SK/CTEG

15   Enterprise.   Plaintiffs are informed and believe, and thereon allege, that Salyer, Pruett, and

16   Woolf directed the activities of the SK/CTEG Enterprise, which consisted of selling Processed

17   Tomato Products in interstate commerce.   Plaintiffs are informed and believe, and thereon

18   allege, that Rahal and Huey carried out the orders and directions of Salyer and  others, which

19   included using Intramark to arrange the sales of tomato products on behalf of one or more of

20   the CTEG Defendants with and without the use of commercial bribes.

21   Pattern of Racketeering Activity

22   Violations of California Penal Code Section 641.3, Commercial Bribery

23   109.   The acts of commercial bribery as described above are chargeable as violations

24   of California Penal Code section 641.3, New Jersey Statutes Annotated section 2C:21-10,

25   Texas Penal Code section 32.43, and are punishable by imprisonment in the state prison for

26   more than one year.   The acts of commercial bribery as described above are also predicate

27   offenses constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

28   / / /

weintraub genshlea chediak
LAW CORPORATION

1    <u>Violations of the Travel Act, 18 U.S.C. § 1952</u>

2         110.   As alleged herein, the SK Defendants repeatedly used the mail and telephone,

3    services in interstate commerce, in carrying out the acts of commercial bribery between the

4    years 2004 and 2008.

5         111.   Each use of the mail and telephone by the SK Defendants to promote, manage,

6    establish, or carry on the unlawful activity, i.e., the scheme of commercial bribery herein

7    alleged, constitutes a violation of the Travel Act, 18 U.S.C. § 1952.   These Travel Act

8    violations are also predicate offenses constituting "racketeering activity" under RICO,

9    18 U.S.C. § 1961(1).

10   <u>Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(3)(C)</u>

11        112.   Plaintiffs are informed and believe, and thereon allege, that for each of the years

12   from at least 2004 to 2008 relevant herein, Intramark received a wire transfer from SK Foods

13   in the approximate amount of at least $600,000.   Plaintiffs are informed and believe, and

14   thereon allege, that these transfers were the proceeds from, or were traceable to the proceeds

15   from, specified unlawful activity, namely the herein described scheme of commercial bribery in

16   violation of California Penal Code section 641.3.

17        113.   Plaintiffs are informed and believe, and thereon allege, that Rahal and Intramark

18   used these funds, or some of them, to make the herein described bribe payments to various

19   purchasing agents on behalf of the SK Defendants and  the CTEG Defendants.  In his Plea and

20   Cooperation Agreement, Rahal admitted that he knew the funds were the proceeds from, or

21   were traceable to the proceeds from, specified unlawful activity, namely the herein described

22   scheme of commercial bribery in violation of California Penal Code section 641.3.   Plaintiffs

23   are informed and believed, and thereon allege, that Salyer, the other SK Defendants and the

24   CTEG Defendants also shared this knowledge.

25        114.   In his Plea and Cooperation Agreement, Rahal admitted, and Plaintiffs are

26   informed and believe, and thereon allege, that the funds transferred between SK Foods and

27   Intramark were transferred with the intent to promote the carrying on of the specified unlawful

28   activity, namely commercial bribery.

**weintraub** genshlea chediak
LAW CORPORATION

115.   The above-described conduct of the SK Defendants, and each of them, constitutes money laundering in violation of 18 U.S.C. § 1956, Laundering of Monetary Instruments.  This violation of 18 U.S.C. § 1956 is listed as a predicate offense in the definition of "racketeering activity" in the RICO Act, 18 U.S.C. § 1961(1).

Mail Fraud and Wire Fraud, 18 U.S.C. §§ 1341, 1343

116.   As described herein, Defendants used the mails in furtherance of their scheme of commercial bribery.  For instance, on or about April 2, 2008, Kraft Foods buyer, **[R.W.]**, mailed confidential bid information for a pending contract with Kraft Foods to Rahal.  This information was part of Defendants' scheme of commercial bribery and was part of the Defendants' scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in which the Defendants used or caused others to use the mails in violation of 18 U.S.C. § 1341.

117.   Plaintiffs are also informed and believe, and thereon allege, that on multiple occasions between 2006 and 2008, the CTEG Defendants used, or caused to be used, the mails and/or wires to send, receive and share the unlawfully obtained confidential bidding information of other competitors, including Plaintiffs, in furtherance of their scheme to obtain money or property by means of false and fraudulent pretenses, representations, or promises. Plaintiffs are also informed and believe, and thereon allege, that on multiple occasions between 2006 and 2008, the CTEG Defendants used, or caused to be used, the mails and/or wires in furtherance of their unlawful scheme to submit rigged bids to prospective customers, including but not limited to, Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.

118.   For instance, Plaintiffs are informed and believe and thereon allege, as the Artley Search Warrant Affidavit details, in or about April 2007, the CTEG Defendants, as a result of the bribery scheme, were informed that Morning Star had bid $.35/lb. for a contract to sell tomato paste to Kraft.  Kraft had been a long-time customer of Plaintiffs.  Plaintiffs are informed and believe and thereon allege that (1) the CTEG Defendants agreed that Kraft would be a legacy account of SK Foods and Ingomar; (2) the CTEG Defendants were advised

1    that Kraft would still award the contract to one or more of the CTEG Defendants for $.36/lb.

2    as long as no other submitted bids were below $.36/lb.; (3) the CTEG Defendants submitted

3    rigged bids of at least $.36/lb. to Kraft; and (4) SK Foods and Ingomar were awarded the

4    contract as part of their legacy accounts despite Morning Star having submitted the lower bid.

5         119.   On another occasion, Plaintiffs are also informed and believe and thereon

6    allege, as detailed in the Artley affidavits, that in or about April 2008, Morning Star submitted

7    a bid to sell Processed Tomato Products to Frito-Lay and that as a result of bribe payments to

8    Frito-Lay's purchasing agent, Morning Star's confidential bid information was provided to and

9    shared among the CTEG Defendants; that the CTEG Defendants used the mails and wires to

10   submit rigged bids to Frito-Lay; that the CTEG Defendants agreed that Frito-Lay was a legacy

11   account of SK Foods and Ingomar; and that one or more of the CTEG Defendants, and not

12   Morning Star, was awarded the Frito-Lay contract as a result of the bribe payments, the turn-

13   over of Plaintiffs' bid information to the CTEG Defendants and the CTEG Defendants' scheme

14   to fix prices, rig bids and allocate customers.

15        120.   Plaintiffs are informed and believe and thereon allege, that the CTEG

16   Defendants also obtained Plaintiffs' confidential bid information from at least two purchasers of

17   Processed Tomato Products, Agusa and ConAgra, and used this unlawfully obtained

18   information to submit rigged bids in furtherance of the scheme to fix prices, rig bids and

19   allocate customers, all to Plaintiffs' detriment.

20        121.   Plaintiffs are informed and believe, and thereon allege, that the CTEG

21   Defendants also repeatedly used, or caused others to use, wire communications in interstate

22   commerce for the purpose of executing the scheme or artifice devised by the CTEG Defendants

23   to defraud or for obtaining money or property by means of false or fraudulent pretenses,

24   representations, or promises in violation of 18 U.S.C. § 1343.  For instance, Rahal repeatedly

25   used the telephone to communicate with Salyer, Huey, and other SK Foods employees, and

26   various purchasing agents to arrange for bribe payments to be paid to the purchasing agents

27   as alleged herein.  The CTEG Defendants used the mails and wires to submit rigged bids to

28   Kraft, Frito-Lay, and other purchasers of Processed Tomato Products as described above.

weintraub genshlea chediak
LAW CORPORATION

122.   The above-described conduct of Defendants constitutes a pattern of racketeering activity as defined in RICO.  18 U.S.C. § 1961(5).

123.   As described herein, Defendants, and each of them, have conducted or participated in, directly or indirectly, the conduct of the SK/CTEG Enterprise's affairs through a pattern or racketeering activity in violation of 18 U.S.C. § 1962(c).  Plaintiffs are informed and believe, and thereon allege, as Rahal admits in his Plea and Cooperation Agreement, that there was an agreement between Rahal and other leaders, employees and associates of SK Foods, including Salyer, to conduct the SK/CTEG Enterprise's affairs through a pattern or racketeering activity.

124.   As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have been unable to compete for contracts for the sale of tomato products to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others. Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others, and as a result, Plaintiffs have been therefore injured in their business or property by reason of the above-described violation of 18 U.S.C. § 1962(c).  For instance, as alleged above, Plaintiffs are informed and believe and thereon allege that the CTEG Defendants were awarded contacts by Kraft and Frito-Lay for the sale of Processed Tomato Products despite the fact that Morning Star had submitted lower bids for these contracts and would have won the contracts but for the CTEG Defendants' unlawful conduct described above.  Plaintiffs are thus entitled to recover threefold the damages they have sustained, plus their costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

### (Against All Defendants)

125.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Second Amended Complaint as if set forth in full.

weintraub genshlea chediak
LAW CORPORATION

126.   Plaintiffs are informed and believe, and thereon allege, that Defendants, and each of them, conspired and agreed with each other to conduct or participate in, directly or indirectly, the conduct of the SK/CTEG Enterprise's affairs through the pattern of racketeering activity herein described.  In his Plea and Cooperation Agreement, Rahal admits that there was an agreement between himself and other leaders, employees and associates of SK Foods to conduct the enterprise's affairs through a pattern or racketeering activity.  Specifically, as detailed above, Rahal participated in telephone calls with Salyer, Huey, and other SK Foods officers and employees regarding the scheme to make bribe payments to purchasing agents for various companies.  The SK Defendants, and each of them, agreed to the scheme to make bribe payments to the purchasing agents to secure contracts for the sale of tomato products from SK Foods.  Plaintiffs are informed and believe, and thereon allege, that the SK Defendants and the CTEG Defendants, and each of them, were aware of the bribe payments and agreed to the scheme to defraud through the use of the unlawfully obtained confidential bid information of other competitors by rigging bids, fixing prices and allocating customers, and agreeing to use the wires and mails to effectuate this unlawful scheme.

127.   Plaintiffs are informed and believe, and thereon allege, that Defendants committed several overt acts in furtherance of the conspiracy, including but not limited to SK Foods' wiring approximately $600,000 each January for use in making bribe payments, Rahal's contacting purchasing agents and offering the purchasing agent a $100 bill to test whether the purchasing agent was susceptible for bribe payments, Rahal actually making bribe payments to the above-named purchasing agents; and the CTEG Defendants' using the mails and wires to submit rigged bids to Processed Tomato Products purchasers in furtherance of their unlawful scheme.

128.   By conspiring with each other to conduct or participate in, directly or indirectly, the conduct of the SK/CTEG Enterprise's affairs through the pattern of racketeering activity herein described,  Defendants, and each of them, have violated 18 U.S.C. § 1962(d).

129.   As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have been unable to compete for contracts for the sale of Processed Tomato Products

weintraub genshlea chediak
LAW CORPORATION

to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others.   Defendants' conduct, as herein described, has caused Plaintiffs to lose sales to companies such as Agusa, B&G Foods, ConAgra, Frito-Lay, Kraft Foods, Safeway, and others and, as a result, Plaintiffs have been therefore injured in their business or property by reason of the above-described violation of 18 U.S.C. § 1962(d).   For instance, Plaintiffs are informed and believe, and thereon allege, that one or more of the CTEG Defendants were awarded contracts to sell Processed Tomato Products to Kraft and Frito-Lay, despite Morning Star having submitted a lower bid, as a result of the unlawful conduct described above.   Plaintiffs are thus entitled to recover threefold the damages they have sustained, plus their costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs pray for judgment as set forth below.

PRAYER

AS TO THE FIRST CLAIM FOR RELIEF

(Antitrust Violations of the Robinson-Patman Act)

(Against SK Defendants)

1.     for an order requiring Defendants, and each of them, to show cause, if any they have, why they should not be enjoined as hereinafter set forth, during the pendency of this action;

2.     for a temporary restraining order, a preliminary injunction, and a permanent injunction, all requiring Defendants, and each of them, and their respective officers, directors, agents, attorneys, servants and employees, and all persons acting under, in concert with, or for them:

(a)     to refrain from making bribe payments to purchasing agents for any company in connection with the purchase or sale of tomato products in interstate commerce; and

(b)     to refrain from requesting or receiving bid information from purchasing agents regarding bids submitted by non-conspiring competitors in connection with contracts for the sale or purchase of tomato products in interstate commerce;

weintraub genshlea chediak
LAW CORPORATION

3.      for general damages and the amount necessary to prevent the unjust enrichment of Defendants, trebled according to statute, 15 U.S.C. § 15(a);

4.      for punitive and exemplary damages;

5.      for prejudgment interest according to statute, 15 U.S.C. § 15(a); and

6.      for Plaintiffs' reasonable attorneys' fees according to statute, 15 U.S.C. § 15(a).

**AS TO THE SECOND CLAIM FOR RELIEF**

**(Antitrust Violations of the Sherman Act)**

**(Against the CTEG Defendants)**

7.      for an order requiring Defendants, and each of them, to show cause, if any they have, why they should not be enjoined as hereinafter set forth, during the pendency of this action;

8.      for a temporary restraining order, a preliminary injunction, and a permanent injunction, all requiring Defendants, and each of them, and their respective officers, directors, agents, attorneys, servants and employees, and all persons acting under, in concert with, or for them:

(a)      to refrain from making bribe payments to purchasing agents for any company in connection with the purchase or sale of tomato products in interstate commerce; and

(b)      to refrain from requesting or receiving bid information from purchasing agents regarding bids submitted by non-conspiring competitors in connection with contracts for the sale or purchase of tomato products in interstate commerce;

9.      for general damages and the amount necessary to prevent the unjust enrichment of Defendants, trebled according to statute, 15 U.S.C. § 15(a);

10.     for punitive and exemplary damages;

11.     for prejudgment interest according to statute, 15 U.S.C. § 15(a); and

12.     for Plaintiffs' reasonable attorneys' fees according to statute, 15 U.S.C. § 15(a).

/ / /

/ / /

**weintraub** genshlea chediak
LAW CORPORATION

### AS TO THE THIRD AND FOURTH CLAIMS FOR RELIEF

### (RICO AND CONSPIRACY TO VIOLATE RICO)

### (Against All Defendants)

13.  for general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

14.  for prejudgment interest according to statute; and

15.  for Plaintiffs' reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

### AS TO ALL CAUSES OF ACTION

### (Against All Defendants)

16.  for costs of suit; and

17.  for such other and further relief as the Court may deem just and proper.


Dated: December 6, 2010                    Respectfully submitted,

                                           **WEINTRAUB GENSHLEA CHEDIAK**
                                           Law Corporation


                                           By:    /s/  Dale C. Campbell
                                                  Dale C. Campbell
                                                  State Bar No. 99173

                                           Attorneys for Plaintiffs
                                           The Morning Star Packing Company,
                                           Liberty Packing Company, LLC, California
                                           Fruit and Tomato Kitchens, LLC, and
                                           The Morning Star Company

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury provided by Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 6, 2010                    Respectfully submitted,

                                           **WEINTRAUB GENSHLEA CHEDIAK**
                                           Law Corporation

                                           By:____/s/  Dale C. Campbell_____
                                                  Dale C. Campbell
                                                  State Bar No. 99173

                                                  Attorneys for Plaintiffs
                                                  The Morning Star Packing Company,
                                                  Liberty Packing Company, LLC, California
                                                  Fruit and Tomato Kitchens, LLC, and
                                                  The Morning Star Company