IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THE MORNING STAR PACKING
COMPANY, et al.,

      Plaintiffs,                              Civ. No. S-09-0208 KJM EFB

  vs.

SK FOODS, L.P., et al.,                         ORDER

      Defendants.
_____/

      Defendants Ingomar Packing Company, Los Gatos Tomato Products, Stuart Woolf and Greg Pruett (defendants) have filed a motion to dismiss the RICO, RICO conspiracy and Sherman Acts claims in the seconded amended complaint (SAC) filed by plaintiffs Morning Star Packing Company LP, Liberty Packing Company, LLC, California Fruit and Tomato Kitchens, LLC and the Morning Star Company (plaintiffs). The motion was submitted without argument. L.R. 230(g).

I. Background

      The backdrop to this litigation is the FBI's investigation of defendant SK Foods and Scott Salyer, its owner, for alleged price-fixing and bribery in the processed tomato product industry. Plaintiffs, also producers of processed tomato products, allege generally that SK's manipulation of the processed tomato market has harmed them civilly.

1

Defendants Ingomar Packing Company, Los Gatos Tomato Products, Greg Pruett and Stuart Woolf brought a motion to dismiss plaintiffs' first amended complaint (FAC), which alleged that defendants' conduct violated the Sherman Act, the Racketeering Influenced and Corrupt Organizations Act (RICO), and California common law unfair competition as well as California Business and Professions Code § 17000 *et seq*. The court denied the motion as to plaintiffs' Sherman Act claims, but granted it as to the California common law and statutory claims as well as the RICO cause of action. ECF No. 115. It noted that plaintiffs had not sufficiently pleaded that the RICO violations proximately caused their injuries. *Id.* at 12.

On December 10, 2010, plaintiffs filed a second amended complaint, alleging violations of the Sherman Act against defendants SK Foods, Scott Salyer, Randall Rahal, Intramark USA, Ingomar Packing, Greg Pruett, Los Gatos Tomato Products and Stuart Woolf, all of whom the complaint groups as the CTEG defendants, and RICO and conspiracy to violate RICO against all defendants. SAC, ECF No. 116 ¶ 16.[1] Defendants have filed a motion to dismiss the SAC, arguing that the SAC fails to state a claim as to the RICO and RICO conspiracy and Sherman Act claims.

II. <u>Standards For A Motion To Dismiss</u>

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." A court may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990).

/////

/////

---

[1] The SAC includes a claimed violation of the Robinson-Patman Act, 15 U.S.C. § 13(c), which is not alleged against these defendants. In addition, the action against defendant Salyer is stayed because of a pending bankruptcy action.

Although a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," ( Fed. R. Civ. P. 8(a)(2)), in order to survive a motion to dismiss this short and plain statement "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___ U.S.___, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action.'" *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950. Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint and the dispositive issues of law in the action. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In making this context-specific evaluation, this court must construe the complaint in the light most favorable to the plaintiff and accept as true the factual allegations of the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). This rule does not apply to "'a legal conclusion couched as a factual allegation,'" (*Papasan v. Allain*, 478 U.S. 265, 286 (1986) (quoted in *Twombly*, 550 U.S. at 555), nor to "allegations that contradict matters properly subject to judicial notice" or to material attached to or incorporated by reference into the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001). A court's consideration of documents attached to a complaint or incorporated by reference or matter of judicial notice will not convert a motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003); *Parks School of Business v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *compare Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002) (noting that even though court may look beyond pleadings on motion to dismiss, generally court is limited to face of the complaint on 12(b)(6) motion).

III. <u>RICO and RICO Conspiracy Claims</u>

      Plaintiffs and defendants are in the business of turning tomatoes into processed tomato products, such as tomato paste and pasta sauce. SAC ¶¶ 24-25. The products are generally sold to large corporate purchasers, such as Kraft Foods, Frito-Lay, and Safeway, which employ purchasing agents to undertake the competitive bidding system for the products. SAC ¶¶ 26-28. Because a single contract typically involves millions of pounds of processed tomato products, even a small pricing difference will affect the total cost of the contract and influence a buyer's decision. SAC ¶ 24.

      Plaintiffs allege that Randall Rahal, a sales broker for SK Foods, paid bribes to purchasing agents for large corporate customers, with Salyer's and SK's knowledge, to secure contracts for SK Foods and to receive confidential information about plaintiffs' bids, which defendants then used to structure their own bids. SAC ¶¶ 33, 35, 69-70.

      In addition, plaintiffs assert that in 2005, SK Foods and its president Salyer, along with Rahal's company Intramark, joined with former competitors Ingomar and its president Pruett and Los Gatos Tomato Products and its president Woolf to fix the price of their processed tomato products, rig bids and allocate the market share among them. SAC ¶¶ 10-14, 72. These defendants created CTEG ostensibly to arrange the sale of processed tomato products overseas but actually to agree on domestic prices. SAC ¶ 77. Salyer, Woolf and Pruett agreed on the prices their companies would charge for tomato paste and diced tomatoes and agreed not to compete for the other's long-standing "legacy" accounts. SAC ¶ 80. They also agreed they would not compete against each other, especially when competing against the plaintiffs, and would submit bids within an agreed price range, which allowed them to focus on competing for plaintiffs' customers. SAC ¶¶ 82-83. The CTEG defendants envisioned controlling the market and eventually crushing competitors, including plaintiffs. SAC ¶ 78. They describe several specific instances, which were not included in the First Amended Complaint:

/////

4

> . . . Plaintiffs are informed and believe. . .as the Artley Search Warrant Affidavit details, in or about April 2007, the CTEG Defendants, as the result of the bribery scheme, were informed that Morning Star had bid $.35/lb. for a contract to sell tomato paste to Kraft. Kraft had been a long time customer of Plaintiffs. Plaintiffs are informed and believe and thereon allege that (1) the CTEG Defendants agreed that Kraft would be a legacy account of SK Foods and Ingomar; (2) the CTEG Defendants were advised that Kraft would still award the contract to one or more of the CTEG Defendants for $.36/lb. as long as no other submitted bids were below $.36/lb. to Kraft; and (4) SK Foods and Ingomar were awarded the contract as part of their legacy accounts despite Morning Star having submitted the lower bid.

SAC ¶ 118. In addition:

> [I]n or about April 2008, Morning Star submitted a bid to sell Processed Tomato Products to Frito-Lay and that as a result of bribe payments to Frito-Lay's purchasing agent, Morning Star's confidential bid information was provided to and shared among the CTEG Defendants; that the CTEG Defendants used the mails and wires to submit rigged bids to Frito-Lay; that the CTEG Defendants agreed that Frito-Lay was a legacy account of SK Foods and Ingomar; and that one or more of the CTEG Defendants, and not Morning Star, was awarded the Frito-Lay contract as a result of the bribe payments, the turn-over of Plaintiffs' bid information to the CTEG Defendants and the CTEG Defendants' scheme to fix prices, rig bids and allocate customers.

SAC ¶ 119. Plaintiffs allege that the CTEG defendants "used the mails and wires to submit rigged bids to Kraft, Frito-Lay, and other purchasers. . . ." SAC ¶ 121.

The SAC also alleges the CTEG defendants obtained plaintiffs' confidential bid information from ConAgra and Agusa and "used this unlawfully obtained information to submit rigged bids . . . ." through the mails. SAC ¶¶ 120-121. Plaintiffs describe the RICO enterprise as consisting of the CTEG defendants, among others, and identify the predicate acts as commercial bribery, in violation of California Penal Code § 641.3, New Jersey Statutes Annotated § 2C:21-10, and Texas Penal Code § 32.43; violations of the Travel Act, 18 U.S.C. § 1952; money laundering in violation of §§ 1956(a)(1)(A)(I) and 1956(a)(3)(C), in that SK Foods sent a wire transfer to Rahal and Intramark for use as bribes; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, in that the defendants shared information about their competitors' bids

5

1  by mail or wire.  Finally, plaintiffs allege that the CTEG defendants conspired to commit RICO
2  violations.  SAC ¶¶ 125-129.
3         Defendants argue that plaintiffs have not sufficiently pleaded proximate cause for
4  the RICO cause of action nor have they sufficiently described Ingomar's and Los Gatos's
5  participation in the RICO predicate acts.  ECF No. 121-1 at 5-8.  Plaintiffs counter that
6  defendants shut plaintiffs out of the contract award process because of the RICO violations and
7  also caused plaintiffs to lose specific contracts.  ECF No. 123 at 11-13.
8         Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or
9  associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct
10 of such enterprise's affairs through a pattern of racketeering activity."  "Racketeering activity" is
11 defined as any of a "generically specified criminal acts as well as the commission of one of a
12 number of listed predicate offenses."  *Sosa v. Directv, Inc.*, 437 F.3d 923, 939 (9th Cir. 2006).  A
13 "pattern of racketeering activity" requires at least two acts.  18 U.S.C. § 1961(1), (5) & (6).
14        Although §1962 defines a crime, a plaintiff may seek civil remedies for RICO
15 violations if he has been "injured in his business or property by reason of a violation of section
16 1962. . . ."  18 U.S.C. § 1964(c).  The elements of a RICO claim are "(1) conduct; (2) of an
17 enterprise; (3) through a pattern (4) of racketeering activities (known as 'predicate acts');
18 (5) causing injury to the plaintiff's 'business or property.'"  *Grimmett v. Brown*, 75 F.3d 506,
19 510 (9th Cir. 1996).  The fifth element has two subparts: the plaintiff must show that the injury
20 was proximately caused by the conduct and that he has suffered a concrete financial loss.  *Chaset
21 v. Fleer/Skybox Intern., LP*, 300 F.3d 1083, 1086 (9th Cir. 2002).
22        In addition, under §§ 1962(d) and 1964(c), a person may be civilly liable if he
23 conspired to violate any of the subsections of § 1962.  *Beck v. Prupis*, 529 U.S. 494, 500 (2000).
24 A RICO conspiracy presupposes the existence of a substantive violation of RICO, but a
25 conspirator may be liable even if he does not commit or agree to commit "the two or more
26 /////

predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997); *Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).

### A. Proximate Cause

Defendants argue that plaintiffs have not sufficiently alleged their injuries were the direct and proximate result of defendants' alleged RICO violations. The Ninth Circuit instructs courts to consider "three non-exhaustive factors" in evaluating a RICO proximate cause question:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1147-48 (9th Cir. 2008) (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2002) (quotations & citations omitted). A court "must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to plaintiff." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir. 2008).

The Ninth Circuit derives its rules from a series of decisions by the Supreme Court exploring proximate cause in RICO civil cases, beginning with *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), which rejected a claim that RICO causation was properly found when the harm was "purely contingent on the harm suffered by" others. *Id.* at 273. Even so, the Court cautioned that fashioning a "black-letter rule" to govern all cases was virtually impossible given the "infinite variety" of claims. *Id.* at 274 n.20.

In *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006), the Court applied the "principles discussed in *Holmes* to a dispute between two competing businesses." Ideal Steel alleged that National (Anza) did not charge sales tax to its cash-paying customers, which allowed it to offer lower prices, which undercut Ideal's sales. The RICO claim was based on

7

1  National's alleged mail and wire fraud, stemming from its submission of fraudulent tax returns.
2  *Id*. at 454.  The Court said that "[a] RICO plaintiff cannot circumvent the proximate-cause
3  requirement simply by claiming that the defendant's aim was to increase market share at a
4  competitor's expense."  *Id*. at 460.  It continued, "the central question [the court] must ask is
5  whether the alleged violation led directly to plaintiff's injuries."  *Id*. at 461.  Determining that
6  "the proper referent of the proximate cause analysis" was National's use of the mails to defraud,
7  it concluded that the cause of Ideal's harm – National's lower prices – was distinct from the
8  RICO violation of defrauding the state, particularly because National could have lowered its
9  prices "for any number of reasons unconnected to the asserted pattern of fraud." *Id*. at 458.
10 Determining what portion of Ideal's lost sales resulted from National's decreased prices would
11 require a "complex assessment" not suited to judicial determination.  *Id*. at 459.

12       In *Bridge v. Phoenix Bond & Indemnity Co*., 553 U.S. 639 (2008), the defendants
13 falsely assured the county they were independent bidders for tax liens when in fact they were all
14 affiliated and subject to restrictions on bidding; although the plaintiff had not relied on this
15 assurance, it was able to establish proximate cause because the alleged injury, the loss of liens,
16 was "the direct result of petitioners' fraud" with no "independent factors" that could account for
17 the loss.  *Id*. at 658.

18       Most recently, in the case of *Hemi Group v. City of New York*, __ U.S. __, 130
19 S.Ct. 983 (2010), New York City had alleged that Hemi, a mail-order cigarette company,
20 committed mail fraud by failing to send reports identifying its customers, as required by New
21 York State.  New York City contended the reports would have aided it in collecting city sales tax
22 from the purchasers.  *Id*. at 987.  The Court rejected the city's theory of proximate cause because
23 it was the customers' failure to pay taxes, rather than Hemi's failure to file reports, that caused
24 the city's harm.  *Id*. at 990.  It emphasized that "in the RICO context, the focus is on the
25 directness of the relationship between the conduct and the harm."  *Id.* at 991.
26 /////

1    Here, plaintiffs allege that the pattern of racketeering activity consisted of
2 defendants' acts of commercial bribery, violations of the travel act to carry out the acts of
3 commercial bribery, money laundering in connection with the acts of commercial bribery, and
4 mail and wire fraud, also in furtherance of the scheme of bribery as well as defendants' scheme
5 to submit rigged bids. SAC ¶¶ 109-121. Thus, defendants' alleged use of commercial bribery,
6 facilitated by acts of money laundering and fraud, is the "proper referent" for the proximate
7 cause inquiry.

8    Plaintiffs describe their injury as an inability "to compete for contracts for the sale
9 of tomato products" and loss of sales, and point to the fact that "the CTEG Defendants were
10 awarded contracts by Kraft and Frito-Lay for the sale of Processed Tomato Products despite the
11 fact that Morning Star had submitted lower bids for these contracts and would have won the
12 contracts but for the CTEG Defendants' unlawful conduct. . . ." SAC ¶¶ 124, 119 (describing
13 specific loss).

14    Defendants rely on several cases to argue that plaintiffs have not adequately
15 pleaded proximate causation. The plaintiffs in those cases were not able to link the RICO
16 predicate acts to the harm they suffered. In *Sybersound*, the plaintiffs had not adequately pled
17 that their competitors' lower prices necessarily stemmed from the copyright infringement that
18 was the RICO predicate nor had they shown they were the most direct victims, in light of the fact
19 that the copyright holders were pursuing actions against the defendants. *Id*. at 1148-49.
20 Similarly, in *James Cape & Sons Company*, 453 F.3d 396, 403 (7th Cir. 2006), the court
21 determined it would be difficult to determine what portion of Cape's lost market share was
22 attributable to the bid rigging scheme described in the complaint. *Id.* at 403. In this case, in
23 contrast, plaintiffs allege not only that the bribery scheme kept them out of the market generally
24 but that they lost specific contracts they otherwise would have received. These allegations
25 differentiate this case from *Sybersound*, *Cape* and *Anza,* for they suggest that the court will not
26 have to undertake a "speculative and complicated" analysis of the connection between the

9

predicate acts and the fraud. *See Astech-Marmon, Inc.*, 349 F.Supp.2d 265, 269 (D. Conn. 2004) (plaintiff showed injury by alleging that defendant subverted municipal bidding process so only contractor with bid-preferences lost the opportunity to bid on county work); *Bulletin Displays v. Regency Outdoor Advertising*, 518 F.Supp.2d 1182, 1189 (C.D. Cal. 2007) (proximate cause shown when collusion between defendant and city ensured defendant would be only entity awarded contracts).

Defendants also argue there are more direct victims, namely, the companies who accepted defendants' rigged bids, who have filed suits stemming from the alleged RICO violations. However, in the SAC, plaintiffs allege they were the direct victims of the commercial bribery scheme and suffered a direct loss, not a "passed-on harm." *Mendoza,* 301 F.3d at 1170. "No precedent suggests that a racketeering enterprise may have only one 'target' or that only a primary target may have standing." *Baisch v. Gallina*, 346 F.3d 366, 375 (2d Cir. 2003)[2]; *In re Refco Inc. Securities Litigation*, 2010 WL 6397586, at *43 (S.D. N.Y. July 19, 2010) ("an injury can be direct even if the plaintiff is not the only target of the defendant's misconduct"). The existence of "different classes of plaintiffs, each of which suffered a different concrete injury proximately caused by the violation" does not defeat standing. *Mendoza*, 301 F.3d at 1172. Plaintiffs have adequately alleged that they are direct, if not the only, victims of the RICO predicate acts. In addition by identifying specific contracts they lost to defendants despite their lower bids, plaintiffs have cured the deficiency the court identified in the FAC; their allegation of lost market opportunities is based squarely on the commercial bribery scheme rather than on a claim that defendants' wrongdoing may incidentally have caused the harm.

/////

/////

---

[2] A later case has suggested that those portions of *Baisch* that discuss foreseeability as part of the RICO proximate cause inquiry have been abrogated by *Hemi*. *See DDR Const. Serv., Inc. v. Siemens Industry, Inc*., 770 F.Supp.2d 627 (S.D.N.Y. 2011).

10

B.  CTEG's Participation In The Predicate Acts

Defendants next argue that plaintiffs have not sufficiently alleged their participation in the RICO predicate acts.  Plaintiffs counter that the court has already found their pleading sufficient as to the CTEG defendants' participation in the bribery scheme and that their allegations are also sufficient as to the other predicate acts.

A person is liable for a civil RICO violation if he conducts or participates, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity.  *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993); 18 U.S.C. § 1962(c).  A pattern of racketeering activity requires "at least two acts of racketeering." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237 (1989); 18 U.S.C. § 1961(5).  When the underlying predicate acts are fraud-based, a complaint must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Lancaster Community Hospital v. Antelope Valley Medical Group, Inc.*, 940 F.2d 397, 405 (9th Cir. 1991); *Sanford v. Memberworks, Inc*., 625 F.3d 550, 557 (9th Cir. 2010).  The elements of a cause of action of mail or wire fraud are (1) formation of a scheme to defraud; (2) use of the mails or wires or causing such a use in furtherance of the scheme; and (3) a specific intent to defraud.  *Id*. at 557. Intent may be inferred when a defendant profits from the fraudulent scheme. *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1056 (9th Cir. 2008), *cert. denied sub nom. Ikon Office Solutions, Inc. v. Newcal Industries*, __ U.S. __, 129 S.Ct. 2788 (2009).

Plaintiffs allege that CTEG was formed to agree on domestic prices for processed tomato products and to control the marketplace; that the CTEG defendants reached an agreement to fix prices; that Rahal bribed purchasing agents on Salyer's behalf and Salyer then shared the information with the CTEG defendants, who were aware of the bribery; that as a result of the bribery, defendants obtained plaintiffs' confidential bid in April 2007 and thereafter, on two identified occasions, used the mails and wires to submit rigged bids . SAC ¶¶ 77-78, 80, 84, 88,

11

118-119. Although these allegations are not sufficient to show the CTEG defendants' participation in the bribery (apart from using the fruits of the bribery), they are sufficient to show defendants' participation in at least two acts of mail fraud: submitting rigged bids on two separate occasions. This is sufficient for the RICO and RICO conspiracy causes of action.

IV. Sherman Act

Plaintiffs allege the defendants' scheme to fix prices, allocate customers, submit rigged bids and pay bribes violated the Sherman Act. 15 U.S.C. § 1. SAC ¶¶ 100-106. In ruling on the motion to dismiss the FAC, the court concluded that plaintiffs' claims of price fixing did not state an antitrust injury and thus a Sherman Act claim, but found the claims of bid rigging, bribery, and allocation of customers to be a sufficient basis for the claim. ECF No. 115 at 6-10. Defendants repeat their arguments, adding two cases not included in the challenge to the FAC. They also suggest that because the SAC makes clear that the affidavit supporting the search warrant (Artley affidavit) issued in connection with a pending forfeiture action is the basis of the Sherman Act claims and the affidavit does not clearly tie the CTEG defendants to the bribery scheme, the renewed motion is proper. ECF No. 121-1 at 9-10 n.4. As plaintiffs note, however, both the FAC and the SAC allege much more than a bribery scheme. Moreover, although defendants argue that plaintiffs' allegations made on information and belief must have come from the Artley affidavit, plaintiffs' complaint relies on other sources of information. *See, e.g.,* SAC ¶¶ 37, 56, 66-71. Finally, although defendants assert the Artley affidavit shows that the CTEG defendants were not involved in the bribery scheme and argue that this court may properly consider it, they do not provide a copy or otherwise direct the court's attention to those portions of the affidavit they believe support their argument. *See* ECF No. 121-1 at 10 n.3. Defendants have not demonstrated why this court should revisit the question previously resolved.

/////

/////

12

1  IT IS THEREFORE ORDERED that the motion to dismiss filed by defendants
2 Ingomar and Los Gatos (ECF No. 121) is denied.
3 DATED: September 30, 2011.

```
                                     _____
                                     UNITED STATES DISTRICT JUDGE
```