1   MORGAN, LEWIS & BOCKIUS LLP
    Stephen Zovickian (SBN 78697)
2   stephen.zovickian@morganlewis.com
    Sujal J. Shah (SBN 215230)
3   sujal.shah@morganlewis.com
    One Market, Spear Street Tower
4   San Francisco, California  94105-1596
    Telephone:  415.442.1000
5   Fax:  415-442.1001

6   Attorneys for Defendant
    Ingomar Packing Company
7
    RAMSEY & EHRLICH LLP
8   Miles F. Ehrlich (SBN 237954)
    miles@ramsey-ehrlich.com
9   803 Hearst Avenue
    Berkeley, California  94710
10  Telephone:  510.548.3600

11  Attorneys for Defendant
    Gregory R. Pruett
12

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16  THE MORNING STAR PACKING          No. 2:09-CV-00208 KJM-EFB
    COMPANY, et al.,
17                                    **BRIEF IN SUPPORT OF INGOMAR
                Plaintiffs,           DEFENDANTS' MOTION FOR
18                                    SUMMARY JUDGMENT**
        v.
19
    SK FOODS, L.P., et al.,
20
                Defendants.
21

22

23

24

25

26

27

MORGAN, LEWIS &      28
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................... 1

II.  THE CLAIMS ALLEGED AGAINST THE INGOMAR DEFENDANTS..................... 3

III. FACTS ............................................................................................................... 4

    A.   The Parties................................................................................................ 4

    B.   The California Tomato Export Group (CTEG)....................................... 5

    C.   The Commercial Bribery Scheme ........................................................... 6

        1.   SK Foods Paid Rahal to Bribe Customers to Secure Contracts for SK Foods ................................................................................. 6

        2.   Ingomar Did Not Know of or Participate in the Bribery Scheme............. 8

    D.   The FBI Investigation and Its Aftermath ............................................... 9

IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT ................................................ 10

V.   ARGUMENT ...................................................................................................... 10

    A.   The Sherman Act Claim Against Ingomar and Pruett Should Be Dismissed...... 10

        1.   Morning Star's Only Antitrust Injury Was Caused By The Commercial Bribery Scheme ................................................................. 11

        2.   There is No Evidence that Ingomar Made an Agreement to Use Commercial Bribery to Deprive Morning Star of Sales........................... 12

            a.   No Direct Evidence ………………………………………… 13

            b.   No Circumstantial Evidence …………………………… 13

    B.   The RICO Claim Should Be Dismissed.................................................. 17

    C.   The RICO Conspiracy Claim Should Be Dismissed ............................. 19

VI.  CONCLUSION .................................................................................................. 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

i

Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

CASES

4

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
5
   141 F.3d 947 (9th Cir. 1998) ................................................................................ 16

6

*Baumer v. Pachl*,
   8 F.3d 1341 (9th Cir. 1993) ................................................................................. 19

7

*Big Bear Lodging Assn. v. Snow Summit, Inc.*,
8
   182 F.3d 1096 (9th Cir. 1999) ............................................................................... 1

9

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................... 3

10

*Chaset v. Fleer/Skybox Int'l, LP*,
11
   300 F.3d 1083 (9th Cir. 2002) ............................................................................. 17

12

*City of Tuscaloosa v. Harcros Chems., Inc.*,
13
   158 F.3d 548 (11th Cir. 1998) ............................................................................. 16

14

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
15
   236 F.3d 1148 (9th Cir. 2001) ............................................................................. 13

16

*Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*,
   528 F.3d 1001 (8th Cir. 2008) ....................................................................... 17, 18

17

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
18
   751 F.3d 990 (9th Cir. 2014) ............................................................................... 18

19

*Grimmett v. Brown*,
   75 F.3d 506 (9th Cir. 1996) ................................................................................. 17

20

*Howard v. Am. Online Inc.*,
21
   208 F.3d 741 (9th Cir. 2000) ............................................................................... 19

22

*In re Citric Acid Litig.*,
23
   191 F.3d 1090 (9th Cir. 1999) ....................................................................... 10, 11

24

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................. 10

25

*In re Vitamins Antitrust Litig.*,
26
   320 F.Supp.2d 1 (D.D.C. 2004) .......................................................................... 11

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
940 F.2d 397 (9th Cir. 1991) ................................................................................... 17, 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................. 1, 10, 11, 12, 13, 14, 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 764 (1984) .......................................................................................... 10, 12

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) ...................................................................................... 10

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
No. 1:09-CV-00560-LJO, 2013 WL 595122 (E.D. Cal. Feb. 15, 2013) .............................. 11

*U.S. Bank Nat. Ass'n v. Franulovic*,
No. CIV 03-1150-HA, 2007 WL 1598091 (D. Or. June 1, 2007) ...................................... 18

*United States v. Persico*,
832 F.2d 705 (2d Cir.1987), *cert. denied,* 486 U.S. 1022 (1988) ..................................... 18

*United States v. Salyer*,
853 F.Supp.2d 1014 (E.D. Cal. 2012), ECF No. 478 ........................................................ 5

*Wilcox v. First Interstate Bank of Or., N.A.*,
815 F.2d 522 (9th Cir. 1987) ...................................................................................... 13

*Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*,
No. 12-15460, 2013 WL 6713999 (E.D. Mich. Dec. 20, 2013) ........................................ 3

**STATUTES**

Cal. Penal Code
§ 641.3(a) (2010) ..................................................................................................... 18

Racketeer Influenced and Corrupt Organizations Act (RICO),
18 U.S.C. §§ 1962, 1964 (2014) ...................................... 1, 2, 3, 4, 17, 18, 19
18 U.S.C. § 1962(d) .................................................................................................. 19

**OTHER AUTHORITIES**

Fed. R. Civ. P.
56(a) ....................................................................................................................... 10
56(c) ........................................................................................................................ 3

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Local Rule
   133(j) ........................................................................................................................... 2

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13

I.      INTRODUCTION

This Court recognized more than three years ago that Morning Star's only claim of injury in this case is that it lost business because of bribes: the "allegation of lost market opportunities is based *squarely on the commercial bribery scheme*" (Order Den. Mot. To Dismiss, ECF No. 130 at 10, emphasis added).[1]  Both Morning Star's alleged antitrust injury and its alleged RICO losses consist of sales it claims it would have won had purchasing agents not been bribed – *i.e.*, contracts it allegedly lost to defendants "despite the fact that Morning Star had submitted lower bids" (*id*. at 9).  Thus, this Court held, the "proper referent" for determining whether there was any cognizable legal injury to Morning Star was the "defendants' alleged use of commercial bribery" (*id*. at 9-10).

Without this critical element of bribery, Morning Star has no cognizable claim under the Sherman Act or RICO resulting from alleged efforts by the defendants to obtain *higher* (or "supra-competitive") prices in the marketplace – regardless of whether these higher prices came about through alleged price fixing, customer allocation, use of confidential information, or bid rigging.  Morning Star is not a customer – but a *competitor* – of the alleged conspirators: Ingomar, Los Gatos Tomato Products, and SK Foods.  Therefore, as a competitor, the Supreme Court has held, Morning Star stood "to gain from any conspiracy to raise the market price" of processed tomato products.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986).  As Judge England put it in an earlier ruling in this case, "Rather than causing harm to [Morning Star], inflated prices for processed tomato goods would likely confer a benefit" (Mem. and Order, ECF No. 115 at 7 (citing *Big Bear Lodging Assn. v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999)).

Thus, the crux of this case is whether either of the Ingomar Defendants participated in an effort to *bribe customers* and thereby exclude or disadvantage Morning Star in its effort to

---

[1] Plaintiffs, all of whom are affiliated companies and collectively referred to as a single entity in the Second Amended Complaint, ECF No. 116 ("SAC") (SAC ¶ 5), are also collectively referred to in this brief as "Morning Star."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

1                    Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

compete for those customers' business.[2]  Without such evidence, and as a matter of law, Morning Star has not sustained an antitrust injury or RICO loss proximately caused by the Ingomar Defendants.

After this Court's September 30, 2011 decision allowing Morning Star to proceed with its Sherman Act and RICO claims based on commercial bribery, Morning Star took extensive discovery to try to find evidence to back up its allegation that the Ingomar Defendants participated in the bribery scheme that allegedly caused its losses.  Morning Star took 13 depositions and – as to the Ingomar Defendants alone – propounded 44 interrogatories, 225 requests for production, and 99 requests for admissions (Affidavit of Stephen Zovickian in Support of Motion ("Zovickian Aff.") ¶ 2).

Yet, after three and a half years of discovery, aided by an even longer government investigation that preceded this civil case (and full cooperation from the Ingomar Defendants as the government's leniency applicants under ACPERA), Morning Star cannot point to any evidence in the record – no testimony, not a single document, nor any other item of admissible evidence – sufficient to establish that the Ingomar Defendants *had any knowledge of* the commercial bribery scheme perpetrated by SK Foods, much less that they *agreed to or otherwise participated in* the bribery activities that allegedly injured Morning Star.

To the contrary, the undisputed evidence establishes that neither Ingomar nor Pruett had any knowledge of, participated in, or agreed to the commercial bribery scheme.  In fact, the architect of the bribery scheme, Randall Rahal – the "exclusive" broker for SK Foods who paid the bribes from his sales commissions to "guarantee the volume of business" for SK Foods (Rahal Dep. at 21:21-24, 65:11-66:19, 210:20-25) – testified that Pruett "never participated in the bribery"; that he never told "Pruett or anyone else at Ingomar about the bribes"; and that he expected his bribery scheme "to be kept within" SK Foods (*id.* at 193:1-15, 197:15-198:13).[3]

---

[2] In this brief, the moving defendants Ingomar Company, LLC ("Ingomar") and Gregory R. Pruett ("Pruett") are collectively referred to as the "Ingomar Defendants."

[3] All cited deposition testimony is attached to the Zovickian Affidavit filed herewith.  Pursuant to Local Rule 133(j), copies of the deposition transcripts will be lodged with the clerk.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

When asked why he kept Ingomar "in the dark about the existence of the bribes," Rahal answered: "Fear. I didn't want him [Pruett] to know" (*id.* at 198:15-25).

With lay discovery now completed, mere "allegations" no longer suffice. "Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand summary judgment, therefore, Morning Star must have admissible evidence "sufficient to establish" – meaning, a proper foundation on which a rational jury could conclude – that the Ingomar Defendants took action to bribe, or joined a conspiracy to bribe, purchasing agents. There is no such evidence in the record. Without any evidence linking Ingomar or Pruett to cognizable antitrust injury or to the proximate cause of the RICO damages alleged in this action, Morning Star's claims against these two defendants fail as a matter of law. It is now appropriate for the Court to grant summary judgment in favor of the Ingomar Defendants and bring the case against them to a close.[4]

## II.   THE CLAIMS ALLEGED AGAINST THE INGOMAR DEFENDANTS

The Second Amended Complaint incorporates by reference and relies on the same basic factual allegations to support both the Sherman Act and RICO claims asserted against the Ingomar Defendants (SAC ¶¶ 100, 107, 125). Morning Star does not allege that defendants colluded to bid prices *lower* than those Morning Star submitted. Rather, Morning Star claims that through commercial bribery and various other forms of alleged wrongdoing – having access to its confidential bid information, price fixing, customer allocation and bid rigging – defendants submitted "*artificially inflated* bids and price quotations" (*id.* 103, italics added), which Morning Star alleges enabled defendants to win business away from it "at supra-competitive levels" (*id.* at

---

[4] It remains the position of the Ingomar Defendants that Morning Star's alleged damages -- lost sales -- do not constitute antitrust injury or a cognizable loss under RICO even if caused by bribery. *See Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*, No. 12-15460, 2013 WL 6713999, at *3 (E.D. Mich. Dec. 20, 2013) (public works bidder who lost subcontracts because of bid-rigging scheme accompanied by "bribes and kickbacks" did not suffer a loss recoverable under the Sherman Act or RICO). This motion, however, does not revisit the Court's September 30, 2011 ruling on that issue and applies it as the law of the case.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

72; 67-69).  *See also* Plaintiffs' Expert Report of Charles R. Mahla, Ph.D. ("Morning Star Expert Report") at 7, ¶ 14 (Morning Star "harmed" because defendants "were able to obtain sales contracts at elevated prices compared to the bid prices submitted by Morning Star") (Zovickian Aff., Exh. L).

Defendants' "artificially inflated" or "elevated" prices, of course, were not the reason that a competitor like Morning Star, who bid lower prices, allegedly lost sales to the defendants, since a higher bid price would not itself cause a customer to reject a competitor's lower bid.[5]  Rather, the gravamen of Morning Star's complaint, as this Court has already ruled, is that the alleged bribery scheme enabled the defendants to win bids they would not have otherwise won (*see* Order Den. Mot. To Dismiss, ECF No. 130 at 10).  Thus, at the very heart of Morning Star's complaint is the essential allegation that the defendants, "by paying illegal bribes to the purchasing agents" (SAC ¶¶ 88, 103), caused Morning Star to lose sales "even though Morning Star had submitted lower bids than [had] defendants" (Pls.' Opp'n to Defs.' Mot. To Dismiss at 10:15-16, ECF No. 123; *see also* SAC ¶¶ 84, 118 and 124).[6]

These lost sales comprise the damages allegedly sustained under all three of the claims made against the Ingomar Defendants:  the Sherman Act Claim (SAC ¶ 105), the RICO claim (*id*. ¶ 124), and the RICO Conspiracy claim (*id*. ¶ 129).  And as this Court succinctly put it:  Morning Star's "allegation of lost market opportunities is based squarely on the commercial bribery scheme" ( Order Den. Mot. To Dismiss, ECF No. 130 at 10).  Without evidence of bribery by the Ingomar Defendants, these claims against them fail as a matter of law.

III.    FACTS

A.    The Parties

Chris J. Rufer is the founder, owner, and president of Morning Star (Rufer Restitution

---

[5] Customers do not always choose the lowest bid.  There are a number of legitimate – and legal – reasons why a customer would accept a higher bid, including the supplier's reliability, product quality, and relationship with the customer (Rufer Depo. at 21:10-22).

[6] Similarly, in its restitution claim in the criminal proceedings against SK Foods and Scott Salyer, Morning Star claims it would have won all the sales made by SK Foods "but for the illegal bribery payments" because "Morning Star has earned the reputation as the industry low cost/high value tomato processor" (Rufer Restitution Dec. at 2:8-11, Zovickian Aff. Exh. M).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4            Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13

Dec. 1:4-13, Zovickian Aff., Exh. M ).  Morning Star is the largest tomato processor in the world (Rufer Dep. at 14:6-13).[7]

SK Foods, Ingomar, and defendant Los Gatos Tomato Products were processors of tomato products and "direct competitors" of Morning Star (SAC ¶¶ 6, 11, 13; SUF 1[8]).  Pruett has been the president of Ingomar (now a limited liability company) since at least 2004 (Pruett Dep. at 16:13-22).

SK Foods is bankrupt (SAC ¶ 6).  Scott Salyer, the former owner of SK Foods, pleaded guilty to bribery (Plea Agreement as to Frederick Scott Salyer, *United States v. Salyer*, 853 F. Supp. 2d 1014 (E.D. Cal. 2012) (No. 2:10-cr-00061), ECF No. 478), as did Randall Rahal, the SK Foods broker who devised the bribery scheme described in the SAC (Plea and Cooperation Agreement as to Randall Lee Rahal (No. 2:08-cr-00566), ECF No. 7).  Jeffrey Beasley, the SK Foods Vice-President of Domestic Sales, and Alan Huey, the SK Foods Senior Vice-President of Sales and Marketing, both of whom were deposed in this action, also pleaded guilty to bribery (Plea and Cooperation Agreement as to Jeffrey Sherman Beasley (No. 2:09-cr-0035, ECF No. 5; Plea and Cooperation Agreement as to Alan Scott Huey (No. 2:09-cr-00468), ECF No. 3).  Tony Manuel, the SK Foods Vice-President of International Sales, who was also deposed, acted as an FBI informant (Manuel Dep. at 57:1-58:14).  Rahal, Beasley and Manuel all settled with Morning Star and agreed to cooperate with it in exchange for a release of claims (Rahal Dep. at 231:24-233:2, Exh. 62; Beasley Dep. at 165:23-167:14, Exh. 22; Manuel Dep. at 133:20-135:8, Exh. 337).  Plaintiffs did not notice or take Salyer's deposition.

B.     The California Tomato Export Group (CTEG)

In mid to late 2005, Los Gatos, Ingomar, and SK Foods began to organize a tomato export trading association and took steps needed to obtain the export certificate from the

---

[7] From 2004 -2008, the independent processors who competed for sales on the open market (and their estimated market shares) were:  Morning Star (33%), SK Foods (20%), Ingomar (15%), Los Gatos Food Products (12%), J.G. Boswell (8%) and San Benito/Tomatek (5%).  Pruett Depo. at 19:4-20:6.  Today, Morning Star's share is estimated at 40%.  *Id.* at 20:22-23.

[8] "SUF" refers to the Statement of Undisputed Facts filed herewith.  It includes the facts material to the motion.  Other facts (which the Ingomar Defendants believe are not disputed) are cited in this brief for background and context, but they are not necessary to the motion.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

Department of Commerce (SUF 2; Wasson Dep. at 31:19-32:19; Pruett Dep. at 109:13-19). The Commerce Department issued the formal certificate in February 2006, authorizing the three companies to jointly market export sales (Zovickian Aff., Exh. K).

For Pruett, "the purpose of CTEG was to grow exports" (Pruett Dep. 135:17-24), but Salyer talked about domestic pricing at most CTEG meetings and it became clear to Pruett by January 2006 that Salyer had an interest in setting domestic prices (*id*. 112:7-113:3; 120:12 - 121:10). Pruett "rationalized that as long as I priced independently from what [Salyer] was talking about that it was legal and we could continue on and try to build the export thing into something significant" (*id*. 213:9-19). "It was a mistake . . . I should have walked away, early. I didn't, my fault, but I had no indication as to the other things he was doing" (*id*. 212:14-19), including the bribery (*id.* 214:3-7).

      C.     <u>The Commercial Bribery Scheme</u>

            1.     <u>SK Foods Paid Rahal to Bribe Customers to Secure</u>
                     <u>Contracts for SK Foods</u>

Starting in the early 1990's, when he began working on behalf of SK Foods as its "exclusive" broker (SUF 3; Rahal Dep. at 15:23-16:3, 21:6-22:2, SAC ¶¶ 9-10, 32), Rahal bribed purchasing agents to obtain contracts on behalf of SK Foods (*id*. at 193:16-197:8).[9] He "used the bribes to gain customers and business for SK" (*id*. at 210:9-12). He "paid . . . the purchasing agent X amount of money in order to obtain the business" (*id*. at 56:18-25). His firm, Intramark, paid the bribes with money from SK Foods for commissions on sales Intramark placed for it (*id*. at 65:11-23, 71:4-11; SAC ¶ 33). Salyer caused SK Foods to send Rahal "a fixed amount at the

---

[9] Rahal started bribing Bob Turner, Nabisco's purchasing agent, "before SK Foods," in 1992 or 1993 (Rahal Depo. at 57:4-11, 60:20-62:9). He continued to bribe Turner when he started working for B&G Foods in 2004 (*id*. at 58:6-60:13; SAC ¶¶ 45-48). Similarly, Rahal bribed the purchasing agent for Borden in 1997 or 1998 (Rahal Depo. at 196:17-24); initially tried to bribe Mike Chavez, the purchasing agent for Safeway, in 2000, and succeeded in bribing him three or four years later (*id*. at 194:24-196:16); started bribing Jim Wahl, Frito-Lay's purchasing agent, no later than 2001 or 2002 (*id*. at 193:16-194:4); and started bribing Robert Watson, Kraft's purchasing agent, in 2003 (*id*. at 194:5-19), such that by July 2004 Rahal was bragging that SK had replaced Morning Star with "a major portion of the [Kraft] business (Cahill Depo. at 53:7 to 54:9 and Exh. 171). *See* SUF 5-9. All of this illegal activity pre-dated CTEG.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

beginning of the year to get me started" (Rahal Dep. at 66:6-19), knowing that Rahal was "using part of that commission to pay bribes" (*id*. at 71:8-11, 65:24-66:5). *See* SUF 4.

Morning Star alleges (and this motion accepts as true) that "Rahal made these illegal bribe payments on behalf of and with SK Foods' and Salyer's knowledge, approval, and direction" (SAC ¶ 33), in order "to secure contracts for SK Foods" from various customers (*id*. 56, 66; 45, 68; 63, 71, 67, and 44; Morning Star Expert Report at 6, ¶ 13 ("SK Foods and Scott Salyer paid bribes . . . to secure business for SK Foods")(Zovickian Aff., Exh. K). Consistent with that allegation, Rahal testified that the bribes "certainly would have had [the] effect" of "limit[ing] the business that SK's competitors would receive from the companies whose purchasing agents were being bribed" (SUF 10; Rahal Dep. at 210:13-19). For example, Rahal testified, the bribed Kraft buyer "took his bribes and he did whatever he could to make sure we got as much of the business as we could" (*id*. at 212:8-13). Tony Manuel, the SK Foods Vice-President of International Sales and FBI informant, likewise testified that Rahal's bribes hurt "any competitor" of SK Foods, including Morning Star, Ingomar and Los Gatos (Manuel Dep. at 127:8-20). Rahal himself did not care what any of the bribed purchasing agents did after the bribe had secured for SK Foods the "guaranteed" volume of sales; with respect to the balance of the purchasing agent's processed tomato needs, "[i]t was up to the purchasing agent to split it up the way he wanted to" (Rahal Dep. at 210:20-25).

Salyer was aware of the bribery scheme and "never questioned it one way or the other" (*id*. at 65:24-66:5). According to Rahal, "all he [Salyer] cared about was results and getting the sales and growing the company" (*id*. at 28:13-15). SK Foods had trouble competing against Morning Star *and* Ingomar. SK Foods "couldn't compete with Morning Star and make money" (*id*. at 39:20) because Morning Star was "the low cost producer . . . We were not." (*id*. at 42:9-14); "and the Ingomar quality was so good and so consistent that he [Salyer] was always the number two guy instead of the number one guy" (*id*. at 92:7-11).

Some of the purchasing agents Rahal bribed (for example, Kraft, Frito Lay, and Agusa) also provided him with confidential bid information concerning SK Foods' competitors,

Brief in Support of Ingomar Defendants' Motion for Summary Judgment

Morgan, Lewis &
Bockius LLP
ATTORNEYS AT LAW
SAN FRANCISCO

including Morning Star *and* Ingomar (SUF 11): "I asked them to give me whatever they had from *any* competitor" (Rahal Dep. at 208:11-20, italics added; 209:2-8, 161:24-162:21), including "the same kind of pricing information on Ingomar that [Rahal was] getting on Morning Star" (*id*. at 208:21-24).

Rahal, who had "paid for" the Morning Star information because he considered it "to be valuable to SK and to Intramark," did not share it with Pruett or anyone else at Ingomar (*id*. at 205:18 to 206:14). According to Beasley, the Morning Star information was not shared "outside of SK Foods" (Beasley Dep. at 158:2-4). The record is void of any evidence that Ingomar received any Morning Star pricing information from Rahal or anyone else; neither Rahal nor Salyer ever told Pruett that they had learned what Morning Star was bidding on particular contracts (Pruett Dep. at 160:11-14). And no SK Foods employee (or anyone else) who was privy to any Morning Star confidential information testified to having shared it with anyone at Ingomar. *See, e.g.,* Manuel Dep. at 127:20-128:7; Beasley Dep. at 157:9-158:8.

### 2. Ingomar Did Not Know of or Participate in the Bribery Scheme

No one at Ingomar knew of or participated in the bribery scheme. *See* SUF 13-15. Prior to the FBI investigation, Pruett had no knowledge of the bribes (*see, e.g.*, Pruett Dep. at 214:3-7, 97:24-98:6; Affidavit of Gregory R. Pruett in Support of Motion ("Pruett Aff.") at ¶ 3). Rahal himself testified that Pruett "never participated in the bribery" and that he never told Pruett "or anyone else at Ingomar about the bribes" (Rahal Dep. at 193:1-11). Indeed, Rahal expected the bribery scheme to be "kept within SK Foods" and "never" told "any competitors of SK Foods about the bribes" (SUF 12; Rahal Dep. at 198:3-14). Specifically, he kept "Ingomar in the dark about the existence of the bribes," due to "fear" because he "[d]idn't know what – what [Pruett] would do" if he discovered that SK Foods was bribing customers (*id*. at 198:15-21). Rahal "d[id]n't like [Pruett]" and "d[id]n't trust him" (Ex. 54; Rahal Dep. at 201:14-202:12).

Besides Rahal, Morning Star deposed other SK Foods officers who testified that they knew about or suspected the scheme, including Beasley, Manual, Huey, and Mark Grewal (the President and COO of SK Foods from May 2005 to the Fall of 2006, who "suspected" that Rahal

Brief in Support of Ingomar Defendants' Motion for Summary Judgment

was bribing customers; Grewal Dep. at 11:12-24; 111:5-14). None testified that Pruett or anyone else at Ingomar knew of or participated in the bribery. Manuel, the FBI informant, swore that "our program" was not discussed outside "the SK group" (Manuel Dep. at 66:12-23; 137:7-10); when asked if he had any reason to believe Pruett or anyone else at Ingomar participated in the bribery scheme, he answered categorically: "No" (*id.* at 137:2 to 138:5). Huey, who knew of the scheme (Huey Dep. at 25:1-30:22), did not utter a single word at his deposition indicating any knowledge of or participation in the scheme by Pruett or anyone else at Ingomar. Grewal and Beasley also testified that they had no information to cause them to believe that Pruett or anyone else at Ingomar knew of or participated in the bribery scheme (Grewal Dep. at 152:13-154:17; Beasley Dep. at 151:19-152:16).

D.      The FBI Investigation and Its Aftermath

As this Court has observed, the "backdrop of this litigation is the FBI's investigation of defendant SK Foods and Scott Salyer, its owner, for alleged price-fixing and bribery in the processed tomato product industry" ( Order Den. Mot. To Dismiss, ECF No. 130 at 1).

On or about April 15, 2008 the federal government seized assets of Intramark and applied for search warrants, which were served on SK Foods, Salyer and Rahal, among others (SUF 16; SAC ¶ 29 *ff.*). The government conducted an extensive investigation that resulted in guilty pleas by Salyer, Rahal, and two of SK Foods' employees (Jeffrey Beasley and Alan Huey) on bribery counts, as set forth above, as well guilty pleas by the purchasing agents of SK Foods customers who accepted bribes.[10] After returning its initial indictment against Salyer, DOJ and Antitrust Division attorneys interviewed Pruett for two full days (Pruett Dep. at 74:19-75:5; Pruett Aff. ¶ 3), and carefully vetted his account against thousands of documents, private journals, emails,

---

[10] James Wahl (Frito Lay), Plea Agreement as to James Richard Wahl , Jr. (No. 2:09-cr-00040), ECF No. 3; Robert Watson (Kraft), Plea Agreement as to Robert Watson (No. 2:09-cr-00035), ECF No. 7; Robert Turner (B&G and Nabisco), Plea Agreement as to Robert C. Turner, Jr. (No. 2:09-cr-00145), ECF No. 9; Michael Chavez (Safeway), Plea Agreement as to Michael Chavez, (No. 2:10-cr-00002), ECF No. 7. *See also* SAC ¶¶ 66-69.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

and secret tape recordings (SUF 37).[11]  To Ingomar's knowledge, no government agency has

ever filed any pleading or other document, or stated in any judicial proceeding, that Pruett or

Ingomar had any participation in or knowledge of the commercial bribery scheme.

## IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he non-moving party must 'do more than simply show that there is some

metaphysical doubt as to the material facts.'"  *Matsushita*, 475 U.S. at 586; *accord*, *Soremekun v.*

*Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative

testimony . . . is insufficient to raise genuine issues of fact.").

## V.   ARGUMENT

### A.   The Sherman Act Claim Against Ingomar and Pruett Should Be Dismissed

The gravamen of Morning Star's complaint – and the singular cause of its alleged

antitrust injury – is that defendants conspired to use commercial bribery to prevent Morning Star

from competing fairly for sales to various customers.  That conspiracy claim requires "direct or

circumstantial evidence that reasonably tends to prove that [defendants] had a conscious

commitment to a common scheme" – here, *an actual agreement to use commercial bribery* –

"designed to achieve [the] unlawful objective" that injured Morning Star.  *Monsanto Co. v.*

*Spray-Rite Serv. Corp.*, 465 U.S. 764, 768 (1984).  Morning Star must also present sufficient

evidence to connect *each defendant* to the alleged conspiracy.  *In re Citric Acid Litig.*, 191 F.3d

1090, 1093 (9th Cir. 1999).  "[A]t the heart of an antitrust conspiracy is an agreement and a

conscious decision by each defendant to join it."  *In re Lithium Ion Batteries Antitrust Litig.*, No.

13-MD-2420 YGR, 2014 WL 309192, at *13 (N.D. Cal. Jan. 21, 2014).

If Morning Star relies on circumstantial evidence to prove the existence of a conspiracy,

to survive summary judgment, it "must present evidence that tends to exclude the possibility that

---

[11] The Ingomar Defendants self-reported their conduct to the government and were granted a
conditional leniency agreement with the Department of Justice Antitrust Division (SUF 36;
Pruett Aff. ¶3; Pruett Depo. at 37:17-38:8).

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB3/376766573.13

10                                    Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the alleged coconspirators acted independently," and it must show that "the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." *Matsushita*, 475 U.S. at 588. "If the defendant has no rational economic motive to conspire, the plaintiff 'must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary' to survive a motion for summary judgment." *Stanislaus Food Products Co. v. USS-POSCO Industries*, No. 1:09-CV-00560-LJO, 2013 WL 595122, at *9 (E.D. Cal. Feb. 15, 2013) (quoting *Matsushita*, 475 U.S. at 587).

As we demonstrate below, the evidence (both direct and circumstantial) considered as a whole does not "reasonably support the inference" that Ingomar agreed to or participated in the bribery scheme. *Citric Acid*, 191 F.3d at 1097; *see also In re Vitamins Antitrust Litig.*, 320 F.Supp.2d 1, 5, 10, 19-20 (D.D.C. 2004) (granting summary judgment to one defendant, UCB, despite "evidence that [it] participated in the price fixing and allocation of the choline market" because the evidence did "not indicate even an inference of UCB's knowledge of or participation in an all-vitamins conspiracy"). Rather, the only reasonable inference that can be drawn from the undisputed evidence is that SK Foods and Rahal acted independently of Ingomar in carrying out their commercial bribery scheme; and that while Ingomar engaged in "collusive action" that allegedly increased the price of processed tomato products, that conduct as a matter of law "could not have harmed" Morning Star. *Matsushita*, 475 U.S. at 588.

    1.    <u>Morning Star's Only Antitrust Injury Was Caused By The Commercial Bribery Scheme</u>

Under the Sherman Act, Morning Star "must show more than a conspiracy in violation of the antitrust laws; [it] must show an injury to [it] resulting from the illegal conduct." *Matsushita*, 475 U.S. at 586. Like the unsuccessful plaintiffs in *Matsushita*, Morning Star charges Ingomar "with a whole host of conspiracies in restraint of trade," but "except for the alleged conspiracy to [deprive Morning Star of sales through commercial bribery], these alleged conspiracies could not have caused [Morning Star] to suffer an 'antitrust injury,' [citation], because they actually tended

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11       Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13

to benefit" Morning Star. *Id.* Thus:

- Morning Star alleges that "the CTEG Defendants and their co-conspirators submitted artificially inflated bids and price quotations." SAC ¶ 103. As the Court explained in *Matsushita*, "[s]uch conduct would indeed violate the Sherman Act [citations], but it could not injure [Morning Star]: as [defendants'] competitors, [the Morning Star plaintiffs] stand to gain from any conspiracy to raise the market price" of processed tomato products. *Matsushita*, 475 U.S. at 583.

- Morning Star alleges that "the CTEG Defendants and other co-conspirators . . . participate[d] in a pattern of collusive bidding practices designed to eliminate competition…by allocating contracts." SAC ¶ 101. But *Matsushita* squarely holds, for the same reason, that the Morning Star plaintiffs "cannot recover for a conspiracy to impose non-price restraints" – such as "a customer allocation agreement" – that "have the effect of either raising market price or limiting output." *Matsushita*, 475 U.S. at 583, 596 n. 20.

- Similarly, the allegation that Ingomar conspired to use Morning Star confidential information to rig bids at "artificially inflated" levels (SAC ¶ 103) does not allege any conduct that actually harmed the Morning Star plaintiffs. "Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive." *Matsushida*, 475 U.S. at 583 (emphasis in original).

Accordingly, although Morning Star repeatedly uses the phrase "and/or" to allege that the "CTEG Defendants' agreement to use illegal bribes and/or to fix prices and/or allocate purchasers caused antitrust injury in the form of a reduction in competition in the market" (SAC ¶ 104), only the bribery scheme caused Morning Star to lose contracts it allegedly "would have won" at lower prices. Without the bribery, none of the other illegal collusive action alleged in the SAC caused Morning Star an antitrust injury as a matter of law.

> 2. <u>There is No Evidence that Ingomar Made an Agreement to Use Commercial Bribery to Deprive Morning Star of Sales</u>

In this case, conspiracy liability under the Sherman Act for any sales Morning Star lost

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

12

Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

requires proof that the Ingomar Defendants "had a conscious commitment to a common scheme" involving the use of commercial bribery. *Monsanto*, 465 U.S. at 764, 768. Here, there is no evidence of any kind that Ingomar knew of, participated in, or agreed to a commercial bribery scheme.

a. <u>No Direct Evidence</u>

"[D]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). There is no direct evidence that Pruett or anyone else at Ingomar agreed to, participated in, or even knew of the bribery scheme (SUF 13-15). Pruett denies it, no witness testified differently, and there is no document to the contrary. In fact, the undisputed direct evidence *refutes* any involvement at all by Ingomar in the bribery: Rahal – the incarcerated architect of the bribery scheme, and someone who entered into a cooperation agreement with Morning Star – testified that he kept it secret from Ingomar out of fear for what Pruett would do if he found out about it (Rahal Dep. at 198:15-21).

b. <u>No Circumstantial Evidence</u>

The "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita,* 475 U.S. at 588. Where, as here, all the direct evidence refutes Ingomar's involvement in the commercial bribery scheme, to survive summary judgment, Morning Star "must show that the inference of [a bribery] conspiracy is reasonable in light of the competing inferences of . . . collusive action [*i.e.*, price-fixing] that could not have harmed" Morning Star. *Id*. It "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently," *id.* at 588; and "from which an inference of conspiracy is more probable than an inference of independent action," *Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 525 (9th Cir. 1987). Here, such an inference is unreasonable. Indeed, it is implausible that Salyer or Rahal even would have allowed Ingomar to join their bribery scheme, for the following reasons:

- Rahal, who had been bribing his customers for many years before CTEG was

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13          Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13

formed, kept the bribery activities secret from Ingomar (SUF 12).

- Rahal alone paid all the bribes, and he paid them out of the commissions he earned on sales he made for SK Foods (SUF 4).

- Rahal and the other SK Foods personnel who knew of the bribery scheme all testified that the purpose of the bribes was to get business for SK Foods at the expense of SK Foods' competitors, *including Ingomar*, and to collect bid information on competitors, *including Ingomar* (SUF 10-11).

Moreover, the "[e]conomic factors strongly suggest[] that [Ingomar] had no motive to join" the bribery scheme, *Matsushita*, 475 U.S. at 587, because Ingomar did not gain any business from it. For example, Rahal had been bribing Frito-Lay's purchasing agent for years before CTEG was formed with the belief that his bribes were securing *all* of the Frito diced tomato business for SK Foods (except for whatever amount was sourced from another supplier, TomaTek) and locking out other competitors (SUF 19).[12]   Until Rahal was deposed in this action, he was unaware that Ingomar had also been selling diced tomatoes to Frito-Lay since 2001 (SUF 20) -- years before CTEG was formed and during the entire time that Rahal was paying bribes under the mistaken impression that those bribes were excluding Ingomar and others. Each year from 2001 through 2007, Ingomar had tried unsuccessfully to increase its sales volumes to Frito-Lay but had no success until after April 2008, when the government's investigation became public and the bribery scheme ended (SUF 26; Pruett Aff. at ¶ 6). One cannot reasonably infer that Ingomar joined a conspiracy to bribe Frito-Lay when the architect of the bribery scheme was paying bribes to *exclude* Ingomar.

Similarly, the economic factors suggest that Ingomar had no motive to join in Rahal's scheme to bribe Kraft. Kraft has been an Ingomar customer since the 1980's (SUF 21; Rufer

---

[12] Rahal had been bribing Frito-Lay's purchasing agent for "at least three or four years before CTEG was formed" (Rahal Depo. at 193:16-194:4). He testified that he knew Ingomar had sold tomato paste to Frito-Lay, but not the higher margin diced product (*id*. at 75:19-22); rather, he believed his bribes had secured SK Foods as one of only two suppliers of diced tomatoes to Frito-Lay (the other being TomaTek) (*id*. at 74:16-75:7)  Rahal was surprised to learn later at his deposition that despite his bribes, Ingomar actually had been supplying Frito-Lay with diced tomato products each year since 2001 (*id*. at 212:15-20, 213:15-19).

Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13

Dep. at 15:8-23, 17:10-13; Pruett Aff. at ¶7).[13]   Rahal began bribing Kraft's purchasing agent in 2003, at least two years before CTEG was formed (SUF 9, 2; Rahal Dep. at 194:5-19).  From 2002 through 2007 – regardless of whether Kraft's primary supplier was Morning Star or SK Foods – Kraft contracted to buy only about 10 million pounds of tomato paste per year from Ingomar (SUF 17-18; Pruett Dep. at 126:20-24; Pruett Aff. at ¶ 7, Exhs. 3 and 4).  In 2006 and 2007, Ingomar bid – unsuccessfully – to sell higher quantities and additional products to Kraft (SUF 23-24).  In 2006, Ingomar bid to sell Kraft 20 million pounds of tomato paste and 4 million pounds of crushed tomatoes; Kraft awarded Ingomar only a 10 million pound contract for paste, consistent with the pattern since at least 2002 (Pruett Aff. at ¶ 7; Exh. 5).  In 2007, Ingomar bid to sell 10 million pounds of paste, 3.5 million pounds of diced tomatoes and 5 million pounds of crushed tomatoes; Kraft awarded Ingomar only the 10 million pounds of paste (Pruett Dep. at 201:15-24, Pruett Aff. ¶ 7, Exh. 6).[14]   One cannot reasonably infer that Ingomar joined a conspiracy to bribe Kraft, when it did not increase its sales to Kraft during the time the bribery took place.

The same basic pattern recurs with respect to the other Morning Star "lost customers": Ingomar's sales did not increase during the CTEG period as to any of them.  For instance:

Safeway.  Ingomar had tried to develop Safeway as a customer since at least 2001, but except for two small spot sales in 2006 (160,348 pounds) and 2007 (321,294 pounds), Ingomar has not sold it any processed tomato products (SUF 33; Pruett Aff. ¶ 9).

B&G Foods.  Except for one contract to sell 1,850,000 pounds of paste from the 2003 crop year (under which it sold 2,060,532 pounds), Ingomar has not sold any processed tomato products to B&G since 2001 (SUF 34; Pruett Aff. ¶ 10).

ConAgra.  Pat Coe, ConAgra's purchasing agent, refused Rahal's attempted bribe

---

[13] Kraft was also a "large volume customer" of Morning Star through 2003, when Morning Star's 5-year contract expired. *See* Rufer Restitution Dec. at 2:17-20 (Zovickian Aff., Exh. M).

[14] For 2008, Ingomar managed to win a contract for 15 million pounds of paste, but that bid was made in May 2008 and the contract awarded on June 25, 2008 (SUF 25; Pruett Aff. ¶7, Exh. 7), after the search warrants had been issued and Rahal's assets seized in mid-April (SAC ¶¶ 29, 31).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

and remains employed by ConAgra (Coe Dep. at 31:14-32:3; Rahal Dep. at 90:11-91:5).

ConAgra has been a substantial customer of Ingomar since at least 2001 (SUF 35; Pruett Aff.

¶ 11).  From 2006-08, however, Ingomar's sales to ConAgra were about half what they had been

in the preceding three-year period (2003-05).  *Id.*

        <u>McCormick USA</u>.  McCormick USA ("McCormick") manufactures and supplies

many of the tomato-based spices used on Frito-Lay's chip products (Rahal Dep. at 79:1-22).

Rahal did not identify McCormick as one of the SK customers he bribed (*id*. at 197:4-11);

nevertheless, Morning Star contends that Frito-Lay's bribed purchasing agent caused

McCormick to terminate its multi-year contract with Morning Star in 2001 and replace Morning

Star with SK Foods.  *See* Rufer Restitution Dec. at 3:17-4:18 (Zovickian Aff., Exh. M).  Morning

Star resumed supplying McCormick after "Salyer's bribery scheme became public knowledge"

(*id*. at 4:9-14).  Ingomar also had a multi-year contract with McCormick, which was also

terminated in or around 2001, with at least one year remaining on the contract (SUF 32; Pruett

Aff. ¶ 12).  Except for relatively small spot sales, Ingomar did not sell any tomato products to

McCormick from 2001 to 2008 (SUF 17-18, 32; Pruett Aff. *¶* 12).

        The only exception to this pattern, Agusa, proves the absence of any bribery conspiracy.

Rahal bribed the purchasing agent for Agusa in the summer of 2007 (SUF 10) -- when Ingomar

competed directly against and won the business *away from SK Foods* (SUF 27).[15]  One cannot

reasonably infer that Ingomar joined SK Foods in a conspiracy to bribe Agusa – or that SK

Foods allowed Ingomar to join it – when Ingomar set out to compete for the very contract Rahal

had hoped to secure for SK Foods through his bribe.

        Thus, with respect to the commercial bribery scheme, the only reasonable inference that

finds support in the undisputed evidence is that Rahal and Salyer acted independently of Ingomar

---

[15] In 2007, Ingomar competed against SK Foods and won a 3-year contract (2007-2009) for 18 million pounds of paste each year (SUF 28; Pruett Aff. ¶8), which upset Salyer because Ingomar "took the Agusa business from him" (SUF 31; Pruett Depo. at 56:23-24).  Rahal bribed the Agusa purchasing manager in connection with the 2007 negotiations, but his bribe only succeeded in getting SK Foods a contract for 5 million pounds of paste, which Agusa had previously sourced from China (SUF 30; Rahal Depo. at 78:25-82:16, 168:18-171:12, Exh. 46; SAC ¶¶ 40-44).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16                    Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13

when bribing customers.  There is simply no evidence that Ingomar agreed to, joined, or participated in (or even knew about) the alleged commercial bribery scheme, the cause of Morning Star's alleged antitrust injury.  Indeed, Ingomar "lacked any rational motive" to join a bribery scheme that did not benefit it and – as Rahal testified – "certainly" would have had the effect of limiting Ingomar's business (Rahal Dep. at 210:13-19).  *Matsushita*, 475 U.S. at 587; *see also Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952-53 (9th Cir. 1998) (affirming summary judgment in part because claim did not "make economic sense"); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 568 (11th Cir. 1998) (affirming summary judgment because "irrational" to infer that defendants "participated in a conspiracy that excluded them from the market").

B.     The RICO Claim Should Be Dismissed

Section 1964(c) of Title 18 creates a civil cause of action "for any person injured in his business or property by reason of" a defendant's violation of the criminal RICO provisions in Section 1962(c).  The elements of a substantive civil RICO claim under Section 1962(c) are "(1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activities (known as 'predicate acts'); (5) causing injury to the plaintiff's 'business or property.'"  Order Den. Mot. To Dismiss, ECF No. 130 at 6 (citing *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).  A "pattern" requires at least two predicate acts, and "the plaintiff must show that the injury was proximately caused by the [prohibited] conduct."  *Id*. at 6.  A "RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation."  *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002).  "Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails."  *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008).

As this Court has already concluded, bribery is "the 'proper referent' for the proximate cause inquiry" because the bribes allegedly prevented Morning Star from competing for sales "despite the fact that Morning Star had submitted lower bids" ( Order Den. Mot. To Dismiss,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

ECF No. 130 at 9).  Thus each of the predicate acts alleged in the SAC hinges on alleged acts of "commercial bribery."  *See* SAC ¶ 109 [state penal codes], 110 [Travel Act], 112 [money laundering], 116 [mail and wire fraud].  As demonstrated above, there is no evidence that either of the Ingomar Defendants, directly or indirectly, committed or caused to be committed, participated in, or even knew of any act of bribery. [16]

Moreover, to establish a substantive RICO violation, Morning Star must prove not only that the Ingomar Defendants participated in two qualifying predicate acts involving bribery, but that they did so with the "mens rea requirement . . . found in the predicate crimes."  *U.S. Bank Nat. Ass'n v. Franulovic*, No. CIV 03-1150-HA, 2007 WL 1598091, at *4 (D. Or. June 1, 2007); *accord, Lancaster,* 940 F.2d at 404 ("A specific intent to deceive is an element of the predicate act, mail fraud, on which [the] RICO claim is based").  And for bribery – the causal lynchpin for each alleged predicate act on which Morning Star's RICO claim is based – the *mens rea* that must be established is a specific intent to engage in a *quid pro quo*.  In other words, Morning Star must have proof that the Ingomar Defendants not only participated in paying a "thing of value" to a purchasing agent but that they did so "corruptly" and with an understanding that the payment was made "in return for [that employee] using or agreeing to use his or her position for the benefit of" Ingomar. *See* Cal. Penal Code § 641.3(a) (2010); *see also* § 641.3(d)(3) (2010)

---

[16] There is an independent reason why, as a matter of law, neither of the alleged predicate acts based on mail or wire fraud can support Morning Star's alleged RICO claims.  Under RICO, the predicate offense must have caused "injury to the plaintiff's 'business or property.'"  Order Den. Mot. To Dismiss, ECF No. 130 at 6.  In *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, the court affirmed summary judgment on a RICO claim, holding that the plaintiff's alleged RICO damages -- lost market share because defendants set out "to 'steal' [its] customers" -- did "not support a claim of mail fraud" as a predicate offense under RICO, because "it cannot be said that these customers were Lancaster's property. The 'fraud' Lancaster alleges is in reality nothing more or less than unalloyed anti-competitive conduct. This conduct may be unacceptable, but it is not 'fraud.'"  *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405-06 (9th Cir. 1991).  Similarly, Morning Star's alleged injury -- lost sales or market share -- does not qualify as fraud under the mail fraud statute.  The same reasoning applies to wire fraud.  *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) ("mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud").  Thus, neither mail nor wire fraud qualifies as a predicate act for the RICO losses claimed by Morning Star.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB3/376766573.13

(defining "corruptly" to mean that the defendant "*specifically intends* to injure or defraud" the employer of the bribe-taker or "competitor of any such employer").  There is no such evidence in the record.

The "requirements of § 1962(c) must be established as to each individual defendant." *Craig Outdoor Adver.*, 528 F.3d at 1027; *see also United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise."), *cert. denied,* 486 U.S. 1022 (1988).  Here, there is no evidence that either of the Ingomar Defendants, directly or indirectly, committed or caused to be committed, participated in, or even knew of any act of bribery, much less with the *mens rea* required by the underlying predicate statutes.

C.     The RICO Conspiracy Claim Should Be Dismissed

To avoid summary judgment on their RICO conspiracy claim, 18 U.S.C. § 1962(d), Morning Star must have evidence sufficient to establish against the Ingomar Defendants either that they made "an agreement that is a substantive violation of RICO or that [they] agreed to commit, or participated in, a violation of two predicate offenses."  *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  Proof of an "agreement" under RICO requires evidence that the defendant "adopt[ed] the goal of furthering or facilitating the criminal endeavor," *and* that the "defendant must also have been 'aware of the essential nature and scope of the enterprise and intended to participate in it.'"  *Id*. (quoting *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)). "'Thus, mere association with the enterprise would not constitute an actionable § 1962(d) violation.  In a RICO conspiracy, as in all conspiracies, agreement is essential.'"  *Baumer*, 8 F.3d at 1346 (internal citation omitted).  After over three years of discovery, aided by an extensive criminal investigation by the government, there is no evidence of any such agreement by either of the Ingomar Defendants.

Specifically, there is no evidence – none whatever – that either of the Ingomar Defendants was "aware of" the commercial bribery scheme, "intended to participate in it," or

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Brief in Support of Ingomar Defendants' Motion for Summary Judgment

"adopt[ed] the goal of furthering or facilitating" it.  Indeed, the undisputed evidence refutes any such claim; the Ingomar Defendants did not agree to participate in and did not intend to participate in a bribery scheme that was kept secret from them.

VI.     CONCLUSION

    For the reasons given above, the Ingomar Defendants are entitled to summary judgment.

DATED:  May 15, 2015             Respectfully submitted,

Ramsey & Ehrlich LLP           Morgan, Lewis & Bockius LLP

By:     /s/ Miles Ehrlich         By:     /s/ Stephen Zovickian
        Miles F. Ehrlich               Stephen Zovickian

    Attorneys for Defendant          Attorneys for Defendant
    Gregory R. Pruett           Ingomar Packing Company

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20        Case No. No. 2:09-CV-00208 KJM-EFB
Brief in Support of Ingomar Defendants' Motion for Summary Judgment

DB3/376766573.13