1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   THE MORNING STAR PACKING                No. 2:09-cv-00208-KJM-KJN
     COMPANY, et al.,
12
                         Plaintiffs,
13                                            ORDER
           v.
14
     S.K. FOODS, L.P., et al.,
15
                         Defendants.
16

17          This matter is before the court on the motion for partial summary judgment, or, in

18   the alternative, an order interpreting a federal statute "pursuant to the [c]ourt's inherent

19   authority," by defendants Ingomar Packing Company and Gregory R. Pruett.  Defs.' Mot., ECF

20   No. 193.  Plaintiffs Morning Star Packing Company, Liberty Packing Company, LLC, California

21   Fruit & Tomato Kitchens, LLC, and The Morning Star Company oppose the motion and

22   defendants have replied.  ECF Nos. 199, 202.  The court decides this matter without a hearing.

23   As explained below, the court construes the motion as a request for determination of whether as a

24   matter of law the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA)

25   limits exposure to civil damages, not just for Sherman Act violations, but for alleged RICO

26   violations and in the face of other antitrust claims as well.  The court GRANTS defendants'

27   motion to the extent set forth below.

28   /////

                                            1

I.      INTRODUCTION

        A.      PROCEDURAL BACKGROUND

                On January 22, 2009, plaintiffs filed their original complaint containing five claims based on alleged federal antitrust and RICO violations against defendants SK Foods, L.P., Scott Salyer, Randall Rahal and Intramark USA, Inc.  Compl., ECF 1.[1]  On December 6, 2010, plaintiffs filed their Second Amended Complaint (SAC), the operative complaint, stating claims against all defendants based on the Robinson-Patman Act (15 U.S.C. § 13(c)); the Sherman Act (15 U.S.C. § 1); the RICO statute (18 U.S.C. § 1962(c)); and asserting conspiracy to violate RICO (18 U.S.C. § 1962).  Specifically, the racketeering activity pleaded is: 1) commercial bribery in violation of California Penal Code § 641.3, New Jersey Statutes Annotated § 2C:21-10, Texas Penal Code § 32.43; 2) violations of the federal Travel Act, 18 U.S.C. § 1952; 3) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(3)(C); and 4) mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.  SAC, ECF No. 116.  On October 15, 2014, defendants filed the instant motion.  ECF No. 193.  On November 7, 2014, plaintiffs filed an opposition, Opp'n, ECF 199, and on November 14, 2014, defendants a reply, ECF No. 202.

        B.      UNDISPUTED FACTUAL BACKGROUND

                On August 5, 2008, defendants Ingomar and its President, Pruett, entered into a leniency agreement with the United States Department of Justice (DOJ) Antitrust Division regarding "possible price fixing, bid rigging, and market allocation, or other conduct violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the processed tomato products industry in the United States."  Leniency Agreement ECF No. 197-1 at 3.  A leniency agreement allows the first entity to report illegal activity to be protected by immunity and to benefit from leniency in fines and punishment if the entity fully cooperates in the investigation and takes "prompt and effective action to terminate its part in the activity."  *See* DOJ Corporate Leniency Policy, Ex. 1, ECF No. 196.  Under ACPERA, an "antitrust leniency agreement" is defined as "a leniency agreement, whether conditional or final, between a person and the Antitrust Division pursuant to the

---

[1] Over the course of the litigation, this case has been related to and consolidated with several other cases.  *See* ECF Nos. 37, 52, 56.

2

1    Corporate Leniency Policy of the Antitrust Division." Pub. L. No. 108-237, § 213 (2004), 118

2    Stat. 661, 665–67 (2004) (codified at 15 U.S.C. § 1 n.1[2]) (ACPERA).

3         In its agreement with DOJ, Ingomar represents it "desires to report"

4    anticompetitive activity and "took prompt and effective action to terminate its part . . .," "did not

5    coerce any other party to participate . . . [and] was not the leader in. . . [or] originator of [] the

6    anticompetitive activity. . . ." *Id*. at 1. The agreement requires "full, continuing and complete

7    cooperation [with] the Antitrust Division" by providing documents, information and responses to

8    questions, making grand jury appearances, and making reasonable efforts to pay restitution. *Id*. at

9    1–2. In exchange for full compliance with the agreement, the Antitrust Division promises to not

10   prosecute Ingomar or any director, officer or employee of Ingomar for participation in

11   anticompetitive activity. *Id*. at 3. It is undisputed the leniency agreement is "conditional," and it

12   has yet to be determined whether Ingomar will be eligible for ACPERA immunity. Defs.' Mot. at

13   4 n.1; Opp'n at 3.

14        Under ACPERA, damages recoverable from a leniency applicant "in a civil action

15   alleging a violation . . . of the Sherman Act . . . or any similar state law" "based on conduct

16   covered by a currently effective leniency agreement" . . . "shall not exceed the portion of the

17   actual damages sustained by such claimant which is attributable to the commerce done by the

18   applicant in the goods or services affected by the violation." ACPERA § 213. This cap on

19   damages is contingent upon the leniency applicant's providing "satisfactory cooperation" to a

20   claimant in a civil action. *Id*. § 213(b). Here, as noted, the civil action involves conduct alleged

21   to have violated the Sherman Act, as well as federal RICO laws, and the Robinson-Patman Act.

22   *See* SAC at 24-33.

23        It is undisputed that, in an effort to comply with its ACPERA obligations, Ingomar

24   has made itself available to plaintiffs to answer any questions or offer additional information

25   /////

26   _____

27        [2] That the statute is codified as a note does not change its force as law. "The Statutes at
     Large provide the evidence of the laws of the United States." *Conyers v. Merit Sys. Prot. Bd.*,
     388 F.3d 1380 & n.2, 1382 (Fed. Cir. 2004) (considering the Aviation and Transportation
28   Security Act (ATSA), codified as a note to 49 U.S.C. § 44935).

1   related to anticompetitive activity and alleged unlawful behavior violations generally.  Defs.'

2   Mot. at 6; Opp'n at 2.

3       C.      REQUEST FOR JUDICIAL NOTICE

4           Ingomar requests that the court take judicial notice of the following documents:

5   (1) DOJ Corporate Leniency Policy (1994); (2) DOJ Frequently Asked Questions Regarding the

6   Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008);

7   (3) Congressional Record, 150 Cong. Rec. 45, 3614 (2004); (4) Congressional Record, 155 Cong.

8   Rec. 85, 6329–30 (2009); (5) Congressional Record, 156 Cong. Rec. 82, 4559–360 (2010).

9   Request for Judicial Notice, ECF No. 196.  Ingomar contends these documents are susceptible to

10  the taking of judicial notice because they are "readily determinable information."  *Id*. at 2.

11  Plaintiffs oppose the request with respect to documents (1) and (2) because they have "no factual

12  bearing" on the matter.  Objection to Judicial Notice, ECF No. 199-4.

13          Under the Federal Rules of Evidence, "[t]he court may judicially notice a fact that

14  is not subject to reasonable dispute because it can be accurately and readily determined from

15  sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  The court finds all

16  of the documents covered by Ingomar's request are relevant to the question before it, as framed

17  above.  They either are "accurately and readily determined" by reference to a trusted source, the

18  DOJ's website, *Jarvis v. JP Morgan Chase Bank, N.A*., No. CV 10-4184, 2010 WL 2927276, at

19  *1 (C.D. Cal. July 23, 2010) ("Judicial notice may be taken of documents available on

20  government websites."), or are official records of the legislative branch.  *Paralyzed Veterans of*

21  *Am. v. McPherson*, 2006 WL 3462780 (N.D. Cal. Nov. 28, 2006) (taking judicial notice of

22  Congressional Record).  Accordingly, the request for judicial notice is granted.[3]

23  II.     FEDERAL COURTS' INHERENT AUTHORITY

24          Federal courts are invested with inherent powers that are "governed not by rule or

25  statute but by the control necessarily vested in courts to manage their own affairs so as to achieve

26

27          [3] The court takes judicial notice of the DOJ FAQ, while noting the exhibit submitted is
    only a portion of the full FAQ.  The court has reviewed the full document, publicly available on
28  the DOJ website at http://www.justice.gov/atr/public/criminal/239583.htm.

1    the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc*., 501 U.S. 32, 43

2    (1991) (quoting *Link v. Wabash R.R. Co*., 370 U.S. 626, 630–31 (1962)). "The broad and

3    inherent power of the District Court to regulate litigation before it is supported by abundant

4    authority . . . ." *Van Bronkhorst v. Safeco Corp*., 529 F.2d 943, 951 (9th Cir. 1976). Here,

5    determining whether defendants may be in a position to benefit from ACPERA's damages

6    limitation provision will clarify certain questions at this stage of the litigation, can be effected on

7    the record before the court, and will aid in the orderly and expeditious resolution of this matter.

8         Federal courts are empowered to interpret leniency agreements, determine their

9    applicability, and enforce them. *See* ACPERA § 213(b) (providing that an amnesty applicant

10   may receive reduced civil liability only "if the court in which the civil action is brought

11   determines, after considering any appropriate pleadings from the claimant, that the applicant . . .

12   has provided satisfactory cooperation to the claimant with respect to the civil action"); *cf. Stolt-*

13   *Nielsen, S.A. v. United States*, 442 F.3d 177, 182 (3d Cir. 2006), *as amended* (May 16, 2006)

14   (making determination in criminal case). For example, in *In re Aftermarket Automotive Lighting*

15   *Products Antitrust Litigation*, 2013 WL 4536569 (C.D. Cal. 2013), another district court issued

16   an order in exercise of its inherent authority in a civil case to determine whether defendants had

17   satisfied their ACPERA obligations before trial. *Id*. at *6.

18        Here, while this case is not ready for trial, the court decides the issue of the

19   potential scope of Ingomar's ACPERA protections as a matter of law, though it does not at this

20   stage decide Ingomar's actual eligibility for the ACPERA damages cap. The scope of ACPERA

21   protection is an issue of statutory interpretation; the judiciary is the final authority on issues of

22   statutory construction. *Fed. Election Comm'n v. Ted Haley Cong. Comm*., 852 F.2d 1111, 1113–

23   14 (9th Cir. 1988).

24   III.    DISCUSSION

25        Defendants seek to establish as a matter of law that they may benefit from the

26   strict limitation on damages applicable to leniency applicants under ACPERA. Specifically,

27   defendants ask the court to find the actions underlying plaintiff's alleged RICO and other antitrust

28   claims were committed "in connection with" those underlying the Sherman Act antitrust claims

such that the cap applies to all claims in this action.  Defs.' Mot. at 4.  Defendants contend they present a narrow question of statutory interpretation based on undisputed facts.  Reply at 2–3.

Plaintiffs, while opposing an order as an exercise of the court's inherent authority, also oppose summary judgment as premature, a position with which the court agrees in part. Opp'n at 5.  To the extent plaintiffs argue that an ACPERA determination would not narrow issues for trial or that, as a matter of law, the leniency agreement does not cover all of plaintiffs' claims, the court disagrees.  In making the determination set forth below, the court relies on the second amended complaint as pled and engages in statutory construction.

As relevant here, ACPERA provides:

(a) In General.--Subject to subsection (d), in any civil action alleging a violation of section 1 or 3 of the Sherman Act, or alleging a violation of any similar State law, based on conduct covered by a currently effective antitrust leniency agreement, the amount of damages recovered by or on behalf of a claimant from an antitrust leniency applicant who satisfies the requirements of subsection (b), together with the amounts so recovered from cooperating individuals who satisfy such requirements, shall not exceed that portion of the actual damages sustained by such claimant which is attributable to the commerce done by the applicant in the goods or services affected by the violation.

(b) Requirements.--Subject to subsection (c), an antitrust leniency applicant or cooperating individual satisfies the requirements of this subsection with respect to a civil action described in subsection (a) if the court in which the civil action is brought determines that the applicant or cooperating individual, as the case may be, has provided satisfactory cooperation to the claimant with respect to the civil action, which cooperation shall include--

(1) providing a full account to the claimant of all facts known to the applicant or cooperating individual, as the case may be, that are potentially relevant to the civil action;

(2) furnishing all documents or other items potentially relevant to the civil action that are in the possession, custody, or control of the applicant or cooperating individual, as the case may be, wherever they are located; and

(3)(A) in the case of a cooperating individual--

(i) making himself or herself available for interviews, depositions, or testimony in connection with the civil action as the claimant may reasonably require; and

6

1

2

(ii) responding completely and truthfully, without making any attempt either falsely to protect or falsely to implicate any person or entity, and without intentionally withholding any potentially relevant information, to all questions asked by the claimant in interviews, depositions, trials, or any other court proceedings in connection with the civil action; or

3

4

5

6

(B) in the case of an antitrust leniency applicant, using its best efforts to secure and facilitate from cooperating individuals covered by the agreement the cooperation described in paragraphs (1) and (2) and subparagraph (A).

7

8

9

10

(c) Timeliness.--If the initial contact by the antitrust leniency applicant with the Antitrust Division regarding conduct covered by the antitrust leniency agreement occurs after a civil action described in subsection (a) has been filed, then the court shall consider, in making the determination concerning satisfactory cooperation described in subsection (b), the timeliness of the applicant's initial cooperation with the claimant.

11

12

13

(d) Continuation.--Nothing in this section shall be construed to modify, impair, or supersede the provisions of sections 4, 4A, and 4C of the Clayton Act relating to the recovery of costs of suit, including a reasonable attorney's fee, and interest on damages, to the extent that such recovery is authorized by such sections.

14

ACPERA § 213.

15

The court looks first to the plain language of the statute to determine whether it is

16

clear and unambiguous, as such language must ordinarily be regarded as conclusive. *United*

17

*States v. Alvarez-Sanchez,* 511 U.S. 350, 356 (1994); *see I.N.S. v. Cardoza-Fonseca*, 480 U.S.

18

421, 433 n.12 (1987) (there is a "strong presumption that Congress expresses its intent through

19

the language it chooses"). If the language is plain, no further construction of the statute is

20

required, for there is nothing to construe. *Id.*; *see also Chevron, U.S.A. v. Natural Resources*

21

*Defense Council, Inc*., 467 U.S. 837, 842–43 (1984).

22

The plain language of the statute here provides that for a leniency applicant to be

23

eligible for the damages cap in a civil action, the civil action must allege a Sherman Act violation,

24

15 U.S.C. §§ 1, 3, based on conduct covered by a leniency agreement. ACPERA § 213(a). The

25

plain language does not say the civil action must allege only a Sherman Act violation. It also

26

does not exclude actions that include other antitrust claims as well, including RICO violations,

27

prosecuted under a different federal statute. *Id.* The statute's damages limitation language is not

28

tied expressly to Sherman Act damages but rather references "the amount of damages recovered

1    by or on behalf of a claimant from a [qualifying] antitrust leniency applicant," and notes those

2    damages "shall not exceed that portion of the actual damages" sustained by a claimant and

3    "attributable to the commerce done by the applicant in the goods or services affected by the

4    violation." *Id*.  While this language requires a connection to a leniency applicant's commercial

5    activities "affected by the violation," referring back to the predicate Sherman Act or similar state

6    law violation, it does not restrict the limitation to the amount of damages recovered by or on

7    behalf of a claimant for a Sherman Act violation alone.  The rest of the statute references "a civil

8    action" generally, without limiting the action to one that contains only a Sherman Act or related

9    state law claim.  *See* ACPERA § 213(b)(1) & (2), (b)(3)(A)(i) & (ii), (c).  Congress, of course, is

10   presumed to know how to say what it means.  Here its meaning, upon a close reading, seems

11   clear.

12            The legislative history is consistent with this reading and does not reflect a "clearly

13   expressed legislative intention" contrary to the plain language of the statute.  *Cardoza-Fonseca*,

14   480 U.S. at 433 n.12.  The DOJ's Corporate Leniency Program began in 1993, eleven years

15   before ACPERA was adopted, and provided that a cartel participant who was first to report a

16   criminal Sherman Act violation and subsequently cooperated with the investigation would receive

17   immunity from the resulting criminal prosecution.  DOJ Corporate Leniency Program, Ex. 1, ECF

18   No. 196.  The leniency program originally did not protect against the treble damages imposed

19   upon a finding of antitrust civil liability, which Congress found chilled participation.  Senator

20   Orrin Hatch (R-UT), in sponsoring ACPERA, explained during the bill's 2004 Senate hearing

21   that it was intended  to "address[] this disincentive to self-reporting" for "corporations and their

22   executives if they provide adequate and timely cooperation to the Government investigators as

23   well as any subsequent private plaintiffs bringing a civil suit based on the covered criminal

24   conduct."  150 Cong. Rec. S3610, S3614 (Apr. 2, 2004); *see also Oracle Am., Inc. v. Micron*

25   *Tech., Inc.*, 817 F. Supp. 2d 1128, 1132 (N.D. Cal. 2011) (citing 150 Cong. Rec. S3613 (2004)

26   (statement of sponsor Senator Hatch that ACPERA was enacted to provide "increased incentives

27   for participants in illegal cartels to blow the whistle on their co-conspirators and cooperate with

28   the Justice Department's Antitrust Division" by limiting "a cooperating company's civil liability

8

1   to actual, rather than treble, damages in return for the company's cooperation in both the resulting

2   criminal case as well as any subsequent civil suit based on the same conduct.")).  *See also* 150

3   Cong. Rec. H3654, H3657 (2004) (statement of Rep. Jim Sensenbrenner (R-Wis.), that "The bill

4   creates an additional incentive for corporations to disclose antitrust violations by limiting their

5   liability in related civil claims to actual damages.").  Senator Patrick Leahy (D-VT) explained that

6   under ACPERA, "to qualify for amnesty, a party must provide substantial cooperation . . . in any

7   civil case brought by private parties that is based on the same unlawful conduct."  *Id.*  It is

8   significant that lawmakers did not limit their statements in favor of limiting liability to Sherman

9   Act actions, but used the more expansive language of "civil action," "civil suit," and "civil

10  liability."

11          In hearings on ACPERA's renewal in 2009, Rep. Henry Johnson (D-Ga.)

12  reiterated that ACPERA was originally enacted to "address[] this shortcoming in the criminal

13  leniency program by also limiting the cooperating party's exposure to liability with respect to

14  civil litigation."  155 Cong. Rec. H.R. 2675 (June 9, 2009).  Rep. Johnson co-sponsored the

15  renewal of the bill in the House with Rep. John Conyers (D-Mich.), Rep. Lamar Smith (R-TX),

16  and Rep. Howard Coble (R-NC).  House Congressional Record at 4, Ex. 4, ECF No. 196-4.

17  During the 2009 renewal proceedings, the sponsoring representatives shared ACPERA's success

18  in providing incentives to destabilize cartels.  Rep. Johnson's testimony emphasized the

19  importance of incentivizing reporting as a key to destabilizing cartels and the success of

20  ACPERA since 2004, as well as ACPERA's role in helping to secure jail sentences in 85 percent

21  of individual prosecutions and over $900 million in criminal fines.  *Id.* at 3–4.  Given this

22  legislative history, ACPERA should be read with the understanding it was enacted to incentivize

23  stakeholders to report any anticompetitive behavior, and intended to prioritize criminal

24  investigations and limit civil antitrust liability.

25          In clarifying congressional intent, the court may also look to the interpretation of

26  the statute by the agency charged with its administration.  *Brock v. Writers Guild of Am., W., Inc.*,

27  762 F.2d 1349, 1353 (9th Cir. 1985).  An agency's interpretation is entitled to deference so long

28  as the agency's interpretation "is based on a permissible construction of the statute."  *See*

1    *Chevron*, 467 U.S. at 843.  "When a statute is ambiguous or leaves key terms undefined, a court

2    must defer to the federal agency's interpretation of the statute, so long as such interpretation is

3    reasonable."  *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1056 (9th Cir. 2008) (citing

4    *Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc*., 423 F.3d 1056, 1067 (9th

5    Cir. 2005)).  An agency's interpretation of a statute is permissible, unless "arbitrary, capricious,

6    or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844.

7            The DOJ, specifically the Antitrust Division, the agency that administers leniency

8    agreements in criminal antitrust cases is identified as such in ACPERA.  *See* ACPERA § 212(1)

9    & (2).  While the DOJ is not charged with administration of ACPERA's civil provisions, its

10   interpretation of the import of a criminal leniency agreement is instructive.  It is the DOJ which is

11   charged with the authority to enter into leniency agreements and designate an entity as a

12   "leniency applicant" that may be subject to ACPERA's requirements and protections.  In order

13   for ACPERA to apply, an applicant must have a continual, meaningful relationship with the DOJ

14   and cooperate in both criminal and civil investigations.  This relationship supports a finding that

15   the DOJ's interpretation of leniency agreements is significant in understanding ACPERA.

16          The DOJ has issued a document explaining corporate leniency agreements, styled

17   as answers to "frequently asked questions," commonly known as "FAQ."  *See* DOJ Antitrust

18   Division Frequently Asked Questions ("DOJ FAQ"), ECF 196-2.  Courts have considered agency

19   FAQs when engaged in statutory interpretation.  *See, e.g*., *Ellenberg v. New Mexico Military Inst*.,

20   572 F.3d 815, 822 (10th Cir. 2009) (noting Department of Education FAQ supports court's

21   reading of the regulation defining "qualified handicapped person" for purposes of eligibility

22   under Section 504 of the Rehabilitation Act); *Peterson v. Islamic Republic of Iran*, No. 10 4518,

23   2013 WL 1155576, at *9 (S.D.N.Y. Mar. 13, 2013) (referencing Treasury Department FAQ in

24   determining requirements of Executive Order issued subject to International Emergency

25   Economic Powers Act), *aff'd*, 758 F.3d 185 (2d Cir. 2014).  The DOJ FAQ confirms that criminal

26   offenses other than Sherman Act violations, including bribery and mail fraud, when occurring in

27   connection with a "bid-rigging scheme" as alleged here, are covered by a leniency agreement

28   when "committed in connection with the antitrust violation."  DOJ FAQ, ECF 196-2 at 7.  This

1  explanation parallels the language of ACPERA, which provides coverage "in any civil action"

2  "based on conduct covered by a currently effective antitrust leniency agreement."  ACPERA §

3  213(a).  The DOJ also explains that a leniency agreement "provides leniency from the Antitrust

4  Division not only for a criminal antitrust violation, but also for other offenses committed in

5  connection with antitrust violation."  DOJ FAQ at 7.  To determine what unlawful activity may

6  also be covered by a leniency agreement, DOJ offers the following guidance: "For example,

7  conduct that is usually integral to the commission of a criminal antitrust violation, such as

8  mailing, faxing, or emailing bids agreed upon with competitors, can constitute other offenses,

9  such as mail or wire fraud violations or conspiracies to defraud."  *Id*. 7.

10        As noted, plaintiffs' second amended complaint alleges bribery, money

11  laundering, violations of the Robinson-Patman Act, 15 U.S.C. § 13, violations of the Travel Act,

12  18 U.S.C. § 1952, mail fraud and wire fraud, and conspiracy, all violations of RICO, 8 U.S.C.

13  § 1962(c) and (d), in addition to the Sherman Act violations.  *See* SAC at 27-32, ECF No. 116.

14  Assuming all of plaintiffs' allegations are true, the facts pled support all of the antitrust claims

15  because the actions were committed in furtherance of anticompetitive behavior.  Based on the

16  legislative intent to extend the type of leniency available in criminal cases to civil cases, as well

17  as the facts as pled in the second amended complaint, the court finds as a matter of law that all of

18  plaintiff's claims, including the alleged RICO violations, are covered by the leniency agreement's

19  damages limitations.

20        The court does not find that Ingomar has fully complied with the leniency

21  agreement; rather the full extent of Ingomar's cooperation has yet to be determined.  "[T]he

22  language of ACPERA suggests that the [c]ourt's assessment of an applicant's cooperation occurs

23  at the time of imposing judgment or otherwise determining liability and damages."  *In re TFT-*

24  *LCD (Flat Panel) Antitrust Litig*., 618 F. Supp. 2d 1194, 1196 (N.D. Cal. 2009).  Ingomar's

25  actual eligibility for ACPERA protection will be resolved at a later stage in the litigation.

26  /////

27  /////

28  /////

11

IV.     CONCLUSION

        The claims pled in plaintiff's second amended complaint are covered by ACPERA's damages limitation provisions as a matter of law.

        IT IS SO ORDERED.

DATED:  June 18, 2015.

_____
UNITED STATES DISTRICT JUDGE