1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   THE MORNING STAR PACKING                    No.  2:09-cv-00208-KJM-EFB
     COMPANY, et al.,
12
                        Plaintiffs,
13                                                ORDER
              v.
14
     SK FOODS, L.P., et al.,
15
                        Defendants.
16

17

18          Plaintiff Morning Star has brought suit against several competitors in the industry,

19   including companies known as Los Gatos and Ingomar.  Morning Star alleged defendants

20   engaged in an anti-competitive scheme that injured Morning Star's business and violated both the

21   Sherman Act and the Racketeer Influenced and Corrupt Organizations Act (RICO).  Ingomar and

22   Los Gatos have moved for summary judgment.

23          At hearing, A. James Kachmar and Dale Campbell appeared for Morning Star,

24   Stephen Zovickian appeared for Ingomar, Miles Ehrlich appeared for Ingomar's president Gregg

25   Pruett, Charles Jaeger appeared for Los Gatos and its president Stuart Woolf, and Malcolm Segal

26   appeared for Scott Salyer.  ECF No. 296.  As explained below, the court GRANTS Ingomar's

27   motion IN PART, DENIES Ingomar's Motion IN PART, and GRANTS Los Gatos's motion.

28

                                                   1

I.     PROCEDURAL HISTORY AND CLAIMS

The Morning Star Packing Company, the Morning Star Company, Liberty Packing Company, and California Fruit & Tomato Kitchens (collectively "plaintiffs" or "Morning Star") commenced this action on January 22, 2009, filed a first amended complaint on January 29, 2010, and filed the operative second amended complaint on December 6, 2010.  ECF Nos. 1, 100, 116.

Morning Star brings three claims against moving parties Ingomar Packing Company and Greg Pruett (collectively Ingomar), and Los Gatos Tomato Products and Stuart Woolf (collectively Los Gatos).[1]  Second Amended Complaint (SAC) ¶¶ 2–4, ECF No. 116; Ingomar Mot., ECF No. 251; Los Gatos Mot., ECF No. 285-1.  These claims include: (1) violation of the Sherman Act, 15 U.S.C. § 1; (2) violation of RICO, 18 U.S.C. § 1962(c); and (3) conspiracy to violate RICO, 18 U.S.C. § 1962(d).  *See generally* SAC.

As noted, Ingomar and Los Gatos move for summary judgment on the Sherman Act and RICO claims.  Morning Star has opposed both motions.  Opp'n to Ingomar Mot., ECF No. 260 (Ingomar Opp'n); Opp'n to Los Gatos Mot. (Los Gatos Opp'n), ECF No. 289.  Ingomar and Los Gatos have replied.  Ingomar Reply, ECF No. 272; Los Gatos Reply, ECF No. 291.

II.     EVIDENTIARY OBJECTIONS

Morning Star makes several objections to the following evidence Ingomar submits in support of its motion: (1) Exhibit 6—a 2007 bid for Kraft Foods, ECF No. 273–2; (2) Exhibit 3—a chart showing Ingomar's contracted sales volume history from 2001–2012, ECF No. 254–3; (3) Exhibit 4—a chart showing Ingomar's contracted sales volume history from 2003–2012, ECF No. 254–4; (4) several paragraphs from Ingomar President Gregory Pruett's declaration, Pruett

---

[1] The other defendants in this suit are: (1) SK Foods, L.P. (SK Foods), (2) SK PM Corporation (SK PM), (3) Scott Salyer, (4) Randall Rahal, (5) Intramark USA, Inc. (Intramark), (6) Alan Huey, and (7) Does 1–50.  SAC ¶¶ 2–4; ECF No. 81.  On October 24, 2013, the court granted Morning Star's motion for default judgment against Alan Huey, ECF No. 159.

The court now DISMISSES the Doe defendants, who were not identified or served.  Fed. R. Civ. P. 4(m) (on its own motion, court may dismiss defendants not served within ninety days after complaint is filed); *Craig v. United States*, 413 F.2d 854, 856 (9th Cir. 1969) (the court may dismiss the Doe defendants sua sponte).

Decl., ECF No. 254; (5) a portion of SK Foods' broker Randy Rahal's deposition; and (6) a portion of SK Foods' Vice President Tony Manuel's deposition. *See* Evid. Obj., ECF No. 260–1. The court reviews these objections below.

A. Exhibit 6

Morning Star objects to the admission of Exhibit 6, contending Ingomar failed to authenticate the exhibit, and in any event filed a blank exhibit sheet. Evid. Obj. at 8–9. Morning Star has submitted the correct exhibit in response to this objection, *see* ECF No. 273–2, so the court focuses on the authentication issue only.

Federal Rule of Evidence 901(b)(1) provides a witness with knowledge of a document can authenticate it by testifying it is "what it is claimed to be," and a party "need only make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Estrada-Eliverio*, 583 F.3d 669, 673 (9th Cir. 2009). Here, Pruett avers Exhibit 6 is a copy of the bid Ingomar submitted to Kraft in 2007. *See* Pruett Decl. ¶ 8. This testimony satisfies the requirement of authenticity. Morning Star's objection is overruled.

B. Exhibit 3

Morning Star objects to Exhibit 3 on two grounds: authenticity and hearsay. Evid. Obj. at 7. As with Exhibit 6, Pruett's declaration establishes the document as authentic. *See* Pruett Decl. ¶ 5. Morning Star's objection to the exhibit's authenticity is overruled, and the court proceeds to the hearsay objection.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Here, Exhibit 3 is a chart showing the quantity of contract sales Ingomar made to several major companies in the tomato processing industry. *See* ECF No. 254–3. Where using a chart to "prove the content of voluminous writings," the proponent must make the originals or duplicates of the underlying evidence available to other parties at a reasonable time and place. Fed. R. Evid. 1006; *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir. 1979). Further, the underlying evidence must be admissible. *United States v. Aubrey*, 800 F.3d 1115, 1130 (9th Cir. 2015). Here, the chart's contents were introduced during Pruett's deposition,

1   Pruett Decl. ¶ 5; Pruett Dep. at 186:1–206:25, and the numbers calculated using Ingomar's

2   business records "kept in the ordinary course of business," Suppl. Pruett Decl. ¶ 2, ECF No. 273.

3   This information satisfies the business records exception to the rule against hearsay, *see* Fed. R.

4   Evid. 803(6). The chart is admissible, and Morning Star's objection is overruled.

5          C.      Exhibit 4

6                  Morning Star objects to Exhibit 4 on the same grounds as Exhibit 3. Evid. Obj. at

7   8–9. Pruett's declaration provides the evidentiary basis for admission, Pruett Decl. ¶ 6.

8   Specifically, Exhibit 4 is a chart based on invoice data "produced to plaintiffs in this case," and is

9   made from records "kept . . . in the ordinary course of business." Suppl. Pruett Decl. ¶ 3. This

10  chart is admissible, and Morning Star's hearsay objection is overruled.

11         D.      Pruett Declaration

12                 Morning Star objects to paragraph four of Pruett's declaration as irrelevant, and

13  paragraphs five through thirteen for lack of personal knowledge. Evid. Obj. at 3–7.

14                 "[Rule 402]'s basic standard of relevance . . . is a liberal one." *See Daubert v.*

15  *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993). Paragraph four provides Pruett's statement

16  regarding his knowledge of SK Foods' bribery scheme, and is therefore relevant to the instant

17  motions. Pruett Decl. ¶ 4.

18                 In paragraphs five through thirteen, Pruett provides sworn information explaining

19  Exhibits 3, 4 and 6, discussed above. Pruett Decl. ¶¶ 5–13. He also explains Exhibits 5 and 7,

20  which are 2006 and 2008 bids made to Kraft, respectively. *Id.* As president of Ingomar,

21  information regarding sales volume contracts and bids submitted to major companies is well

22  within Pruett's personal knowledge. *See In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000)

23  ("Personal knowledge may be inferred from a declarant's position" within a company or

24  business); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (finding a

25  business chairman's personal knowledge of various corporate activities could be presumed).

26  Morning Star's objections are overruled. The court will consider Pruett's declaration.

27

28

4

E.      Randy Rahal Deposition

Morning Star objects to portions of Rahal's deposition, specifically his testimony regarding SK Foods' use of bribes to gain customers and business, which limited the business SK competitors would receive from the bribed companies. Evid. Obj. at 9 (citing Rahal Dep. 210:9–19). Morning Star contends Rahal lacks personal knowledge of these facts, and the testimony is otherwise speculative. *Id.* Morning Star also contends the testimony is improper lay opinion because it is not helpful to the trier of fact. *Id.*

As discussed below, the undisputed evidence shows Rahal was the person tasked with initiating SK Foods' bribes. Thus the bribery scheme and its logical consequences were well within Rahal's realm of personal knowledge. Additionally, the testimony is helpful to determining what effect, if any, SK Foods' scheme had on Morning Star and Morning Star's competitors, as well as in considering Morning Star's contention that Ingomar and Los Gatos participated in the bribery scheme. Morning Star's objections here as well are overruled.

F.      Anthony Manuel Deposition

Morning Star objects to portions of Manuel's deposition, specifically his testimony that Morning Star, Los Gatos, and Ingomar would all be hurt by SK Foods' bribery scheme. Evid. Obj. at 10 (citing Manuel Dep. 127:8–20). Morning Star objects on grounds of lack of personal knowledge, speculation, and improper lay opinion. *Id.* Manuel was an officer of SK Foods and an FBI informant who provided information to law enforcement during the bribery scheme; he witnessed the effects of the bribery on other competitors. Manuel Dep. at 58:1–3. Accordingly, the bribery scheme and at least some of its effects were within Manuel's personal knowledge and his testimony may be helpful to the trier of fact. Morning Star's objections are overruled.

III.    BACKGROUND

The following facts are undisputed unless otherwise stated.

A.      The Players

The parties in this case were or are players in the competitive California tomato processing industry, in which various companies submit bids for distribution contracts with

5

1  businesses like Kraft, Frito-Lay, McCain, and Safeway.  Rahal Dep. 67:24–25, 76:22, 77:8,

2  103:16–19.  Chris Rufer is the president of Morning Star.  *See generally* Ingomar Opp'n; Ingomar

3  Mot.—Pls.' Undisputed Material Facts (IPUMF) Nos. 2, 14, ECF No. 275.  Ingomar and its

4  President Greg Pruett, and Los Gatos and its President Stuart Woolf, are Morning Star's

5  competitors.  *Id.*; Ingomar Mot.—Undisputed Material Facts (IUMF) No. 1, ECF No. 276; Los

6  Gatos Mot.—Pls.' Undisputed Material Facts (LPUMF) No. 3, ECF No. 291-3.  Although not a

7  moving party in the instant motion, SK Foods and its former President Scott Salyer were also

8  critical players in the tomato processing industry, competitors of Morning Star's, and as discussed

9  in more detail below, partners in an export trading coalition with Los Gatos and Ingomar.  IUMF

10  Nos. 1,2.

11      B.       Bribery in the Tomato Processing Industry

12          Since the 1990s, Morning Star had a reputation of being the lowest cost producer

13  in the tomato processing industry.  IPUMF No. 2.  Morning Star consistently undercut SK Food's

14  pricing, Rahal Dep. 38:11–16, which spurred Scott Salyer's "ill will" toward Chris Rufer, IPUMF

15  No. 17.  Salyer was not quiet about its feelings toward Rufer, and in fact spoke to "everybody" in

16  the industry about his desire not only to compete with Morning Star, but to "beat" it.  IPUMF

17  No. 16.  At one point, Salyer tried to hurt the low-cost producer by recruiting and eventually

18  hiring away several Morning Star employees, including Morning Star salespersons Jeff Beasley

19  and Tony Manuel, and Morning Star Vice President Michael Poretti.  IPUMF No. 18.  To gain a

20  further competitive advantage, Salyer hired Intramark, a sales brokerage company, with Randall

21  Rahal as a sales broker for SK Foods in 1991 or 1992.  IUMF No. 3.

22          Shortly after Salyer hired Rahal, Rahal began bribing purchasing agents for several

23  large industry customers.  IUMF Nos. 3, 8.  With Salyer's knowledge, approval, and resources,

24  Rahal bribed purchasing agents for Nabisco, Borden, Frito Lay, IUMF Nos. 5–8, Safeway, Rahal

25  Dep. 195:11–15; Kraft Foods, and Agusa, IUMF Nos. 9, 29.  The purpose of the bribes was to

26  gain business and maintain existing business, IPUMF No. 97, and it was common knowledge in

27  the industry that Rahal bribed purchasing agents in order to get this business, IUMF No. 92.

28  Although Rahal attempted to bribe Con Agra's purchasing agent, Rahal Dep. 90:11–13, the agent

returned the money, *id.*, 90:25. In any event, the bribes led various companies, including Kraft, to grant SK Foods contracts that may have otherwise gone to other tomato processing companies like Morning Star, Los Gatos, and Ingomar. Rahal Dep. 158:1–7; Manuel Dep. 126:13–127:20.

In addition to granting contracts, purchasing agents with Kraft, Frito-Lay, and Agusa gave Rahal confidential bid information about SK Foods' competitors, including Morning Star and Ingomar. Rahal Dep. 208:19–25, 209:4–10. Agents that Rahal did not bribe also gave him confidential bid information, including Con Agra's purchasing agent, Rahal Dep. 142:13–21, and Barilla's purchasing agent, Rahal Dep. 209:22–25. The confidential information concerned details on a company's bid, including the volume of processed tomato product offered, the amount of product, and the price of the bid. Rahal Dep. 209:7–10. Rahal's bribes continued until April 2008, when the federal government seized Intramark's assets and obtained search warrants to execute with respect to SK Foods, Salyer, Rahal, and many "others." IUMF No. 16. It is undisputed that Morning Star lost profits based on sales to customers SK Foods bribed, including Frito-Lay, Safeway, Kraft, and Agusa. Charles Mahla Report (Mahla Report) ¶¶ 20–29; 52–76, ECF No. 20-8.[2]

C.    California Tomato Export Group

In mid-to-late 2005, Scott Salyer teamed up with Greg Pruett of Ingomar and Stuart Woolf of Los Gatos to form a tomato export trading association called the California Tomato Export Group (CTEG), IUMF Nos. 2, through which members would jointly sell processed tomato products to international markets, Pruett Dep. 100:1–2. Los Gatos and Ingomar hoped their CTEG membership would increase their international market share. IPUMF No. 22. In November 2005, the CTEG applied for an export group license, IPUMF No. 23, it received an export certificate in February 2006, IUMF No. 2. The CTEG then applied for federal export assistance and marketing funding. Pruett Dep. 147:1–6. It engaged international brokers to assist in selling processed tomato products to international markets. Pruett Dep. 147:11–13. If an

_____

[2] Charles Mahla is plaintiffs' expert witness. *See* Mahla Report at ¶¶ 1–3.

international customer requested a certain amount of product, CTEG's customers would share the business among its members.  Pruett Dep. 148:20–24.

        1.    <u>Price-Fixing</u>

Although the export certificate explicitly prohibited discussing domestic pricing, IPUMF No. 25, Salyer intended to use CTEG to "control the market in the United States," IPUMF No. 30.  In fact, he admitted to Rahal "the whole purpose of CTEG was for price collusion," and if SK Foods could not "stop Morning Star, and if [Salyer] could get [Ingomar and Los Gatos] involved, then they could skim off all the high-value business and let Morning Star have the cheap business."  IPUMF No. 31.

The CTEG members discussed domestic pricing as early as September 2005, IPUMF No. 33, and continued to do so through routine, private unrecorded "executive sessions," IPUMF No. 37.  Woolf cautioned his co-conspirators to limit their discussions to telephone or meetings so an email would not come back to "haunt" them.  Woolf Dep. 161:7–24.  At his deposition, Pruett testified he knew by "January 2006" that "Salyer had an interest in setting domestic prices."  Pruett Dep. at 212:14–19.  He further testified he "should have walked away, early" but did not, which he admitted was "a mistake."  *Id.*

In or about early 2006, tension among the CTEG members threatened the collaboration.  In February 2006, Salyer caught Los Gatos undercutting SK Foods' bid on a contract with McCain by three cents less than the CTEG members' agreed-upon price.  IPUMF No. 59.  Ingomar sent a low bid to Red Gold at about the same time, after the CTEG members had agreed to bid a certain price.  IPUMF No. 68.  As a result, Salyer threatened to withdraw from CTEG and sent a resignation letter to its partners on February 13, 2006, noting Ingomar and Los Gatos could not "keep their word as partners in further developing or maintaining the [California] tomato market."  IPUMF No. 61.

To prevent CTEG's disbanding, Woolf agreed to withdraw Los Gatos's bid to McCain.  IPUMF Nos. 63, 64.  Los Gatos then submitted a bid reflecting the initially agreed-upon price.  IPUMF No. 64.  Pruett told SK Foods that Ingomar's Red Gold bid was a mistake and would be remedied.  IPUMF No. 69.

2. <u>Market Allocation</u>

In addition to price fixing, Salyer at least once discussed market allocation with the CTEG members, and SK Foods, Ingomar, and Los Gatos agreed not to compete for the same industry customers. IPUMF No. 53. To that end, CTEG members would share a list of their domestic customers. IPUMF No. 54. The list included "legacy accounts," for which a member had a prior business relationship with a particular customer; CTEG members were to tell each other if they were considering submitting a bid to a legacy account customer. IPUMF No. 55. At his deposition, Rahal summarized Salyer's understanding of the market allocation plan, which was "to protect each other's customers" and not provide quotes to each other's legacy accounts. IPUMF No. 56.

Los Gatos and Ingomar both increased their export business and financial position through their participation in the CTEG. IPUMF Nos. 127, 128. In particular, Los Gatos increased its gross profit during the life of CTEG approximately eightfold, IPUMF No. 129, while Ingomar experienced a ten to twenty percent increase in total sales, IPUMF No. 130. The CTEG partnership lasted from mid-2005 to March 2008, when the Federal Bureau of Investigation and the Internal Revenue Service executed search warrants based on a court's finding of probable cause that an unlawful bribery scheme existed. IPUMF No. 131; LPUMF No. 119.

D. <u>The CTEG and the Bribery Scheme</u>

The parties dispute whether the CTEG plan to discuss domestic pricing and market allocation was connected to Rahal's various bribes to industry purchasing agents. Morning Star points to several undisputed facts to contend the CTEG domestic pricing discussions and bribery scheme were connected. These facts include that Woolf had long been acquainted with Pruett, having attended the same residential preparatory high school in the 1970s, LPUMF No. 3, and that Pruett knew SK Foods obtained confidential bid information from various customers, including ConAgra, Red Gold, Agusa, and Kraft, IPUMF No. 86.

Morning Star also points to a conversation Rahal had with Woolf during a CTEG meeting on April 11 or 12, 2006. IPUMF No. 275; Rahal Dep. 131:16–19. During a lunch meeting, when Rahal was sitting next to Woolf, Woolf said, "I understand you're bribing some of

the customers." Rahal Dep. 131:16–19. Rahal replied, "Well, how do you know that?" Rahal

Dep. 131:16–22. Woolf replied, "Just what I hear is what I hear." *Id*. After this confrontation,

Woolf never brought up the subject of bribes again. Rahal Dep. 131:16–132:3.

Lastly, Morning Star points to Ingomar and SK Foods' agreement to bid a certain

price for a contract with Kraft in 2007, when both were CTEG members. Pruett Dep. 48:15–21.

During his deposition, Pruett testified that Rahal approached him in a CTEG meeting to

recommend Pruett bid at least thirty-six cents per pound for Kraft business. Pruett Dep. 48:15–

21. Rahal walked up to Pruett, gave him a card with a price on the back and said, "This is where

we are on price." Rahal Dep. 153:15–20. Pruett looked at the card, said yes, and walked away.

*Id*. Pruett ended up bidding 36.5 cents a pound, relying on Rahal's statement that if he bid at

thirty-six cents or higher Ingomar would get a 10 million pound contract with Kraft. Pruett Dep.

49:1–9.

Ingomar points to parts of Pruett's deposition suggesting Ingomar legally obtained

its Kraft contract: "We had gotten 10 million pounds of business from Kraft forever. So the fact

that he told me that we're going to get 10 million pounds was, you know, no great surprise.

That's what we had been getting for five or six years." Pruett Dep. 126:14–25.

As noted, the Ingomar, Los Gatos, and SK Foods partnership ended in 2008 when

the federal government executed search warrants as part of its criminal investigation into the

bribery scheme. IPUMF No. 131, 132; LPUMF No. 119.

IV.     LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "that there

is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*,

477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish

that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . ; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts").  Moreover, "the requirement is that there be no genuine issue of material fact . . . .  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247–48.

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

V.     DISCUSSION

     A.     Sherman Act Claim

Los Gatos and Ingomar argue their conduct, which they contend is limited to price-fixing, bid-rigging, and market allocation, could not have harmed Morning Star because such conduct artificially raised prices in the market while limiting output.  Ingomar Mot. at 6; Los Gatos Mot. at 6, 22.  Morning Star argues its injury is attributed to defendants' conduct because both Ingomar and Los Gatos played a role in an overarching CTEG conspiracy to restrain trade, which went beyond price fixing, bid rigging, and market allocation, and included bribery to gain business at Morning Star's expense.  Ingomar Opp'n at 17; Los Gatos Opp'n at 19.  The court considers these arguments below.

1      1.     Price-Fixing and Market Allocation

2      a)     Legal Standards

3 As a matter of law, market competitors cannot recover from a conspiracy of their

4 rivals to charge "higher than competitive prices." *Matsushita*, 475 U.S. at 583. Likewise,

5 business competitors cannot recover for a conspiracy to impose non-price restraints that either

6 raise market price or limit output. *Id.* at 583.

7 In *Matsushita*, the Supreme Court explained while price-fixing, which includes

8 charging higher than competitive prices, would violate the Sherman Act and harm customers, it

9 could not injure complaining competitors who stood to gain from "any conspiracy to raise the

10 market price" for a certain product. *Matsushita*, 475 U.S. at 583 (citing *Brunswick Corp. v.

11 Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). Such competitors stood to gain from their

12 competitors' conspiracy because their relatively lower prices would appear more attractive to

13 customers. *Id.*; *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th

14 Cir. 1999) ("Plaintiffs stand to benefit from the fact that prices for those services are inflated.").

15 This is true even if the complaining competitors charged supracompetitive prices, which are rates

16 charged above and beyond competitive levels in a market. *Rebel Oil Co. v. Atl. Richfield Co.,* 51

17 F.3d 1421, 1434 (9th Cir. 1995). The Supreme Court also held non-price restraints such as

18 market allocation agreements, which include an arrangement to sell to a limited number of

19 distributors with a goal of avoiding "intragroup competition," *Matsushita*, 475 U.S. at 602, could

20 not harm a plaintiff whose "supracompetitive pricing [would also appear] more attractive" to

21 customers, *id.* at 580. Accordingly, for competitors to be liable for a Sherman Act violation,

22 plaintiffs must allege conduct or "other conspiracies" distinct from those causing higher than

23 competitive prices or limiting output. *Id.* at 586 (internal citations omitted).

24      b)     Analysis

25 Here, Ingomar agreed with SK Foods to submit a higher than normal bid to Kraft,

26 which allegedly caused Morning Star anti-trust injury. Ingomar Opp'n at 11–12. Additionally,

27 Ingomar and Los Gatos agreed with SK Foods not to compete with each other's customers after

28 demarcating each CTEG member's "legacy accounts." IPUMF No. 53. Consistent with

*Matsushita*, Ingomar's and Los Gatos's conduct, standing alone, cannot support Morning Star's Sherman Act claim. For one, Ingomar's price-fixing agreement with SK Foods, which resulted in "higher than competitive prices," made Morning Star's lower bid to Kraft look more competitive, even if the agreement with Kraft ultimately harmed Kraft and violated anti-trust law. *See Matsushita*, 475 U.S. at 580. For the same reasons, Ingomar's and Los Gatos's agreement not to compete with each other or with SK Foods, which would have limited defendants' output to any "legacy" customer, would have benefitted Morning Star, who itself was not subject to any agreement to limit output to any legacy customer. *See id.* Because defendants' agreement to submit higher bids or allocate customers could not, by itself, cause Morning Star injury, Morning Star must establish defendants' conduct or "other conspiracies" caused it injury in order to withstand summary judgment. *See id.* at 596.

Morning Star in fact contends conduct outside the price-fixing and market allocation scheme caused its injury, namely Ingomar's bid rigging with Kraft and bribes SK Foods paid Morning Star's current and potential customers. Ingomar Opp'n at 11–12; Los Gatos Opp'n at 6. These acts are assessed below.

### 2. Bribery Scheme and Bid Rigging

#### a) Legal Standards

Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal citations omitted). To establish a violation under § 1, the following must be shown: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) intent to harm or restrain competition; and (3) actual restraint on competition. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1365 (9th Cir. 1992); *accord Amarel v. Connell*, 102 F.3d 1494, 1522 (9th Cir. 1996).

A plaintiff can establish a genuine issue of material fact by producing either direct evidence that defendants conspired to engage in conduct that violated § 1, or circumstantial

13

evidence that could lead a reasonable factfinder to conclude defendants so conspired. *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999). Direct evidence of a § 1 conspiracy "must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). In the Sherman Act context, direct evidence establishes without inference there was a "meeting of minds between defendants," *id.* at 1156, or a "conscious commitment to a common scheme designed to achieve an unlawful objective," *id.* at 1155.

In the absence of direct evidence, to overcome the defendants' motion for summary judgment, the plaintiff must produce circumstantial evidence that proves the existence of a conspiracy. *Id.* "[C]ircumstantial evidence is not testimony to the specific fact being asserted, but testimony to other facts and circumstances from which the jury may infer that the fact being asserted does or does not exist." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990). As with direct evidence, the circumstantial evidence must support a reasonable jury inference that there was a "meeting of minds between defendants" or a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Cnty. of Tuolumne*, 236 F.3d at 1155–56.

The Ninth Circuit applies a two-part burden shifting test whenever a plaintiff's case rests entirely on circumstantial evidence. First, the defendant can "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *In re Citric Acid Litig.*, 191 F.3d at 1094 (citing *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). If this is shown, the burden shifts back to the plaintiff to provide specific evidence that the defendant was not engaging in permissible competitive behavior. *Id.* (citing *City of Long Beach v. Standard Oil Co. of Cal.*, 872 F.2d 1401, 1406 (9th Cir 1989).; *Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1159 (9th Cir. 1988)).

b)    Analysis

Here, to overcome Ingomar's and Los Gatos's motions for summary judgment, Morning Star must point to direct or circumstantial evidence showing each defendant reached a "meeting of the minds" or had a "conscious commitment to a common scheme designed to

14

achieve an unlawful objective." *Cnty of Tuolumne*, 236 F.3d at 1155–56. The court addresses each defendant below.

### (1) Ingomar

#### (a) Anti-Competitive Conduct

Here, Morning Star cites the following as "direct evidence" of Ingomar's involvement in the bribery scheme: (1) Pruett knew by "January 2006" that "Salyer had an interest in setting domestic prices," Ingomar Opp'n. at 18, and Pruett knew he "should have walked away, early" but did not, admitting that was "a mistake," *id.*; (2) Salyer "threatened to withdraw from CTEG because Ingomar and Los Gatos breached the parties' agreement to bid certain prices for certain domestic customers," *id.*; (3) Ingomar and Los Gatos agreed to "placate Salyer's demands on domestic pricing and bid-rigging," *id.* at 19; (4) Ingomar agreed to allocate customers through "legacy accounts," *id.*; and (5) Ingomar knew SK would share the confidential pricing information of competitors not only to fix prices, but to "police" the conspirators like Los Gatos and Ingomar, *id.*

Viewing the evidence in the light most favorable to Morning Star, no reasonable jury could conclude this evidence directly supports the assertion that Ingomar or Pruett participated in a bribery conspiracy, much less reached a "meeting of the minds" with Rahal, Salyer, or any member of SK Foods to bribe customers. *See Cnty. of Tuolumne*, 236 F.3d at 1155–56. That Pruett knew Salyer had an interest in setting domestic prices, or that Salyer threatened to withdraw from CTEG, or that Ingomar and Los Gatos agreed to placate Salyer's demands to bid artificially high prices, does not, without at least some inferences, establish Ingomar engaged in a conspiracy to bribe customers. Because Morning Star has not established "direct evidence" of Ingomar's participation in the bribery scheme, Morning Star must provide circumstantial evidence to sustain its claim. *See In re Citric Acid Litig.*, 191 F.3d at 1094.

Here, Morning Star does not argue circumstantial evidence establishes a genuine dispute as to Ingomar's participation in the bribery scheme, *see generally* Ingomar Opp'n., so the court relies on Morning Star's facts in support of its direct evidence argument and other evidence in the record, including: Ingomar's successful bid to Kraft, Pruett's statements as to why the

15

Kraft bid was successful, and Rahal's statement that Ingomar's bid, along with SK Foods' bribes, were necessary to obtaining the Kraft deal. Rahal Dep. 157:8–158:7.

The parties do not dispute Kraft awarded Ingomar a contract for 10 million pounds of processed tomato product in 2007, after Rahal or Salyer asked Pruett to bid at least thirty-six cents per pound. IPUMF No. 77. Pruett ended up bidding 36.5 cents a pound, relying on Rahal's statement that if he bid at thirty-six cents or higher Ingomar would guarantee the contract. Pruett Dep. 49:1–9.

Viewing this evidence in the light most favorable to Morning Star, and drawing all reasonable inferences in its favor, a reasonable juror could conclude Ingomar and SK Foods had a "meeting of the minds" to bribe customers. A juror need not devolve into speculation to reasonably conclude Pruett, a business owner in the tomato processing industry, sensed Rahal or Salyer engaged in some form of "quid pro quo" with Kraft in order to confidently offer Pruett the Kraft contract. Although the basis of Rahal's or Salyer's agreement with Pruett was grounded in submitting an inflated and rigged bid, a reasonable juror could infer the only way an inflated bid would be successful is through a bribe. The evidence could support a finding of Ingomar's participation in the bribery scheme.

Further, the circumstantial evidence may lead a reasonable juror to find Pruett and Ingomar consciously agreed to submit a rigged bid to Kraft, and that the successful Kraft contract resulting from the rigged bid, combined with SK Foods' bribe to Kraft, injured Morning Star. The offense of "bid rigging," in violation of antitrust laws, is an agreement between two or more persons to eliminate, reduce, or interfere with competition for a job or a contract that is to be awarded on the basis of bids. *See United States v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010).

As noted, Pruett bid 36.5 cents a pound for the 2007 Kraft contract after agreeing with Salyer or Rahal through a subtle card exchange at the CTEG meeting in April 2006. Rahal Dep. 153:15–20. Further, the record shows Pruett knew Salyer, Rahal, and other SK Foods members were getting information about competitors' confidential bids from various customers, including Kraft. IPUMF No. 86. From this, a reasonable juror could conclude Pruett and

1   Ingomar knowingly agreed to reduce or interfere with competition by submitting a rigged bid, a

2   violation of the Sherman Act. *Green*, 592 F.3d at 1068.

3                      (b)         Ingomar's Rebuttal Evidence

4           Ingomar contends regardless of any alleged bid rigging, its conduct could not have

5   injured Morning Star. Ingomar Mot. at 6. The record suggests otherwise. For instance, Rahal

6   testified in order to ensure the success of SK Foods' Kraft deal, Pruett had to submit Ingomar's

7   bid. Rahal Dep. 184:1–17. In Salyer's opinion, if Ingomar bid at least thirty-six cents a pound,

8   SK Foods' contract price of forty cents a pound would appear more legitimate by comparison.

9   Rahal Dep. 183:12–15. In other words, in light of Ingomar's relatively lower bid, SK Foods,

10   through bribery, could obtain the Kraft bid at a higher price. *See id.* To unsuspecting eyes,

11   SK Foods' price might appear normal when compared to bids like Ingomar's. Whether

12   Ingomar's rigged bid contributed to Morning Star's injury is a question of fact best left to a jury.

13           To further rebut Morning Star's circumstantial evidence of bid rigging or bribery,

14   Ingomar argues that from 2002 through 2007, regardless of whether Kraft's primary supplier was

15   Morning Star or SK Foods, Kraft contracted to buy ten million pounds of tomato paste per year

16   from Ingomar. Ingomar Mot. at 20. Ingomar further contends it was unsuccessful in its attempt

17   to increase its supply to Kraft; it argues its lack of success precludes any reasonable inference that

18   Ingomar joined a conspiracy to bribe Kraft. *Id.* While this evidence may support one possible

19   justification for obtaining the Kraft contract, it does not preclude a reasonable juror's concluding

20   that Ingomar's bid rigging agreement injured Morning Star. Because Ingomar has not shown the

21   only proper conclusion is that its agreement with Rahal was consistent with "proper business

22   practice," the showing necessary for the burden to shift back to Morning Star, the court declines

23   to grant summary judgment to Ingomar on this claim. *See In re Citric Acid Litig.*, 191 F.3d at

24   1094.

25           For these reasons, Ingomar's motion for summary judgment is DENIED.

26

27

28

(2)     Los Gatos

(a)     Bribery

Morning Star contends the following "direct evidence" supports a finding of Los Gatos's participation in the bribery conspiracy: (1) Woolf cautioned his co-conspirators to limit their discussions to telephone or meetings so that an email "would not come back to haunt them," Los Gatos Opp'n at 20; (2) Los Gatos agreed to allocate customers, i.e., "legacy accounts," with its co-conspirators so that they would not bid for each other's business, *id.*; (3) and Woolf asked for permission from SK Foods before bidding for business from SK Foods' legacy customers, *id.* Morning Star contends Los Gatos engaged in this activity despite knowing it was unlawful. *Id.*

No reasonable jury could conclude this evidence directly supports the assertion that Los Gatos participated in a bribery conspiracy, much less had a "meeting of the minds" with Rahal, Salyer, or any member of SK Foods, to bribe purchasing agents. *Cnty. of Tuolumne*, 236 F.3d at 1155–56. To sustain its claim against Los Gatos, Morning Star needs to produce circumstantial evidence from which a jury could reasonably infer Los Gatos participated in a bribery conspiracy. *See In re Citric Acid Litig.*, 191 F.3d at 1094.

To support a circumstantial finding of bribery, Morning Star points to a CTEG group orientation meeting in April 2006, where Woolf said to Rahal, "I understand you're bribing some of the customers." Rahal Dep. 131:16–19. Rahal replied, "Well, how do you know that?" Rahal Dep. 131:16–22. Woolf responded, "Just what I hear is what I hear." *Id.* These statements, paired with Morning Star's other evidence, are insufficient for Morning Star to withstand summary judgment.

Drawing all inferences in favor of Morning Star, no reasonable juror could conclude this evidence illustrates Los Gatos's conscious commitment to a common bribery scheme, or a meeting of the minds to commit bribery. Woolf's comment, by itself, does not show or suggest he himself agreed to engage in bribery. As the record established, after this confrontation, Woolf never brought up the subject of bribes again. Rahal Dep. 131:16–132:3. No evidence establishes Woolf did anything else or dug further to determine if his information was

18

well founded.  Without more, this information amounts to "mere allegation and speculation. . . [which] do not create  a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996); *see e.g., Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 737 F. Supp. 2d 1257, 1269 (E.D. Wash. 2010) ("Mere suspicion or commonality of interests is insufficient to prove a conspiracy."); *Rutledge v. Elec. Hose & Rubber Co.*, 327 F. Supp. 1267, 1272 (C.D. Cal. 1971) ("[A] conspiracy must be proved by independent evidence and mere suspicion of wrongdoing is not enough.").

The other evidence of record that Los Gatos engaged in price fixing and market allocation is also insufficient to establish Los Gatos engaged in bribery, for assertions of "parallel conduct" are not enough to raise the suggestion of a "preceding agreement," and allow at most an inference of "parallel conduct that would just as well be independent action." *Twombly*, 550 U.S. at 557; *see also City of Vernon*, 955 F.2d at 1371.  As noted above, price fixing and market allocation alone cannot cause Morning Star injury.  *See* pages 12–13 *supra*.  Accordingly, to sustain its claim on summary judgment, Morning Star must point to "other conspiracies" causing it injury.  *Matsushita*, 475 U.S. at 596, 598.

(b)     Bid Rigging

Morning Star argues the "CTEG defendants" engaged in bid rigging, but does not claim Los Gatos's conduct caused injury, and points to no evidence of such injury.  *See generally* Los Gatos Opp'n; *see also City of Vernon*, 955 F.2d at 1365 (to sustain Sherman Act claim, plaintiff must show actual restraint of competition).

The court GRANTS summary judgment for Los Gatos on the Sherman Act claim.

B.     <u>RICO Claims</u>

Ingomar and Los Gatos move for summary judgment on Morning Star's RICO and RICO conspiracy claims, contending no reasonable factfinder could conclude their acts did not proximately cause injury to Morning Star.  Ingomar Mot. at 22–25; Los Gatos Mot. at 21–24. Morning Star's opposition mirrors its Sherman Act argument that defendants violated RICO as active participants in the overarching CTEG conspiracy.  Ingomar Opp'n at 23–29; Los Gatos Opp'n at 23–28.  As explained below, because no reasonable jury could find Ingomar and

Los Gatos violated RICO or engaged in a RICO conspiracy, the court GRANTS summary

judgment for both defendants on both RICO claims.

The Racketeer Influenced and Corrupt Organizations Act, or RICO, provides in

relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c); *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015). RICO

provides a private right of action for "[a]ny person injured in his business or property" by a RICO

violation. 18 U.S.C. § 1964(c). To establish a RICO claim, the plaintiff must show "(1) conduct

(2) of an enterprise (3) through a pattern (4) of racketeering activity (known as "predicate acts")

(5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510

(9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S.

479, 496 (1985)).

"Conduct" necessarily implies some degree of direction over an enterprise's

affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993). "Enterprise" includes "any

individual, partnership, corporation, association, or other legal entity, and any union or group of

individuals associated in fact although not a legal entity." *Odom v. Microsoft Corp.*, 486 F.3d

541, 548 (9th Cir. 2007). "Pattern," as it refers to "racketeering activity," means "at least two

acts of racketeering." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). "Racketeering" is

activity that is indictable under specified provisions of Title 18 of the United States Code,

including mail and wire fraud. *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir.

1987). The fifth element of "injury" has two subparts: (1) the plaintiff must show the conduct

proximately caused the injury; and (2) that he suffered a concrete financial loss, and "not mere

injury to a valuable intangible property interest." *Chaset v. Fleer/Skybox Intern., LP*, 300 F.3d

1083, 1087 (9th Cir. 2002).

A "pattern of racketeering activity" is established when a plaintiff proves that a

defendant committed two or more predicate acts. 18 U.S.C. § 1961(5). Where a plaintiff asserts

a RICO claim against multiple defendants, the plaintiff must establish each individual defendant committed at least two predicate acts. *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) ("Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by each defendant."); *Keel v. Schwarzenegger*, No. 08–07591, 2009 WL 1444644, at *6 (C.D. Cal. May 19, 2009) ("The requirements of § 1962(c) must be established as to each individual Defendant) (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987)).

Here, Ingomar and Los Gatos contend Morning Star cannot establish each defendant engaged in at least two predicate racketeering acts that injured Morning Star. Ingomar Mot. at 22–25; Los Gatos Mot. at 21–24. Morning Star contends it has raised a genuine dispute of fact as to proximate cause, asserting it need only show injury stemming from the "conduct" of the enterprise, which in this case is the CTEG conspiracy to restrain trade, which included bribery. Ingomar Opp'n at 23–29; Los Gatos Opp'n at 23–28.

When a court assesses the causation element of a RICO claim for injury to business or property, the central question is whether the alleged violation led directly to the plaintiff's injuries. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). The plaintiff must prove "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 464 (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

In *Anza*, the Supreme Court held "the compensable injury" flowing from a RICO violation "necessarily is the harm caused by predicate acts." *Id.* at 457 (citing *Sedima*, 473 U.S at 497). In support of its holding the Court found defendants defrauded the New York Taxing Authority by failing to charge sales tax to cash-paying customers. *Id.* at 457–58. Nonetheless, the Court concluded the plaintiff could not sustain a RICO claim by simply contending it lost profits due to defendants' ability to charge lower prices as a result of defrauding the state. *Id.* In the Court's view, the defendants' decision to lower prices was "entirely distinct" from defendants' "pattern of mail fraud and wire fraud" used to cheat the state. *Id.* at 458. The plaintiff could not sustain its RICO claim. *Id.*

Here, for Morning Star to defeat summary judgment, it must show there is a dispute of fact as to whether each defendant committed at least two predicate acts giving rise to a RICO violation, which in turn caused Morning Star's injury in the form of lost profits. *Anza*, 547 U.S. at 461; *Keel*, 2009 WL 1444644 at *6.

### 1. Ingomar

Although Morning Star argues Ingomar committed at "least two predicate acts of mail [and] wire fraud," it only points to one such act, namely Ingomar's rigged Kraft bid. Ingomar Opp'n at 26. Morning Star does not point to any other instance of mail or wire fraud in its moving papers or contend Ingomar's other acts, which can reasonably be construed as acts of price-fixing and market allocation, injured Morning Star. The court does not otherwise find evidence of injury and in any event is not required to comb the record in an effort to locate some reason to deny summary judgment. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). Without "at least two predicate acts," causing injury, no reasonable juror could conclude Morning Star established a RICO claim against Ingomar. *H.J. Inc.*, 492 U.S. at 237; *Anza*, 547 U.S. at 461. The court GRANTS Ingomar's motion for summary judgment on the RICO claim.

### 2. Los Gatos

As to Los Gatos, Morning Star points to no injury-causing predicate acts, contending only generally that Los Gatos is liable because it participated in the "conduct of the RICO enterprise," which entailed "the scheme to submit rigged bids." Los Gatos Opp'n at 24. Without evidence that could be used to establish what predicate acts, if any, injured Morning Star, no reasonable juror could conclude Morning Star has established a RICO claim against Los Gatos. The court GRANTS Los Gatos's motion for summary judgment on the RICO claim as well.

### 3. Conspiracy

Because the court GRANTS Ingomar's and Los Gatos's motions for summary judgment, it also GRANTS summary judgment on the RICO conspiracy claims. *See Howard v.*

*Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (dismissing plaintiff's RICO conspiracy claim where plaintiff could not show a substantive violation of RICO).

VI.     <u>CONCLUSION</u>

The court DENIES Ingomar's motion for summary judgment on the Sherman Act claim; GRANTS Ingomar's motion on the RICO claim, and GRANTS Ingomar's motion on the RICO conspiracy claim.

The court GRANTS Los Gatos's motion on the Sherman Act claim, GRANTS Los Gatos's motion on the RICO claim, and GRANTS Los Gatos's motion on the RICO conspiracy claim.

Accordingly, the following claims will proceed to trial: (1) Robinson-Patman Act claim against SK Foods, SK PM, Salyer, Rahal, and Intramark; (2) Sherman Act claim against Ingomar, Pruett, SK Foods, Salyer, Rahal, and Intramark; (3) RICO claim against SK Foods, SK PM Corporation, Scott Salyer, Randall Rahall, and Intramark; (4) RICO conspiracy claim against SK Foods, SK PM Corporation, Scott Salyer, Randall Rahall, and Intramark.

A final pretrial conference is set for August 11, 2017, at 10:00 a.m. with joint final pre-trial statements due July 28, 2017.

The court dismisses all Doe defendants. Fed. R. Civ. P. 4(m).

This order resolves ECF Nos. 251 & 285-1.

IT IS SO ORDERED.

DATED: June 13, 2017.

_____
UNITED STATES DISTRICT JUDGE

23