UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE MORNING STAR PACKING COMPANY, a California limited partnership, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>SK FOODS, L.P., a California limited partnership, et al.,<br><br>Defendants. | No. 2:09-CV-00208 KJM-EFB<br><br>ORDER |

Plaintiffs the Morning Star Packing Company, Liberty Packing Company, LLC, California Fruit and Tomato Kitchens, LLC and the Morning Star Company ("Plaintiffs") move for reconsideration of this court's summary judgment order. Mot., ECF No. 306-1; *see* Order Summ. J. at 23, ECF No. 304. Defendants oppose. Opp'n, ECF No. 314. Plaintiffs have replied. Reply, ECF No. 315. For the reasons below, the court DENIES plaintiffs' motion for reconsideration.

I.     BACKGROUND

    A.     Factual Background

The following facts are undisputed unless otherwise stated and are drawn from the court's summary judgment order. *See* Order Summ. J. (Order) at 5–10, ECF No. 304.

1

### 1. The Parties

The parties in this case were or are players in the competitive California tomato processing industry. Rahal Dep. 67:24–25, 76:22, 77:8, 103:16–19. Chris Rufer is the president of plaintiff Morning Star. *See generally* ECF No. 260; Ingomar Mot.—Pls.' Undisputed Material Facts (IPUMF) Nos. 2, 14, ECF No. 275. Ingomar and its President Greg Pruett (Ingomar defendants), and Los Gatos and its President Stuart Woolf (Los Gatos defendants), are Morning Star's competitors. *Id.*; Ingomar Undisputed Material Facts (IUMF) No. 1, ECF No. 276; Los Gatos Pls.' Undisputed Material Facts (LPUMF) No. 3, ECF No. 291-3. SK Foods and its former President Scott Salyer were also critical players in the tomato processing industry, competitors of Morning Star's, and partners in an export trading coalition with Los Gatos and Ingomar. IUMF Nos. 1, 2.

### 2. Bribery in the Tomato Processing Industry

Since the 1990s, Morning Star had a reputation of being the lowest cost producer in the tomato processing industry. IPUMF No. 2. Morning Star undercut SK Food's pricing, which prompted Scott Salyer's "ill will" toward Chris Rufer. IPUMF No. 17. To gain a competitive advantage, Salyer hired Intramark, a sales brokerage company, with Randall Rahal as a sales broker for SK Foods in 1991 or 1992. IUMF No. 3. After Salyer hired Rahal, Rahal began bribing purchasing agents for several large industry customers. The purpose of the bribes was to gain business and maintain existing business. IPUMF No. 97. The bribes led various companies to grant SK Foods contracts that may have otherwise gone to other tomato processing companies such as Morning Star, Los Gatos and Ingomar. Rahal Dep. 158:1–7; Manuel Dep. 126:13–127:20. Rahal's bribes continued until April 2008, when the Federal Bureau of Investigation seized Intramark's assets and obtained search warrants to execute against SK Foods, Salyer, Rahal and many "others." IUMF No. 16. It is undisputed that Morning Star lost profits based on sales to customers SK Foods bribed. Mahla Report ¶¶ 20–29, 52–76, ECF No. 20-8.

### 3. California Tomato Export Group

In 2005, Scott Salyer teamed up with Greg Pruett of Ingomar and Stuart Woolf of Los Gatos to form a tomato export trading association called the California Tomato Export Group

(CTEG), IUMF No. 2, through which members would jointly sell processed tomato products to international markets, Pruett Dep. 100:1–2. Los Gatos and Ingomar hoped their CTEG membership would increase their international market share. IPUMF No. 22. CTEG engaged international brokers to assist in selling processed tomato products to international markets. Pruett Dep. 147:11–13. If an international customer requested a certain amount of product, CTEG's customers would share the business among its members. Pruett Dep. 148:20–24. The CTEG partnership lasted from mid to late 2005 to March 2008, when the Federal Bureau of Investigation and the Internal Revenue Service executed search warrants at SK Foods locations and against Salyer based on a court's finding of probable cause that an unlawful bribery scheme existed. IPUMF No. 131; LPUMF No. 119.

### 4. Price-Fixing

Salyer intended to use CTEG to "control the market in the United States." IPUMF No. 30. Salyer admitted to Rahal "the whole purpose of CTEG was for price collusion," and if SK Foods could not "stop Morning Star, and if [Salyer] could get [Ingomar and Los Gatos] involved, then they could skim off all the high-value business and let Morning Star have the cheap business." IPUMF No. 31. The CTEG members discussed domestic pricing as early as September 2005, IPUMF No. 33, and continued to do so through routine, private, unrecorded "executive sessions," IPUMF No. 37.

### 5. Market Allocation

In addition to price fixing, Salyer discussed market allocation at least once with CTEG members; SK Foods, Ingomar and Los Gatos agreed not to compete for the same industry customers. IPUMF No. 53. Further, CTEG members would share a list of their domestic customers. IPUMF No. 54. The list included "legacy accounts," in which a member had a prior business relationship with a particular customer; CTEG members were to tell each other if they were considering submitting a bid to a legacy account customer. IPUMF No. 55. At his deposition, Rahal summarized Salyer's understanding of the market allocation plan, which was "to protect each other's customers" and not provide quotes to each other's legacy accounts. IPUMF No. 56. Los Gatos and Ingomar both increased their export business and financial

1 | position through their participation in CTEG. IPUMF Nos. 127, 128. Specifically, Los Gatos
2 | increased its gross profit during the life of CTEG approximately eightfold. IPUMF No. 129.

### 6. CTEG and the Bribery Scheme

The parties dispute whether the CTEG plan to discuss domestic pricing and market allocation was connected to Rahal's various bribes to industry purchasing agents. Morning Star points to several undisputed facts to contend the CTEG domestic pricing discussions and bribery scheme were connected. These facts include that Woolf had long been acquainted with Pruett, having attended the same residential preparatory high school in the 1970s, LPUMF No. 3, and that Pruett knew SK Foods obtained confidential bid information from various customers, including ConAgra, Red Gold, Agusa, and Kraft, IPUMF No. 86. Morning Star also points to a conversation Rahal had with Woolf during a CTEG meeting in April 2006. IPUMF No. 275; Rahal Dep. 131:16–19. According to Rahal, Woolf said "I understand you're bribing some of the customers." Rahal Dep. 131:16–19. Rahal replied, "Well, how do you know that?" Rahal Dep. 131:16–22. Woolf replied, "Just what I hear is what I hear." *Id*. After this confrontation, Woolf never brought up the subject of bribes again. Rahal Dep. 131:16–132:3. As noted above, the Ingomar, Los Gatos and SK Foods partnership ended in 2008 when the federal government executed search warrants as part of its criminal investigation into the bribery scheme. IPUMF No. 131, 132; LPUMF No. 119.

### B. Procedural

Plaintiffs sued for violations of the Robinson-Patman Act, Sherman Act and Racketeer Influenced and Corrupt Organizations Act (RICO). ECF Nos. 1, 100, 116. The Ingomar defendants and Los Gatos defendants each moved for summary judgment on the Sherman Act and RICO claims asserted against them. ECF Nos. 251, 285-1. The court denied the Ingomar defendants' motion for summary judgment on the Sherman Act claim but granted their motion on the RICO claims. Order at 23. The court also granted the Los Gatos defendants' motion on the Sherman Act claim and RICO claims. *Id*. Plaintiffs and the Ingomar defendants later entered into a confidential settlement agreement resolving all disputes between them. ECF No. 322 at 2. Based on plaintiffs' stipulation with Ingomar and Pruett, the court ordered

plaintiffs' action as to Ingomar and Pruett dismissed with prejudice. *Id*. at 3. The court therefore only considers plaintiffs' motion for reconsideration as it pertains to defendants Los Gatos and Woolf.

II.     LEGAL STANDARD

District courts "possess[] the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient*.*" *City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (citations and emphasis omitted). In addition, the Federal Rules of Civil Procedure authorize courts to revise "any order or other decision . . . that adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties . . . at any time before the entry of judgment adjudicating all of the claims and all of the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

However, a "motion for reconsideration should not be granted lightly, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Marlyn Nutraceuticals, Inc., v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 880 (9th Cir. 2009) (citation omitted). Clear error occurs where "the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citing *United States v. U.S. Gypsum Co*., 333 U.S. 364, 395 (1948)).

The Ninth Circuit has held that it is not an abuse of discretion to deny a motion for reconsideration merely because the underlying order is "erroneous," rather than "clearly erroneous." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.4 (9th Cir. 1999). "Mere doubts or disagreement about the wisdom of a prior decision . . . will not suffice . . . . To be clearly erroneous, a decision must . . . [be] more than just maybe or probably wrong; it must be dead wrong." *Campion v. Old Repub. Home Prot. Co*., Inc, No. 09-CV-748-JMA(NLS), 2011 WL 1935967, at *1 (S.D. Cal. May 20, 2011) (quoting *Hopwood v. State of Tex*., 236 F.3d 256, 273 (5th Cir. 2000)); see also *Oto v. Metro Life Ins*. Co., 224 F.3d 601, 606 (7th Cir. 2000) (movant must demonstrate a "wholesale disregard, misapplication, or failure to recognize controlling precedent") (citation omitted).

### III. DISCUSSION

Plaintiffs argue the court misapplied the standard articulated in *Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000), by requiring the plaintiffs to show that defendants personally committed two predicate acts in violation of RICO. Mot. at 2–3, 5–9. Plaintiffs also argue the court improperly determined the bribery scheme was a separate conspiracy from defendants' anti-competitive conduct. *Id.* at 9–10. The court finds both arguments unconvincing as explained below.

#### A. Sherman Act Claim

Plaintiffs contend the court erred by improperly determining there were separate conspiracies involving price-fixing, bid rigging and bribery by the antitrust participants as a matter of law. Mot. at 2, 9-10. Plaintiffs contend this is a question of fact for the jury. *Id.* at 10. Los Gatos defendants contend plaintiffs present nothing new in support of their antitrust argument and that plaintiff's sole argument—that a court cannot itself decide whether there is insufficient evidence for a jury to consider the nature of an alleged conspiracy—misunderstands the classic constitutional function of the court. Opp'n at 1, 7. In reply, plaintiffs also assert the court erred by concluding that a reasonable jury could not infer that Los Gatos defendants were aware of the bribery, referring to "evidence that Mr. Woolf confronted Mr. Rahal about his bribery in the early days of the CTEG conspiracy." Reply at 10.

Plaintiffs' position ignores the purpose of summary judgment itself, which is to determine whether the evidentiary record discloses any genuine dispute of material fact that should go to the jury. *See* Order at 13–14 ("A plaintiff can establish a genuine issue of material fact by producing either direct evidence that defendants conspired to engage in conduct that violated § 1, or circumstantial evidence that could lead a reasonable factfinder to conclude defendants so conspired.") (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999)). The court finds it properly concluded there was no genuine dispute of material fact sufficient to put the Sherman Act claim before a jury, which necessarily precluded a jury from deciding whether there was one conspiracy or whether multiple conspiracies were at issue. The court explains its reasoning below.

6

Initially, the court observed as a matter of law that market competitors cannot recover from a conspiracy of their rivals to charge "higher than competitive prices." Order at 12 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986)); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1056 (9th Cir. 1999) ("There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct.") In *Matsushita*, the Supreme Court held non-price restraints such as market allocation agreements could not harm a plaintiff whose "supracompetitive pricing [would also appear] more attractive" to customers. *Matsushita,* 475 U.S at 580. The court finds, therefore, it properly concluded in its summary judgment order that defendants' "agreement to submit higher bids or allocate customers could not, by itself, cause Morning Star injury," which therefore required plaintiffs to "establish defendants' conduct or 'other conspiracies' caused it injury in order to withstand summary judgment." Order at 13; *see also Matsushita*, 475 U.S. at 575 ("To survive petitioners' motion for a summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. If the factual context renders respondents' claims implausible, i.e., claims that make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary.").

Because the price fixing and market allocation conduct did not cause injury to plaintiffs, this court analyzed plaintiffs' arguments that CTEG was engaged in bid rigging and bribery. Order at 13 ("Morning Star in fact contends conduct outside the price-fixing and market allocation scheme caused its injury, namely Ingomar's bid rigging with Kraft and bribes SK Foods paid Morning Star's current and potential customers."). Plaintiffs did "not claim Los Gatos's conduct caused injury[] and [did not point to any] evidence of such injury." *Id.* at 19. Thus, the only remaining conduct plaintiffs argued to support a claim of conspiracy against the Los Gatos defendants under the Sherman Act was bribery. *Id.* at 18.

Because plaintiffs had not put forth any claim or evidence of injury stemming from bid rigging, the court analyzed the only evidence plaintiffs did supply that would support a legally cognizable Sherman Act Claim against the Los Gatos defendants: evidence offered by plaintiffs

regarding the Los Gatos defendants' participation in bribery. The court found plaintiffs offered the following direct evidence supporting a finding that Los Gatos participated in bribery: (1) Woolf cautioned his co-conspirators to limit their discussion to telephone or meetings so that an e-mail "would not come back to haunt them"; (2) Los Gatos agreed to allocate customers, i.e., "legacy accounts," with its co-conspirators so they would not bid for each other's business; and (3) Woolf asked for permission from SK Foods before bidding for business from SK Foods' legacy customers. Order at 18 (citations omitted).

The court concludes it properly found that "no reasonable jury could conclude this evidence directly supports the assertion that Los Gatos participated in a bribery conspiracy, much less had a 'meeting of the minds' with Rahal, Salyer, or any member of SK Foods, to bribe purchasing agents." *Id.* Further, the court found that plaintiffs' circumstantial evidence, the statements made at a CTEG group orientation meeting in April 2006 by Woolf to Rahal -- that Woolf understood and had heard Rahal was "bribing some of the customers" -- , were not sufficient to create a genuine dispute of material fact. *Id.*; *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) (plaintiff's failure to produce evidence from which a jury could infer reasonably that conduct was conspiratorial, not unilateral, will lead to summary judgment for the defendant); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1175 (9th Cir. 2016) ("[A]necdotal speculation and supposition are not a substitute for evidence, and that evidence decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment."); *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (affirming district court's decision granting summary judgment to defendants because plaintiffs failed to allege sufficient facts to show causal antitrust injury stemming from defendants' actions). Plaintiffs do not cite any "newly discovered evidence" or show any "clear error" by this court in applying the summary judgment standard. *See Marlyn Nutraceuticals, Inc.*, 571 F.3d at 880.

Plaintiffs offer *United States v. Roselli*, 432 F.2d 879 (9th Cir. 1970), to support their argument that "the issue of whether there was one conspiracy or two is a question of fact for the jury." Mot. at 8 n.1. But the court in *Roselli* did not address a party's inability to create a

dispute of genuine material fact at summary judgment on the existence of any conspiracy at all sufficient to sustain a Sherman Act claim. Instead, the court addressed an alleged single conspiracy at trial and defendants' assertions that the government had instead proven separate conspiracies. *Roselli*, 432 F.2d at 897–98. Thus, the court asserting the jury could decide "[w]hether there was one conspiracy or two" as a "question of fact" is an unremarkable proposition not applicable to this case. Similarly, the Second Circuit observed in *United States v. Crosby*, 294 F.2d 928, 945 (2d Cir. 1961), "[w]hether a scheme is one conspiracy or several is primarily a jury question, since it is a question of fact as to the nature of the agreement." But the *Crosby* court's statement assumes the existence of a scheme, or at least a genuine dispute of material fact sufficient to allow some conspiracy claim to go forward. And plaintiffs' third cited case, *United States v. Am. Honda Motor Co.*, 273 F. Supp. 810, 816 (N.D. Ill. 1967), distinguishes only between the record indicating "one conspiracy" or "four claimed separate conspiracies." None of these cases addressed the issues here, which involved claims of price fixing, market allocation and bid rigging that were insufficient as a matter of law, and insufficient allegations of bribery against Los Gatos defendants to create a genuine dispute of material fact. *See* Order at 18–19. The court did not distinguish between multiple conspiracies but instead addressed plaintiffs' argument of "an overarching CTEG conspiracy," then explained that none of the evidence put forward by plaintiffs established a genuine dispute of material fact sufficient to permit a claim legally cognizable under the Sherman Act to go before a jury.

The court DENIES plaintiffs' motion for reconsideration of this court's order granting summary judgment to the Los Gatos defendants on the Sherman Act claim.

B. <u>RICO Conspiracy Claims</u>

Plaintiffs also contend this court committed "clear error" in granting the Los Gatos defendants' summary judgment on plaintiffs' RICO conspiracy claims by misapplying the standard in *Howard*, 208 F.3d 741. Mot. at 2–3, 5–9. Both plaintiffs and the Los Gatos defendants agree that *Howard* sets forth the correct standard for determining whether there has been a substantive violation of RICO under 18 U.S.C. § 1962. Opp'n at 2. Plaintiffs assert this court based its decision on the proposition "that if Morning Star cannot establish that the

9

Los Gatos [defendants] committed two RICO predicate acts themselves, they cannot be found liable for conspiring to violate RICO." Mot. at 2. In opposition, the Los Gatos defendants contend the court applied the correct standard and the court "did not say [plaintiffs must show each defendant committed or agreed to commit two predicate acts itself] (and neither does the *Howard* case)." Opp'n at 2. The Los Gatos defendants assert the parties agree plaintiffs must have presented "admissible evidence sufficient for a reasonable juror to find that the defendants each (1) had knowledge of the nature, purpose and scope of the conspiracy, and (2) intended to participate in a racketeering scheme that involves two predicate acts or to assist in carrying them out." *Id.* at 3.

In reply, plaintiffs contend the court did not consider RICO violations by other members of CTEG in ruling on the conspiracy claim. Reply at 4. Plaintiffs also contend in reply that this court and the Los Gatos defendants have ignored a previous holding by this court in which it held "a conspirator may be liable even if he does not commit or agree to commit 'the two or more predicate acts requisite to the underlying offense.'" *Id.* at 2 (citing *Morning Star Packing Co. v. SK Foods, L.P.*, No. CIV. S-09-0208 KJM, 2011 WL 4591069, at *4 (E.D. Cal. Sept. 30, 2011)).

Although plaintiffs are correct that the Los Gatos defendants did not need to commit or agree to commit the two predicate acts that establish a substantive RICO claim, plaintiffs have failed to show a genuine dispute of material fact sufficient to permit a jury to hear a RICO conspiracy claim against the Los Gatos defendants. The court explains the relevant law and reasoning below.

1. <u>RICO Claims Generally</u>

The elements of a civil RICO claim are "(1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activities (known as 'predicate acts'); (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir.1996); *see also Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). The fifth element has two subparts: the plaintiff must show the injury was proximately caused by the conduct and plaintiff has suffered a concrete financial loss. *Chaset v. Fleer/Skybox Intern.*,

LP, 300 F.3d 1083, 1086 (9th Cir. 2002). In addition, under 18 U.S.C. §§ 1962(d) and 1964(c), a person may be civilly liable if he conspired to violate any of the substantive RICO violations listed under § 1962. *Beck v. Prupis*, 529 U.S. 494, 500 (2000).

### 2. Injury and Causation

Although the availability of RICO conspiracy liability under § 1962(d) permits a plaintiff to sue co-conspirators "who might not themselves have violated one of the substantive provisions of § 1962, it is well established that a plaintiff may bring suit for civil conspiracy only if he has been injured by an action that is itself tortious." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 918 (C.D. Cal. 2012) (citing *Beck*, 529 U.S. at 501); *see also Abraham v. Antelope Valley Healthcare Dist.*, No. CV 04-8525 GPS (EX), 2006 WL 8431419, at *5 (C.D. Cal. Feb. 21, 2006) (relying on *Beck* and dismissing a RICO count with prejudice because plaintiff was injured by his termination, "not by the alleged bribery scheme").

The Supreme Court also has addressed proximate cause for civil RICO claims, including § 1962(d) RICO conspiracy claims. For instance, in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006), the Court addressed "a dispute between two competing businesses." There, Ideal Steel alleged that National (Anza) did not charge sales tax to its cash-paying customers, which allowed it to offer lower prices, which undercut Ideal's sales. The RICO claim was based on National's alleged mail and wire fraud, stemming from its submission of fraudulent tax returns. *Id.* at 454. The Court observed that "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.* at 460. It continued, "the central question [the court] must ask is whether the alleged violation led directly to plaintiff's injuries." *Id.* at 461. Determining that "the proper referent of the proximate cause analysis" was National's use of the mails to defraud, it concluded that the cause of Ideal's harm—National's lower prices—was distinct from the RICO violation of defrauding the state, particularly because National could have lowered its prices "for any number of reasons unconnected to the asserted pattern of fraud." *Id.* at 458. Determining what portion of Ideal's lost sales resulted from National's decreased prices would require a "complex assessment" not suited to judicial determination. *Id.* at 459.

Additionally, in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), New York City had alleged that Hemi, a mail-order cigarette company, committed mail fraud by failing to send reports identifying its customers, as required by New York state law. New York City contended the reports would have aided it in collecting city sales tax from the purchasers. *Id.* at 5-6. The Court rejected the city's theory of proximate cause because it was the customers' failure to pay taxes, rather than Hemi's failure to file reports, that caused the city's harm. *Id.* at 11. The Court emphasized that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Id.* at 12. The Court emphasized a claim would not meet RICO's direct relationship requirement if it required the Court to move beyond the first step in the causal chain. *Id.* at 8–12.

Here, as stated above, plaintiffs may have suffered injuries only from the alleged bribery perpetrated by Rahal and SK Foods. *Compare* Order at 13 (recognizing "defendants' agreement to submit higher bids or allocate customers could not, by itself, cause [plaintiffs] injury . . . ."), *and Morning Star*, 2011 WL 4591069, at *6 ("However, in the SAC, plaintiffs allege they were the direct victims of the commercial bribery scheme and suffered a direct loss . . . ."), *with Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense."). Even the court's acknowledgement that evidence of Ingomar's bid rigging in one instance might lead a reasonable juror to find Morning Star suffered injury was based on that bid rigging "combined with SK Foods' bribe." Order at 16. Thus, for plaintiffs' RICO conspiracy claim against the Los Gatos defendants to survive summary judgment, there must have been a dispute of genuine material fact that would permit a reasonable juror to conclude the Los Gatos defendants were liable for a RICO conspiracy that included the bribery scheme of Rahal and SK Foods.

### 3. Intent and Agreement

Plaintiffs' evidence cited in support of their opposition to summary judgment did not show a genuine dispute of material fact that would permit a reasonable juror to conclude Los Gatos defendants "knew about the essential nature of this enterprise"—that is, the bribery

12

scheme perpetrated by Rahal and SK Foods. *See United States v. Christensen*, 828 F.3d 763, 782 (9th Cir. 2015). Nor was there a genuine dispute of material fact leaving open the possibility a reasonable juror could conclude the bribery scheme was connected to the enterprise involving price-fixing and market allocation.

"To establish a violation of section 1962(d), [p]laintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard*, 208 F.3d at 751. As explained above, "an agreement that is a substantive violation of RICO" or an agreement to participate in "a violation of two predicate offenses" must be an agreement that caused injury to plaintiffs. *Id.*; *Beck*, 529 U.S. at 501; *Anza*, 547 U.S. at 460. As the Supreme Court explained, a conspirator need only "adopt the goal of furthering or facilitating the criminal endeavor," and the conspirator "may do so in any number of ways short of agreeing to undertake all the acts necessary for the crime's completion." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Although the *Salinas* Court reasoned a conspirator did not need to "commit or agree to commit the two or more predicate acts requisite to the underlying offense," the Court found one defendant "committed at least two acts of racketeering activity when he accepted numerous bribes" and the other defendant "knew about and agreed to facilitate the scheme." *Id.* at 65–66. "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Id.* at 64. More recently, the Ninth Circuit again recognized that "a RICO conspiracy under § 1962(d) requires only that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'" *Christensen*, 828 F.3d at 780 (citation omitted).

Nevertheless, here no disputed material facts would permit a reasonable juror to infer the Los Gatos defendants agreed to a scheme involving bribery or that the Los Gatos defendants were both "aware of the essential nature and scope of the enterprise and intended to participate in" an enterprise involving bribery. *See Howard*, 208 F.3d at 751 (citation omitted); *Christensen*, 828 F.3d at 780. As discussed above and in the court's summary judgment order, the court found the direct evidence insufficient to support "the assertion that Los Gatos

13

participated in a bribery conspiracy." Order at 18. The direct evidence discussed in the summary judgment order—Woolf's cautioning to limit discussions to phone calls or meetings, Los Gatos's agreeing to allocate customers to avoid bidding for each other's business and Woolf's asking for permission before bidding for business from another company's "legacy" customer—would not permit a reasonable juror to infer anything about an agreement to a scheme involving bribery that would damage plaintiffs' business. And the circumstantial evidence plaintiffs offered—Woolf's call to Rahal that Woolf understood and had heard Rahal was "bribing some of the customers"— at best would permit a reasonable juror to infer knowledge, but not intent to participate in a scheme involving bribery. *See id.* None of this evidence would permit a reasonable juror to infer that the Los Gatos defendants "adopt[ed] the goal of furthering or facilitating the criminal endeavor" that damaged plaintiffs here—the bribery scheme. *See Salinas*, 522 U.S. at 65.

The court's findings as to the Los Gatos defendants differed from its findings as to the Ingomar defendants, given the court noted an instance of Ingomar submitting "an inflated and rigged bid" that would permit "a reasonable juror [to] infer the only way an inflated bid would be successful is through a bribe" and "could support a finding of Ingomar's participation in the bribery scheme." Order at 16; *see also id.* at 18 ("Drawing all inferences in favor of Morning Star, no reasonable juror could conclude this evidence illustrates Los Gatos's conscious commitment to a common bribery scheme, or a meeting of the minds to commit bribery."). Plaintiffs' carefully worded reply brief acknowledges this distinction. *See* Reply at 8 ("[E]vidence demonstrates that the Ingomar Defendants [but not the Los Gatos defendants] agreed to and participated in the running of the CTEG enterprise, including the bribery scheme.").

Although the court's analysis at pages 22 to 23 of its summary judgment order is not a complete explanation of the application of *Howard* here, the court's ruling does not reflect "clear error." *Marlyn Nutraceuticals*, 571 F.3d at 880. The court's analysis of RICO claims considered Los Gatos defendants' and Ingomar defendants' liability both for substantive RICO claims and a RICO conspiracy claim. *See* Order at 19–23. Thus, the court's acknowledgment of defendants' contentions that plaintiff "cannot establish each defendant engaged in at least two predicate racketeering acts" applied to the substantive RICO claims, not the RICO conspiracy

14

claims. *Id.* at 21. The court did write that plaintiff could defeat summary judgment by showing "there is a dispute of fact as to whether each defendant committed at least two predicate acts giving rise to a RICO violation, which in turn caused Morning Star's injury in the form of lost profits." *Id.* at 22 (citing in part *Anza*, 547 U.S. at 461). But that analysis applied to whether the Ingomar defendants or Los Gatos defendants themselves committed substantive RICO violations, as reflected in the evaluation of predicate acts committed by Ingomar and Los Gatos. *See id.* at 22. Although the court's later parenthetical explanation of *Howard* did not completely explain why the Los Gatos defendants were entitled to summary judgment as to the RICO conspiracy claim, the court's order elucidates sufficiently why there was no genuine dispute of material fact that a reasonable juror could resolve to find the Los Gatos defendants had agreed or intended to participate in a scheme involving bribery—the only scheme that injured plaintiffs. *Compare id.* at 22–23 (citing *Howard* and granting summary judgment on the RICO conspiracy claims "[b]ecause the court GRANTS Ingomar's and Los Gatos's motions for summary judgment"), *with id.* at 18–23 (explaining "no reasonable juror could find [the] evidence illustrates Los Gatos's conscious commitment to a common bribery scheme, or a meeting of the minds to commit bribery," stating that other evidence of Los Gatos engaging in price fixing and market allocation was "not enough to raise the suggestion of a 'preceding agreement,'" observing plaintiff "does not claim Los Gatos's [bid-rigging] conduct caused injury" and granting summary judgment to Los Gatos on both Sherman Act claim and substantive RICO claim before granting summary judgment on RICO conspiracy claim). The court, in order to have made its rationale clear, should have explained its reliance on its earlier evaluation of the evidence related to allegations of bribery, price fixing, market allocation and bid rigging against Los Gatos. *See id.* at 18–19. As *Howard* stated, "[a] defendant must also have been 'aware of the essential nature and scope of the enterprise and intended to participate in it.'" 208 F.3d at 751 (citation omitted); *see Christensen*, 828 F.3d at 780. And again, as the court found in its original order, "no reasonable juror could find [the] evidence illustrates Los Gatos's conscious commitment to a common bribery scheme, or a meeting of the minds to commit bribery," the only scheme that injured plaintiffs. *See* Order at 18.

## IV. CONCLUSION

Plaintiffs fail to show that the court committed clear error. The court therefore DENIES plaintiffs' motion for reconsideration.

IT IS SO ORDERED.

DATED: August 7, 2018.

_____
UNITED STATES DISTRICT JUDGE